IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MELANIE CLINE, et al., | ) | CASE NO. 1:07 CV 1070 |
| | ) | |
| | ) | JUDGE O'MALLEY |
| | ) | |
| Plaintiffs, | ) | MAGISTRATE JUDGE McHARGH |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF MANSFIELD, OHIO, et al., | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

I.  INTRODUCTION

In the instant action, Plaintiffs bring five claims against various governmental entities and individuals related to the execution of a nighttime search warrant at 347 South Main Street in Mansfield, Ohio on September 12, 2006.  A more detailed factual background appears in Section II., below.

Plaintiffs' first claim is a federal claim under 42 U.S.C. § 1983 alleging constitutional violations of "the right to due process of law and the right to be free of unreasonable searches and seizures" under the Fourth and Fourteenth Amendments to the U.S. Constitution.  (Doc. 40, Am. Compl., at ¶ 70).  The other four claims are state law claims alleging spoliation of evidence, intentional infliction of emotional distress, negligent infliction of emotional distress, and assault and battery. (Id. at ¶¶ 71-74).

A total of five motions for summary judgment have been filed in this case.  The first was

1

filed by Defendants Jeff Alfrey and Richland County, Ohio (doc. 69); the second by Defendant

A.S.O.R.T. Team[1] (doc. 70); the third by Defendants City of Shelby, ASORT Team, Lance Combs,

and David Mack (doc. 71); the fourth by Defendants City of Mansfield, Jason Bammann, Ed

Schmidt, and Frank Parella (doc. 72); and the fifth by Defendants City of Ontario, John Mager, Dale

Myers, and Riley Snavely (doc. 94).  Each motion is supported by a reply. (Doc. 105 (Richland), 106

(Ontario), 107 (Mansfield) 108 (ASORT), and 109 (Shelby)).

　　　　With leave of court (*see* doc. 91 and corresponding non-document order), Plaintiffs have filed

a single memorandum in opposition to these motions.  (Doc. 102).

## II.  FACTUAL BACKGROUND

### A.  Plaintiffs' Asserted Facts

　　　　On the evening of September 12, 2006, four adults and two children were gathered together

inside 347 South Main Street.  They were: Melanie Cline and Earl Fuller, who were residents of the

house; Thomas Willis and Kiana Smith, who were visiting; and Melanie Cline's two children, Kierre

Fuller and Milanie Cline.  Plaintiff Cline, Kierre and Milanie were upstairs asleep in their beds.

Plaintiffs Smith and Willis were sitting on the couch in the living room watching television and

waiting for a mechanic across the street to finish repairing Smith's car.  Plaintiff Fuller was sitting

at a computer in the dining room playing a computer game.

#### 1.  Plaintiff Willis' Testimony

　　　　At some point during the evening, Smith said that she was going upstairs to use the

---

[1]ASORT stands for "Allied Special Operations Response Team," a tactical team formed by the Richland County Chiefs of Police Association.  (Doc. 70, brief, at 1).  ASORT is sometimes cited by the parties as "A.S.O.R.T." but for consistency's sake, the court will use "ASORT."

bathroom, and Willis said that he was going to go across the street to check on Smith's car.  (Doc. 88, Willis Depo., at 31).   He had been checking on the progress of the car periodically throughout the evening.  (Id. at 26, 29-30).  Willis went over to the door, lit a cigarette, and began to step out the screen door.  (Id. at 31-33).  At that point, Willis noticed "some heads peeking from around the side of the house."  (Id. at 31-32).  He stepped back inside the house and told Fuller that there were some people outside the house.  (Id. at 33; doc. 80, Fuller Depo., at 28).  Fuller laughed in response, and Willis said, "No, I'm for real."  (Doc. 88, Willis Depo., at 34; doc. 80, Fuller Depo, at 28).

Willis opened the screen door again, stepped "halfway" onto the porch, and looked out again, this time seeing "four heads."  (Doc. 88, Willis Depo., at 34-35, 141).  Willis turned his head and called back into the house, "I think it's the police."  (Id. at 36).  He testified that he called back loud enough that Fuller, who was still inside the house, and anyone near the porch would have heard it.  (Id. at 41).

At that point, Willis observed "more than three" officers dressed in black with helmets "running up from around the bushes."  (Id. at 38-39).  Willis testified that he "froze for a second" but then stepped backwards into the house as the officers ran up the steps, shutting the screen door behind him.  (Id. at 39-41).  He testified that he shut the door because it looked as though one of the officers was trying to throw something into the house.  (Id. at 39).  He then saw something hit the screen door.  (Id. at 42-43).  He assumed it was a flash-bang grenade because something emitting a bright light and a loud bang went off somewhere in front of the house a few seconds later.  (Id. at 42-44).

Willis testified he did not hear the police saying anything as they were making their way up the stairs and into the house.  (Id. at 45).  He also  testified that he was disoriented for a brief period

3

of time after the flash-bang device went off.  (Id. at 41, 45, 139).  When the police entered, Willis was struck by something that felt like an arm across his chest as an officer "tackled" him to the floor.  (Id. at 47-48).  While Willis and the officer stumbled backward and fell, Willis' foot was caught underneath him.  (Id. at 48, 59).  As a result, Willis sprained his ankle.  (Id. at 59).  Willis has been unable to identify the officer who "tackled" him.  (Id. at 48).

After the "tackle," Willis was handcuffed with zip-ties, and an officer asked him if his name was "Thomas Winbush."  (Id. at 50-51, 55).  An officer then raised Willis up from the floor and searched his pockets for weapons.  (Id. at 54).  The officer then sat Willis down in a love seat in the living room.  (Id. at 54-55).  Shortly thereafter, Willis observed Smith coming down the stairs, holding Milanie.  (Id. at 62).  Smith and Milanie then sat next to Willis on the love seat.  (Id. at 63).  Willis estimates that he remained seated on the love seat for thirty minutes.  (Id. at 56).  Sometime later, Officer Nicholson asked Willis to stand up and proceeded to perform a pat-down search of Willis' person.  (Id. at 69-70).

### 2.  Plaintiff Fuller's Testimony

Fuller's testimony regarding the conversation that he and Willis had while Willis was standing at the door is substantially the same as Willis' testimony.  He testified:

> [Willis] had just stood up and he lit himself a cigarette and he said, 'I'm going to go over and check on the car.' And [Smith] said, 'Okay, I'm going to go upstairs and use the bathroom.'
>
> So she went upstairs. [Willis] sat there and I remember hearing a lighter strike. He lit a cigarette.  And he was looking out the front door and he said, 'Hey, man, somebody's out there playing around.'  And I rolled back my chair to look out my front door because the screen was there and the front door was open and I said, 'Man, there ain't nobody out there.'  He said, 'I'm telling you, man, I just seen somebody peek their head around the corner.'  I was like whatever.  So I kept playing Yahoo Spades.

4

> As he started walking toward the door I heard him say, 'Man,' and they just stormed, swoosh, 'Police, police,' and I just laid down on the ground as they hadn't even made it to the dining room and I was on the ground laying there.

(Doc. 80, Fuller Depo., at 28-29).

Fuller immediately lay face down on the floor when the officers entered the residence.  (Id. at 30).  He heard the officers yell "Police!" several times.  (Id. at 85-86).  He testified:

> Q:    [A]t some point you heard them yell 'Police,' correct?
>
> A:    Yes, they yelled 'Police' and then that flash bang, boom.
>
> Q:    Let me stop you there.  When you heard them yell 'Police,' where were they?
>
> A:    I don't know. I couldn't see them.  I just laid down.  All I heard was 'Police' and I turned away and just laid down on the floor."

(Id. at 30).

After the officers entered the residence, they handcuffed Fuller with zip-ties.  (Id. at 32-33).  Then one of the officers put a gun to Fuller's neck and a foot on his back.  (Id. at 34).  He heard the officers tell Willis to 'Get down!' but he did not see the officers restraining Willis.  (Id. at 33).

At some point while he was handcuffed and lying on the floor, Fuller rolled onto his side and asked what was happening.  (Id. at 88).  Ontario Police Chief Myers then grabbed a shotgun from another officer, came over to Fuller, kicked him twice in his back, and said "I told you don't move." (Id. at 37).  Fuller then replied, "Sir, you don't have to worry about it, I'm not going to move."  (Id.).

Shortly thereafter, Fuller saw Cline come down the stairs with Kierre.  (Id. at 46).  Fuller estimates that he was on the ground handcuffed for twenty to twenty-five minutes, at which point, Officer Schmidt put Fuller in a chair and cut off his zip-tie handcuffs.  (Id. at 99, 38-39).  Fuller estimates that he remained in the chair for another fifteen minutes.  (Id. at 99).  While sitting in the

5

chair, Fuller asked to see the search warrant, but the officers ignored him. (Id. at 51). However, he states that Myers came over to the house later to give the residents a copy of the warrant.

### 3. Plaintiff Cline's Testimony

Cline was asleep, lying face down in her bed, when she woke up suddenly with an "excruciating sharp pain running up [her] back and heavy pressure on top of [her] and [] felt the barrel of a gun in the back of [her] neck.." (Doc. 77, Cline Depo., at 25). It felt to her as if someone were standing on top of her with both feet — one foot on her lower back and one foot at the bottom of her neck. (Id. at 59). She testified that at that point she opened her eyes and heard a lot of yelling, but she did not know what was happening or that the police were in her house. (Id. at 26-27). Cline admits that she is a heavy sleeper. (Id. at 70).

Then, Cline was "roughly jerked" up off the bed and put in handcuffs. (Id. at 28). She stood for approximately five minutes while the officers searched her room. (Id. at 29).

Around that time, Cline began crying and asking where her children were. (Id.). The officers told her that they "would proceed on to the rooms." (Id.). Then, Cline and the officers went to Kierre's room, and one of the officers picked up Kierre and began carrying him. (Id. at 29-30).

At that point, Cline asked an officer if he would cover her up because her breasts were exposed and she was handcuffed. (Id. at 30). The officer — who turned out to be Defendant Alfrey — complied. (Id.).

Cline and officers then proceeded to Milanie's room, but no one was in there, so they proceeded downstairs. (Id. at 31). Once downstairs, Cline observed Milanie sitting on Smith's lap. The officers then took off Cline's handcuffs, sat her down, and put her son in her lap. (Id.).

Cline asked the officers what was happening and for their badge numbers, but they repeatedly

6

told her to shut up and sit down.  (Id. at 32-33).

### 4.  Plaintiff Smith Testimony

Kiana Smith testified that she was in the upstairs bathroom when ASORT entered the house. (Doc. 86, Smith Depo., at 25).  She heard people arguing outside and a loud boom, and then she saw a blue light in the sky.  (Id. at 28).  Smith wanted to run downstairs, but then she saw four people dressed in black run by the door to the bathroom.  (Id. at 30).  She was going to close the door when an officer turned on her with a rifle and told her to get down and put her face on the floor.  (Id.). Smith complied.  (Id. at 35).  Then, the officer told Smith to get off the ground and lift her shirt and turn around in a circle so that he could see if she had a weapon.  (Id. at 38-39).  Smith again complied.  (Id. at 39-40). She was wearing a bra underneath her shirt.  (Id. at 40).  The officer then told Smith to get down on the ground again, and Smith complied.  (Id. at 41).  While Smith was lying on the ground, the officer kicked her in her left hip.  (Id. at 42-43).  He then ordered her to go into the next bedroom with the child.  (Id. at 45-46).

Smith went into Milanie's room where she saw Milanie sitting on her bed.  (Id. at 47).  Smith sat with Milanie and held her.  (Id.).  When Smith was in Milanie's bedroom, an officer grabbed her purse and dumped its contents onto Milanie's bed to search them.  (Id.).  After looking through her things, the officer told Smith to pack up her stuff and go downstairs with the child.  (Id. at 48-49). Smith then carried Milanie downstairs and joined Willis on the love seat.  (Id. at 16, 75).  She observed an officer carrying Kierre downstairs around the same time.  (Id. at 80).  Neither Smith nor Milanie ever was handcuffed.  (Id. at 46-49).

Smith testified that the officer's kick did not cause any bruising or other injury to her hip; however, she believes that the kick to her hip caused injury to her back.  (Id. at 85-86).

7

<u>5.  The Search Warrant and Affidavit</u>

Plaintiffs present the following as facts related to the search warrant application.  The search warrant and affidavit packet is six pages long.  (Doc. 102, at 3) (citing doc. 87, Exhibit 66, "Search Warrant").  The pages are numbered consecutively.  (Id.).  The first page, entitled "Search Warrant," indicates the name of the court (Mansfield Municipal Court in Richland County) and the name of the Chief of Police for the City of Ontario (Dale Myers).  (Id.).  The address of the place to be searched does not appear on the first page.  (Id.).

The second page of the packet, entitled "Affidavit for Search Warrant," lists the place to be searched as "347 South Main Street."  (Id.).  It lists the things and persons to be found there as "Joe Foster, a revolver, jewelry, credit cards, a checkbook, and pry tools that were used to open a stolen safe."  (Id.).

The third and fourth pages of the packet consist of several sections of the Ohio Revised Code corresponding to the criminal offenses that Joseph Foster allegedly committed.  (Id.).

The fifth page of the packet contains the factual basis for the affiant's belief that Joseph Foster and the other items listed in the packet will be found at 347 South Main Street.  (Id.).  That page reads as follows:

*AFFIANT STATES THAT THE FACTUAL BASIS FOR SUCH BELIEFS ARE*:

1.  Upon his/her knowledge as a Law Enforcement Officer.
2.  (11) years of Law Enforcement experience.
3.  Currently assigned to the (Detective) Bureau of the Ontario Police Department.
4.  A previously reliable informant was sent inside the residence to verify that Joseph foster was inside the residence.  He confirmed that Joseph Foster was inside the residence.
5.  Surveillance was maintained of the 618 Burns Street Address to assure that Joseph Foster has not left the residence.

8

6.     The Ontario Police Department has received two tips from unknown callers stating that Joseph Foster is staying at 618 Burns Street.

7.     Joseph is believed to be armed as he was identified by the victim as having a weapon at the time of the Aggravated Robbery and Aggravated Burglary.

(Doc. 102, at 3-4) (citing doc. 87, Exhibit 66, "Search Warrant").

The affidavit indicates that it was sworn to and signed by Defendant Snavely and witnessed by Acting Magistrate Donald R. Teffner.  (Id. at 4).  The command portion of the warrant begins on page five with a statement that a nighttime warrant is authorized because Joseph Foster has a history of violent crimes. (Id.).

The sixth page contains another description of 347 South Main, repeated from the second page.  The warrant was signed "Acting Magistrate Donald Teffner, Mansfield Municipal Court" at 9:35 p.m. on September 12, 2006. (Id.).

### B.  Defendants' Asserted Facts

Where relevant and where Plaintiffs have asserted no facts concerning the events leading up to the raid of the Cline/Fuller household, the court recites some of Defendants' asserted facts below. The court notes, however, that it must take all facts in a light most favorable to Plaintiffs for purposes of these motions for summary judgment.

### 1.  Defendant Snavely's Testimony

On September 12, 2006, Ontario Police Detective Riley Snavely was investigating Joseph Foster, a suspect wanted for home invasion and armed robbery, when he received a phone call from a confidential informant.  (Doc. 87, Snavely Depo., at 5, 7).  The confidential informant told Snavely that he was planning to meet Foster later that day.  (Id. at 12).  After receiving verification from Snavely that the Ontario Police would provide him with relocation funds, the informant confirmed

9

that he would go forward with the meeting with Foster.  (Id. at 12-13).  The meeting was to take place at 618 Burns Street in Mansfield, Ohio.  (Id. at 13).  Snavely believed that the informant was trustworthy based on the fact that the informant had been receiving calls on his cell phone from a phone number known to belong to Foster.  (Id. at 7).

Snavely began preparing an application for a search warrant to enter 618 Burns Street on his computer at the Ontario Police Department.  (Id. at 13-14).  He also inquired at the Richland County Prosecutor's Office about using ASORT based on his belief that Foster was likely armed and dangerous.  After the Prosecutor's Office approved the use of ASORT for the search of 618 Burns Street, Snavely contacted ASORT personnel to request their assistance.  He also began making arrangements with other officers to assist in the surveillance of 618 Burns Street.

Snavely asserts that he had several more conversations with the informant over the course day on September 12, 2006.  During one of these conversations, the informant told Snavely that he had been communicating with Foster off and on for several hours, that Foster was getting "jumpy," and that if the police did not act soon Foster would move on to another location.  (Id. at 13).

Sometime later, the informant called Defendant Snavely to tell him that Foster was going to meet the informant at 347 South Main Street instead of 618 Burns Street.  (Id. at 14).  Defendant Snavely went to meet the informant and asked him to drive him by the 347 South Main address.  (Id.).  He left the draft search warrant application accessible on his computer.

Around 8:30 to 9:00 p.m., Snavely, Defendant Ed Schmidt and the informant drove past 347 South Main.  (Id.).  As they drove past the house, the informant confirmed that it was the address where Foster was located and indicated that he saw Foster standing in the doorway.  (Id.).  The informant then left to meet with Foster.  Defendant Snavely testified that shortly thereafter the

10

informant called to tell him that he had just met with Foster behind 347 South Main and that Foster went back into the residence through the back door after their meeting.

At that point, Defendant Snavely called another officer at the Ontario Police Department and asked him to change the address on the search warrant application from 618 Burns Street to 347 South Main Street. (Id. at 15).  He also called the officers that were to conduct the surveillance and told them to come to 347 South Main Street instead.  (Id.).

Shortly thereafter, an officer at the Ontario Police Department called Snavely to tell him that he had faxed the paperwork for the warrant to Magistrate Teffner of Mansfield Municipal Court and that the magistrate was ready for him.  (Id.).  The magistrate signed and issued the warrant.  (Id.).

Snavely then took the warrant to Sergeant Mack, one of the ASORT team leaders.  (Id. at 16).  Mack wanted Snavely to drive him by the residence, and Snavely did so.  (Id.).

Snavely then returned to his surveillance point at 347 South Main and watched the back of the house with Ed. Schmidt.  (Id. at 17-18).

### 2.  Defendant Myers Testimony

Ontario Police Chief Dale Myers and Mansfield Detective Frank Parella conducted surveillance of the front of the residence.  (Doc. 85, Myers Depo., at 15, 17-19).  Myers testified that the ASORT team informed Snavely at some point that it would not execute the warrant without a copy of the warrant itself, so Snavely left his surveillance point to deliver a copy of the warrant to the Mansfield Police Department.

Myers was outside 347 South Main when the ASORT officers made entry.  (Id. at 28-29).  He observed some members of ASORT coming out of the house about two to three minutes after the team made entry.  (Id.).  Myers testified that Earl Fuller was sitting on a chair, handcuffed, in the

11

dining room when he entered the residence; he stated that he observed another black male in the living room who was not restrained.  (Id. at 30-31).  He denies kicking anyone that evening.  (Id. at 38-39).

Myers realized that no one had brought a copy of the search warrant to the residence, so he left to pick up a copy of the warrant and told the residents that he would return shortly.  (Id. at 24, 31, 36).  He returned approximately ten to fifteen minutes later, gave the residents a copy of the warrant and his business card, and then left.  (Id. at 39).

The following day, Defendant Myers filed the return on the warrant with Magistrate Teffner. (Id. at 41-42).  He told the magistrate that the warrant had been served at 347 South Main Street, but pointed out that the affidavit to the warrant still contained references to "618 Burns Street."  (Id. at 41-43).  The magistrate then crossed out the references to 618 Burns Street, wrote in "347 South Main Street," and initialed the changes.  (Id.).  Myers signed the return and filed it with the Clerk of Court.  (Id. at 43).

### 3.  Defendant Bammann's Testimony

Bammann testified that he entered Cline's room after he heard Defendant Mack ordering someone, who turned out to be Plaintiff Cline, to get on the ground and put her hands behind her back.  (Doc. 76, Bammann Depo., at 30-31).  Bammann "could tell" that Cline was not complying and observed Cline "digging" her hands underneath something on the bed.  (Id. at 31-32).  He feared that Cline might have been reaching for a weapon.  (Id. at 34).  He remembered that Cline's body was exposed from the waist up.  (Id. at 32).

Bammann then placed his foot on the center of Cline's back in order "to gain her compliance."  (Id. at 34-35).  He testified that he put "just enough [weight] to get her to comply,"

12

but he did not use his whole weight.  (Id. at 37).  He testified that he used his foot because his hands were holding his rifle.  (Id. at 35).  Once Bammann placed his foot on Cline's back, the officers were able to handcuff Cline with her hands behind her back.  (Id. at 34-37).

Bammann then proceeded to Kierre's room where he found a little boy, who turned out to be Kierre, on a bunk bed.  (Id. at 41-42).  Bammann picked up Kierre and carried him downstairs.  (Id. at 41).  Kierre did not appear to be upset and did not resist.  (Id. at 42).  Once they arrived downstairs, Bammann put Kierre in Cline's lap and left the residence.  (Id. at 44).  He remembered that Cline was upset with him for touching Kierre.  (Id. at 43).

### III.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the entire record "shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Non-moving parties may rest neither upon the mere allegations of their pleadings nor upon general allegations that issues of fact may exist.  *See Bryant v. Commonwealth of Kentucky*, 490 F.2d 1273, 1275 (6th Cir. 1974).  The Supreme Court has held that:

> . . . Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The evidence need not be in a form admissible at trial in order to avoid summary judgment, but Rule 56(e) requires the opposing party:

> to go beyond the pleadings and by [his] own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

*Id.* at 324.

13

The Sixth Circuit in *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989), has interpreted *Celotex* and two related cases, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), and *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio*, 475 U.S. 574 (1986), as establishing a "new era" of favorable regard for summary judgment motions.  *Stree*t points out that the movant has the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.  This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.  *Street*, 886 F.2d at 1479.

The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Id.*  In ruling on a motion for summary judgment, the court must construe the evidence, as well as any inferences to be drawn from it, in the light most favorable to the party opposing the motion.  *Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 229 (6th Cir. 1990).

## IV.  ASORT

The first issue to be resolved is the legal status of defendant ASORT.  The amended complaint names ASORT as a "regional law enforcement organization made up of units of local government that belong to the Richland County Sheriffs' Association." (Doc. 40, at ¶ 22).  ASORT has moved for summary judgment on the grounds that it "is not a legal entity capable of being sued." (Doc. 70, at 1).

According to ASORT's brief in support of its motion for summary judgment, ASORT "is a tactical team, similar to S.W.A.T. that was formed by the Richland County Chiefs of Police

14

Association[2]. . . in order to respond to tactical operations and high risk situations." (Doc. 70, brief in support, at 1).  RCCPA is "a private organization composed of the chief law enforcement officers for the Richland County Sheriff's Department, the Mansfield Police Department," and the police departments for the cities of Lexington, Ontario, Shelby, Belleville and Butler.  (Id.).

In a separate joint motion for summary judgment filed by ASORT, along with City of Shelby, Combs and Mack, ASORT is described similarly as "a tactical team, similar to S.W.A.T.[,] that was formed by the [RCCPA] in order to respond to tactical operations and high risk situations."  (Doc. 71, brief in support, at 3).  The joint motion further indicates that ASORT "members are police officers that have volunteered for [ASORT] service from a variety of police departments in Richland County." (Id.).

The Richland County Defendants describe ASORT as "a multi-jurisdictional police tactical team consisting of members from the Richland County Sheriff's Office and various police departments throughout Richland County."  (Doc. 69, at 3).  They indicate that ASORT "responds to tactical and high risk search warrant situations," and that ASORT's commander "reports to the Chiefs of Police Association Board which is made up of all the Chiefs of Police from the police departments within Richland County as well as the Sheriff of Richland County."  (Id.).

<u>ASORT's Motion for Summary Judgment</u>

In its motion, ASORT contends that it is not a legal entity capable of being sued.  (Doc. 70, brief in support, at 4).  ASORT states that the members of the RCCPA did not intend to create a separate legal entity when ASORT was formed.  (Id. at 5).  ASORT argues that it does not have its own operating budget, and that each home department remains responsible for the "salary, uniforms,

---

[2] The court will refer to this group as RCCPA, rather than "R.C.C.P.A."

equipment, initial training and discipline of its members." (Id. at 6).  It further argues that team members remain employees of their home law enforcement agencies and are governed by the practices of their home departments even when on ASORT assignment. (Id.).

ASORT points out that Ohio police departments have no independent legal status, but are merely sub-departments of the municipalities that operate them. (Id. at 6).  It also argues that subdivisions of governmental agencies are not entities capable of being sued. (Id. at 4).  However, ASORT does not contend either that it is a subdivision of a governmental agency or that it is itself a police department.  (See id., at 1).  Rather, ASORT states that it is a "tactical team," formed by RCCPA, which in turn is "a private organization" composed of local police chiefs and the county sheriff.  (Id.).

The ASORT Manual itself provides minimal assistance with respect to this inquiry.  The Manual's definition of ASORT reads as follows:

> ASORT, (Allied Special Operations Response Team), was formed through the Richland County Association of Chiefs of Police (RCACP) consisting of all Richland County police agencies and the Richland County Sheriff.  ASORT personnel are drawn from various police agencies in Richland County.

(Doc. 71, Exhibit D, ASORT Manual, at 1).

The section concerning "organizational structure" states:

> ASORT was formed through the Richland County Chiefs Association.  Therefore, decisions concerning ASORT shall be voted on by the Association.  A minimum of three (3) votes are required; (Example:  Personnel guidelines, Standard Operating Procedures and Equipment).

(Id. at 2).

16

Plaintiffs respond in their opposition that ASORT clearly is a "person" for purposes of Section 1983.[3]  (Doc. 102, at 31-33).  Plaintiffs indicate that although states are not "persons" under Section 1983, local governments are considered "persons."  (Id. at 31) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) and *Berry v. City of Detroit*, 25 F.3d 1342, 1345 (6th Cir. 1994), cert. denied, 513 U.S. 1111 (1995)).  Not only municipalities, but also "other local government units" are included among those "persons" to whom Section 1983 applies.  Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 690 (1978).  The Sixth Circuit has reasoned that, under Will, those entities which are not arms of the state should generally be considered "persons" for purposes of Section 1983.  Alkire v. Irving, 330 F.3d 802, 812 n.7 (6th Cir. 2003).

Plaintiffs contend that "ASORT is not incorporated, and is best described as an unincorporated association."  (Doc. 102, at 31).  They argue that ASORT should be considered "simply an unincorporated association of local governments."  (Id.).  According to Plaintiffs, "ASORT is a group of governmental units that are acting together to provide tactical police services."  (Id. at 32-33).  Plaintiffs point out that many types of local government entities have been held to be "persons," including those made up of multiple local governments.  (Id. at 32).  In

---

[3] Section 1983 provides as follows:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

*Will v. Michigan Dep't of State Police*, 491 U.S. 58, 60 n.1 (1989) *(quoting 42 U.S.C. § 1983).*

17

addition, ASORT should be considered an association, and associations are considered "persons." (Id. at 33).

Plaintiffs note that an unincorporated association may be sued under Civil Rule 17(b)(3).[4] (Doc. 102, at 36) (citing Fed. R. Civ. P. 17(b)(3)).  Civil Rule 17 governs the capacity to sue or be sued in federal court.  Fed. R. Civ. P. 17.  The capacity to sue or be sued for parties other than individuals or corporations is determined by the law of the state where the court is located, with two exceptions.  Fed. R. Civ. P. 17(b)(3).  The relevant exception here provides that "a partnership or *other unincorporated association with no such capacity under that state's law* may sue or be sued in its common name  to enforce a substantive right existing under the United States Constitution or laws."  Fed. R. Civ. P. 17(b)(3)(A) (emphasis added).

Thus, under Rule 17(b), "in an action where a substantive federal right as distinguished from a right arising under local state law is involved, the capacity of an unincorporated association to sue or be sued will be governed by federal law." *Wilson & Co. v. United Packinghouse Workers of Am.*, 181 F.Supp. 809, 815 (D. Iowa 1960); *see generally* Fed. R. Civ. P. 17(b)(3)(A).

ASORT contends Plaintiffs must identify an Ohio statute that establishes ASORT as a separate legal entity.  (Doc. 70, brief in support, at 3).  ASORT argues that Ohio Rev. Code § 737.04 suggests that a multijurisdictional entity such as ASORT possesses no separate legal existence.  (Id. at 3-4).  However, where "a federal substantive right is claimed, federal courts must apply federal and not state law in determining what constitutes an unincorporated association for capacity

---

[4] The State of Ohio has also departed from the common law norm, and  permits an unincorporated association to sue or be sued "as an entity under the name by which it is commonly known and called." Ohio Rev. Code § 1745.01; *Tanner v. Columbus Lodge No. 11, Loyal Order of Moose*, 44 Ohio St.2d 49, 50-51, 337 N.E.2d 625, 626 (1975).

18

purposes." *Associated Students of Univ. of Cal. at Riverside v. Kleindienst*, 60 F.R.D. 65, 67 (C.D. Cal. 1973) (citing cases).

An unincorporated association has been defined by federal courts as "a voluntary group of persons, without a charter, formed by mutual consent for the purpose of promoting a common enterprise or prosecuting a common objective." *Id.* (quoting *Local 4076, United Steelworkers v. United Steelworkers*, 327 F.Supp. 1400, 1403 (W.D. Pa.1971) (union local)). *See also Prewitt Enterprises, Inc. v. OPEC*, 353 F.3d 916, 922 n.6 (11th Cir. 2003), *cert. denied*, 543 U.S. 814 (2004) (Organization of Petroleum Exporting Countries). That definition seems apt here, and fairly describes the relationship of the various defendants. *See generally Matje v. Leis*, 571 F.Supp. 918, 924 (S.D. Ohio 1983) ("Regional Enforcement Narcotics Unit" may properly be sued as unincorporated association).

Federal courts have found other voluntary associations involving governmental entities (although their purposes and activities differ from ASORT) to be "persons" under Section 1983. In *Wright v. Arkansas Activities Ass'n*, 501 F.2d 25, 27-28 (8th Cir. 1974), the Eighth Circuit found a voluntary association to be a "person" under Section 1983. The association was not created by state statute or the state constitution, nor was it an agency of the state, but rather the association was established by local school systems on a voluntary basis. The court found that the association was not immune from suit, and was a "person" under Section 1983. *Wright*, 501 F.2d at 28.

The Fifth Circuit, in *Walsh v. Louisiana High School Athletic Ass'n*, 616 F.2d 152, 156 (5th Cir. 1980), *cert. denied*, 449 U.S. 1124 (1981), came to the same conclusion. The voluntary association in *Walsh* was not a regularly constituted agency of the state, nor was its existence

provided for by statute or the state constitution, and the court concluded that the association was a "person" for purposes of Section 1983.  *Walsh*, 616 F.2d at 156.

In its reply, ASORT responds that the issue of whether ASORT is a "person" is not relevant to their argument that ASORT does not possess a "separate legal existence from the individual political subdivisions of which it is comprised." (Doc. 108, at 1).  On the contrary, the court finds ASORT is an unincorporated association which is amenable to suit.  *Matje*, 571 F.Supp. at 918; *Associated Students*, 60 F.R.D. at 67; *Wilson*, 181 F.Supp. at 815; Fed. R. Civ. P. 17(b)(3)(A). Plaintiffs argue that defendants have not identified any type of immunity, sovereign or otherwise, which would protect ASORT from suit.  (Doc. 102, at 33).

ASORT argues in favor of a "general presumption that in the absence of a specific state statute mandating that the multijurisdictional task force was a separate entity, the Court [must] look at the intent of the founders to determine whether or not they intended to create a separate legal entity."  (Doc. 108, at 3) (citing *Timberlake v. Benton*, 786 F.Supp. 676 (M.D. Tenn. 1992)).

In *Timberlake*, the district court did not apply a "general presumption."  Rather, the court analyzed whether a local drug task force (the 19th Judicial District Drug Task Force), created pursuant to the Tennessee Code Annotated, was "a person subject to suit under 42 U.S.C. §1983." *Timberlake*, 786 F.Supp. at 682.  The court recognized that courts have not been uniform in their approach to the meaning of "person."  *Id.*  The task force director argued that he was not amenable to suit in his official capacity since the task force was not a person subject to suit under Section 1983.  *Id.*

20

The court noted that the task force resembled a police department, in the sense that it was comprised of police officers, and functioned to enforce the law.  However, it was distinguishable from a police department in that:

> . . . the Task Force is not a department of any one city. It encompasses several counties and cities. It has a board of directors independent of any one city, and a unique source of funding. The authority for creation of the Task Force comes from two provisions of Tennessee law.

*Timberlake*, 786 F.Supp. at 682.

The Tennessee statute allowed two or more public agencies to enter into agreements for joint cooperation, and allowed the possibility of creating a separate legal entity for this purpose.  *Id.* Where no legal entity was created, the mutual aid agreement was required to provide for the manner of acquiring, holding, and disposing of real property.  *Id.* at 683 n.1.  Also, the parties to the agreement were required to form a joint board responsible for administering the task force.  *Id.* at 683 n.2.  Despite the organizational structure required by the Tennessee statute, the court found that the provisions of the agreement at issue "tend to indicate that no distinct entity was created."  *Id.* at 682.

The court in *Timberlake* pointed out that the state statute permitted cities and counties to enter into mutual aid agreements "without the creation of a separate legal entity."  *Id.* at 683.  The court "believe[d] that the creation of a legal entity capable of being sued should not be left to chance."  With that view, the court found that the task force was "a joint undertaking of several counties and cities and not a 'person' amenable to suit under § 1983."  *Id.*

This court is not persuaded by the reasoning of *Timberlake*.  The mutual aid agreement which led to the formation of the task force at issue can hardly be said to be the result of "chance."  The

21

agreement included provisions for a Board of Directors, the acquiring, holding, and disposing of real property, and provisions for mutual indemnity.  While the task force may not have constituted a "separate legal entity" under Tennessee law, the task force's creation and existence was not a random or "chance" occurrence, but rather a deliberate action.

More importantly, the analysis of the task force's legal capacity to be sued in a federal Section 1983 action should have continued under Civil Rule 17, rather than ending solely under Tennessee law.  Having found that the task force had no legal capacity to be sued under Tennessee law, the court should have gone on to apply federal law to determine if the task force was an unincorporated association capable of being sued.  *Associated Students*, 60 F.R.D. at 67; *Wilson*, 181 F.Supp. at 815; Fed. R. Civ. P. 17(b)(3)(A) ("other unincorporated association with no such capacity [to be sued] under that state's law may . . . be sued under its common name").

Another case cited by ASORT, *Hervey v. Estes*, 65 F.3d 784 (9th Cir. 1995), relied substantially on the incomplete analysis put forth in *Timberlake*.  *See Hervey*, 65 F.3d at 792 (citing *Timberlake*).  In *Hervey*, the plaintiffs sued the Tahoma Narcotics Enforcement Team (TNET) and other defendants, alleging excessive force during a "military-style raid" to search for a meth lab on rural property.  *Id.* at 786.  The court stated that "TNET is composed of several local, county, and state governmental entities," and that it "is not a municipality or local governmental entity, it is an intergovernmental association."  *Id.* at 791-792.

Relying on the flawed *Timberlake* analysis, the court stated that TNET "is only subject to suit if the parties that created TNET intended to create a separate legal entity."  *Hervey*, 65 F.3d at 792 (citing *Timberlake*, 786 F.Supp. at 682-688)[5].  The court noted that, under Washington law (and

_____

[5] *Hervey* also cites *Maltby v. Winston*, 36 F.3d 548, 560 n.14 (7th Cir. 1994), which mentions *Timberlake* in passing.  Under Illinois law, the task force in question was subject to suit

similar to the Tennessee law in *Timberlake*), "public agencies entering into an agreement for joint or cooperative action may, but need not, establish a separate legal entity."  The court found that the TNET agreement did not contemplate a separate legal entity.  *Id.*  The court found that:

> The agreement creating TNET does not indicate from what authority it springs.  Absent some indication from either state law or from the enabling document that anyone intended TNET to be a formal independent entity . . . we conclude that it is not an entity subject to suit under section 1983.

*Hervey*, 65 F.3d at 792.  Having determined TNET's lack of legal status under Washington state law, the court never proceeded to apply federal law under Civil Rule 17.

ASORT also cites *Brown v. Fifth Judicial Dist. Drug Task Force*, 255 F.3d 475 (8th Cir. 2001), and *Eversole v. Steele*, 59 F.3d 710, 716 n.6 (7th Cir. 1995), in support of its arguments.  (Doc. 70, brief in support, at 4.)  In *Brown*, the court of appeals held that the district court's dismissal of a case against a drug task force, on the basis that it was not a legal entity capable of being sued, was not plain error.  *Brown*, 255 F.3d at 476.  The court found plaintiff's argument that the task force was an unincorporated association "plausible" under Rule 17, *id.* at 477, but found no "plain error" in the district court's ruling.  In its plain error analysis, the court cited *Eversole* and *Hervey*, among others, which found that similar drug task forces were not separate legal entities subject to suit.  *Id.* at 477.  The court in *Brown*  concluded that "it seems to us that the District Court committed no error.  In any case, the error, if there was one, is certainly not 'plain.'"  *Id.* at 478.

*Hervey*, and its reliance on *Timberlake*, has already been discussed.  *Eversole*  provides even shakier support for the conclusion at issue.  The court in *Eversole*  was discussing the issue of whether certain individual defendants possessed final policymaking authority.  *Eversole*, 59 F.3d at

---

under state law (and thus implicitly under Fed. R. Civ. P. 17(b)(3)).

715-716.  During this discussion, in the footnote cited by ASORT, the court simply states that the drug task force "was not an official entity."  *Id.* at 716 n.6.

Whether considered a "joint undertaking," *Timberlake*, 786 F.Supp. at 683, or "an intergovernmental association," *Hervey*, 65 F.3d at 792, the task forces in those cases would certainly appear to be the type of "other local government units to be included among those persons to whom § 1983 applies."  *Monell*, 436 U.S. at 690.  Having found that they had no legal capacity to be sued under state law, Federal Civil Rule 17(b)(3)(A) would then apply, and a determination whether the task force was an unincorporated association capable of being sued should have followed.

In the case before this court, the formation and purpose of ASORT, and the structure and composition of ASORT and its teams, was not "left to chance."  A structure and Manual were put into place to govern the composition and procedures of ASORT and its teams.  (Doc. 71, Exhibit D, ASORT Manual.)  Similarly, the decision to deploy ASORT to serve the search warrant, and the composition, role, and procedures of the ASORT team which served the warrant were not random events, but deliberate choices, guided by ASORT policies.  The ASORT team which served the warrant was a pre-existing group (with two additions from the other ASORT team), organized in advance for the very purpose of serving warrants, not a random group of police officers from different jurisdictions spontaneously composed for mutual assistance, for example, to respond to an unexpected disaster or riot.  Under these circumstances, the fact that ASORT may not exist as a "legal entity" under Ohio law does not serve to provide ASORT with a de facto immunity from federal suit under Section 1983.

24

For the reasons discussed more fully earlier, the court finds that ASORT is an unincorporated association which is amenable to suit under federal law. *Matje*, 571 F.Supp. at 918; *Associated Students*, 60 F.R.D. at 67; *Wilson*, 181 F.Supp. at 815; Fed. R. Civ. P. 17(b)(3)(A). For purposes of Section 1983, then, the court finds ASORT is a "person" which may be sued under Section 1983. ASORT's motion for summary judgment (doc. 70) should be DENIED, because it has failed to demonstrate that it is entitled to judgment as a matter of law for the reasons stated in that motion.

## V. SECTION 1983 and QUALIFIED IMMUNITY

"In order to prevail on a Section 1983 claim, a plaintiff must establish the violation of a constitutional right by a person acting under color of state law." *Mills v. City of Barbourville*, 389 F.3d 568, 574 (6th Cir. 2004). A government official who is performing a discretionary function is entitled to qualified immunity from suit[6] as long as his conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson*, 129 S.Ct. at 815 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Painter v. Robertson*, 185 F.3d 557, 567 (6th Cir. 1999). In other words, any "objectively reasonable" action by a state officer, as assessed in the light of clearly established law at the time of the conduct at issue, will be protected by qualified immunity. *Painter*, 185 F.3d at 567. Qualified immunity can be defeated if the official "knew or reasonably should have known" that the action he took would violate the constitutional rights of the plaintiff. *Harlow*, 457 U.S. at 815. Qualified immunity is a purely legal question which must be determined early in the proceedings. *Saucier*, 533 U.S. at 200; *Siegert v. Gilley*, 500 U.S. 226, 232 (1991).

---

[6] Qualified immunity is an immunity from suit, rather than a mere defense to liability. *Pearson*, 129 S.Ct. at 815 ; *Saucier*, 533 U.S. at 200; *Dunigan*, 390 F.3d at 490.

The defendants bear the initial burden of coming forward with facts which suggest that they were acting within the scope of their discretionary authority at the time in question. *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992). (The defendants here have met their initial burden: it is uncontested that the police officers were acting in their official capacities.)

The burden then shifts to the plaintiffs. The ultimate burden of proof is on the plaintiffs to show that the defendants are not entitled to qualified immunity. *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005); *Cartwright v. City of Marine City*, 336 F.3d 487, 490-491 (6th Cir. 2003) (citing *Rich*, 955 F.2d at 1095); *Hamilton v. Myers*, 281 F.3d 520, 531 (6th Cir. 2002). Upon the assertion of qualified immunity, the plaintiffs must put forward "specific, nonconclusory factual allegations" that would defeat the immunity. *Siegert*, 500 U.S. at 236 (Kennedy, J., concurring).

The Supreme Court recently held that the "two-step sequence" previously required by *Saucier v. Katz* "should no longer be regarded as mandatory," and that district courts have discretion in "deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S.Ct. at 818. The two factors which are relevant to demonstrate whether or not the defendants are entitled to qualified immunity from suit are "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right," and "whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Pearson*, 129 S.Ct. at 815-816 (internal citations omitted); *see also Saucier*, 533 U.S. at 201.

Whether the right was clearly established "must be undertaken in light of the specific context of the case, not as a general broad proposition." *Saucier*, 533 U.S. at 201. The relevant inquiry in determining whether a right is clearly established is "whether it would be clear to a reasonable officer

26

that his conduct was unlawful in the situation he confronted." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004); *Saucier*, 533 U.S. at 202.  If the law does not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. *Saucier*, 533 U.S. at 201.  *See also Pearson*, 129 S.Ct. at 816 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

"In other words, where a constitutional violation exists, an officer's personal liability turns on the 'objective legal reasonableness' of the action in view of the circumstances the officer confronted assessed in light of 'clearly established' legal rules." *Dunigan*, 390 F.3d at 491 (citing *Saucier*, 533 U.S. at 202; *Anderson*, 483 U.S. at 639).

Several of the Defendant police officers in this case have asserted that they are entitled to qualified immunity.  Plaintiffs raise a number of arguments in response.  Specifically, Plaintiffs argue that Defendant police officers are not entitled to qualified immunity because they:  (A) failed to knock and announce their presence and purpose; (B) executed an invalid warrant; (C) used excessive force against Plaintiffs in executing the warrant; and (D) subjected Plaintiffs to an unreasonably lengthy detention.  (*See* doc. 102).

### A. Failure to Knock and Announce

Plaintiffs appear to raise two arguments related to the "knock and announce" requirement. The court addresses each in turn.

### 1.  Prior to Entry

First, Plaintiffs seem to argue that Defendants violated their Fourth Amendment right to be free of unreasonable searches and seizures when they entered the Cline/Fuller residence without knocking and announcing their presence and purpose.

"Absent exigent circumstances, the Fourth Amendment requires the police to knock and announce their presence before forcibly entering a location to execute a search warrant." *United States v. Pelayo-Landero*, 285 F.3d 491, 498 (6th Cir. 2002). "[T]his common law 'knock and announce requirement forms part of the reasonableness inquiry under the Fourth Amendment." *Wilson v. Arkansas*, 514 U.S. 927, 929 (1995). The fundamental purpose of the 'knock and announce' rule is "to respect the sanctity of a person's home by affording notice to those inside so that they may open the door peaceably and without the needless destruction of property, as well as avoiding the possibility of a violent confrontation if those inside mistook the police for intruders." *United States v. Spikes*, 158 F.3d 913, 925 (6th Cir. 1998).

However, the requirement that police knock and announce their presence and purpose before entering a residence is not absolute, as "law enforcement interests may also establish the reasonableness of an unannounced entry." *Wilson*, 514 U.S. at 935-37. Whether or not an unannounced entry into a person's home is reasonable must be determined on a case-by-case basis. *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997). The Sixth Circuit has recognized at least three exceptions to the knock and announce requirement: (1) the persons within already know of the officers' authority and purpose; (2) the officers have a justified belief that someone within is in imminent peril or bodily harm; or (3) the officers have a justified belief that those within are aware of their presence and are engaged in escape or the destruction of evidence. *Dickerson*, 101 F.3d at 1158-59.

To be excused from the knock and announce requirement, police must only "have a reasonable suspicion . . . under the particular circumstances" that one of the exceptions exists, and "this showing is not high." *Richards*, 520 U.S. at 394. In deciding whether Defendant police

28

officers are entitled to qualified immunity, the court must determine "'whether an objectively reasonable officer, confronted with similar circumstances, could have reasonably believed that exigent circumstances existed' to justify noncompliance with the knock and announce rule." *Dickerson*, 101 F.3d at 1158 (quoting *Hall v. Shipley*, 932 F.2d 1147, 1151 (6th Cir. 1991).

It is undisputed that Defendant police officers did not knock prior to entering the Cline/Fuller residence, but several of the Defendants claim that they announced "Police, Search Warrant" as they ran up the steps of the porch.  (*See e.g.*, doc. 79, Evans Depo., at 16; doc. 82, Mack Depo., at 32-34). Plaintiffs appear to disagree about whether the officers announced themselves prior to entry. Plaintiff Fuller testified that he heard the Defendant officers yelling "Police!" and "Get Down!" as the officers were running up the steps of the porch into the residence.  (Doc. 80, Fuller Depo., at 28-29, 33).  Plaintiff Willis testified that he could not hear the Defendant officers saying anything as they entered.  (Doc. 88, Willis Depo, at 45).  However, Plaintiff Willis also testified that he could not see or hear clearly at that time because he was disoriented from the recent detonation of the flash-bang device.  (Id.).

Defendants do not seriously argue that they explicitly complied with the knock and announce requirement.  Rather, Defendants argue that they were excused from complying because they had a reasonable suspicion that doing so would be futile.  Defendants point to Plaintiff Willis' testimony in support of this assertion.  Plaintiff Willis testified that he was on his way out to the porch to smoke a cigarette when he saw a few heads poking out of the bushes on the side of the house.  (Doc. 88, Willis Depo., at 31-33).  At that point he turned around and called back to Plaintiff Fuller that there were some people outside his house.  (Id. at 31-32).  Plaintiff Fuller laughed, and Plaintiff Willis said, "No, I'm for real."  (Id. at 34).  Then, Plaintiff Willis opened up the screen door again,

29

saw more heads in the bushes, and turned around and called inside to Plaintiff Fuller, "I think it's the police." (Id. at 36).  At that point, the police started coming up the steps of the porch and Plaintiff Willis retreated into the house, shutting the screen door behind him.  (Id. at 39-41).  He explained that he retreated and shut the screen door as the officers ran up the steps because one of the officers looked like he was going to throw something into the house.  (Id. at 39).  Defendants argue that it would have appeared to a reasonable officer on the scene that Plaintiff Willis, by backing into the house and shutting the door, either was consenting to their entry or had no intention of letting them inside.  Therefore, argue Defendants, the Defendant police officers did not need to knock and announce their presence and purpose because it would have been clear to any officer from Plaintiff Willis' behavior that it would have been futile to do so.

Based on Plaintiff Willis' version of the events, the court agrees with Defendants that objectively reasonable officers on the scene reasonably could have believed that knocking and announcing their presence would have been futile or that one of the other exigencies existed in this case for dispensing with the knock and announce requirement.  Plaintiff Willis admits that he was standing on the porch when the officers were on the side of the house, that he turned around and called back into the house several times to alert Plaintiff Fuller to the presence of the people he saw, and then retreated into the house as the police began making their way up the steps.  Plaintiff Willis admits that he said "I think it's the police" loud enough that Plaintiff Fuller and anyone near the porch would have heard it.  Defendants do not specifically allege that any of the individual officers actually heard Plaintiff Willis make this statement.  Nevertheless, a reasonable police officer on the scene very well might have believed that, based on Plaintiff Willis' behavior, Plaintiff Willis already knew that the police were there and that he was not going to let them in voluntarily.  *See U.S. v.*

30

*Johnson*, 488 F.3d 690, 697 (6th Cir. 2007) (holding that officers were not required to knock and announce their presence and purpose in part because it would have been futile where defendant turned and fled into the house after police arrived at the house and shouted "police"); *see also U.S. v. Hardin*, 106 Fed.Appx. 442, 445, 2004 WL 1987143 at *3 (6th Cir. Sept. 1, 2004) (holding that officers did not violate the knock and announce rule where they yelled "police, search warrant" through the screen door, and the defendant responded by retreating a few steps into the residence). The court also notes that the Defendant police officers in this case were searching for a suspect they reasonably believed, based on the allegations contained within the search warrant, to be armed and dangerous. This fact, when viewed in combination with Plaintiff Willis' behavior, adds to the likelihood that an officer on the scene might reasonably have believed that one or more of the relevant exigencies existed to dispense with the knock and announce requirement. Thus, to the extent Plaintiffs argue that Defendant police officers should be denied qualified immunity based on their failure to knock and announce prior to entry, such contention is without merit. The court notes in so determining that the standard for dispensing with the knock and announce requirement based on an officer's reasonable suspicion that one of the exceptions exists is "not high." *Richards*, 520 U.S. at 394.

### 2. After Entry, During Search

In their second argument related to the knock and announce requirement, Plaintiffs allege that Defendant police officers should have continued to announce themselves as "police" after entry while making their way through the Cline/Fuller residence and that ASORT has a "policy of stopping the knock and announce requirement after initially entering a residence." (*See* doc. 102, at 18). Plaintiffs suggest that the Defendants' failure to continue to announce "police" violated Plaintiffs'

rights, although they are not particularly clear about which ones or how. They seem to argue that the failure to continue announcing is connected to Plaintiffs Smith's, Cline's, Kierre's, and Milanie's claims for excessive force. (*See* id. at 18-19). These Plaintiffs were upstairs at the time of the officers' arrival and allege that they did not realize upon coming into contact with Defendants that they were police officers.

Plaintiffs cite a recent Northern District of Ohio case, *Chappell v. City of Cleveland*, 584 F.Supp.2d 974, 1002 (N.D. Ohio 2008), for the proposition that

> [i]t is objectively unreasonable for an officer to encounter a suspect in a confined, darkened area without identifying himself as a police officer, that doing so is more than mere negligence, and that any deadly force caused by that conduct is constitutionally impermissible.

Plaintiffs do not cite to — and the court has not found — any case law indicating that a failure on the part of police to announce themselves continuously throughout the course of the search after entry is, in and of itself, a Fourth Amendment violation.

*Chappell* involved the use of deadly force against an allegedly armed suspect. At issue in that case was whether the defendant police officers' failure to announce themselves as "Cleveland Police" was material to the issue of whether the officers' use of deadly force against the suspect was objectively unreasonable. *Id.* at 1001. The defendant police officers claimed that they were justified in using deadly force against the suspect because the suspect came at them with a knife, and that the suspect's decision to hide in the closet, pick up a knife, and come out of the closet with a knife was unrelated to any actions on the part of the defendants. *Id.* at 999. However, the suspect's estate argued that the defendants' failure to properly identify themselves when they entered the suspect's bedroom

32

> caused the suspect to hide in the closet and possibly grab a knife for protection to
> fend off the possible intruder or intruders he heard rumbling through the house, and
> that it was this objectively unreasonable behavior on the part of the [d]etectives that
> led to the use of deadly force.

*Id.* at 998-99.  Taking the facts in a light most favorable to the plaintiff, the Court concluded that

there were indeed genuine issues of material fact as to: (1) whether the defendants' alleged failure

to identify themselves as police caused the suspect — who may have believed that the police were

intruders — to take up a knife to defend himself, (2) whether the suspect's possible response in

taking up the knife to defend himself, in turn, led to the officers' use of deadly force, and (3)

whether, therefore, the officers' use of deadly force was unreasonable.  *Id.* at 1001.

As Defendants correctly note, the facts of this case differ markedly from those in *Chappell*.

First, *Chappell* involved the use of deadly force against a suspect.  As noted in *Sledd v. Lindsay*, 102

F.3d 282, 288 (7th Cir. 1996) and quoted in *Chappell*, 584 F.Supp.2d at 998, "[i]n a situation where

a person has no reason to know that someone is a police officer, and the officer's identity is

concealed, the normal rules governing *use of deadly force* and right to resist are modified."

(Emphasis added).  The police officers in this case clearly did not use deadly force against any of the

Plaintiffs.  Thus, to the extent that the holding in *Chappell* is affected by the fact that the police

officers used deadly force against the suspect — as opposed to less-than-deadly force — that factor

is not at play here.

Second, while there may be issues of fact as to whether the Defendant police officers

identified themselves as "police" upon encountering the Plaintiffs upstairs, any such issues of fact

are not material to the officers' alleged use of excessive force in this case.  The relevant question

under *Chappell* is whether Defendants' allegedly unreasonable failure to identify themselves as

police *caused Plaintiffs to react* in a way that precipitated the Defendants' use of excessive force. Plaintiffs do not advance such an argument, and it is unclear to the court what difference, if any, it would have made if Defendants had identified themselves as police, assuming for the moment that they did not do so.  There is no indication in the record that Kierre or Milanie thought the police were intruders, or even if they did, that they resisted or otherwise reacted in an adverse way when the officers encountered them in their bedrooms.  By her own account, Plaintiff Smith complied with each and every one of the officers' orders, and she does not allege that any of her reactions was based on her belief that the officers were in fact intruders.  Plaintiff Cline admits that she is "heavy" sleeper.  (Doc. 77, Cline Depo., at 70).  She does not — and cannot in good faith — argue that she even would have heard the officers saying "police," let alone complied immediately with the officers' orders or otherwise changed her behavior had the officers identified themselves.  Since Plaintiffs do not argue that the Defendants' failure to identify themselves materially altered the situation upstairs in a manner that precipitated the use of excessive force, the court cannot say that the Defendants' failure to identify themselves was unreasonable within the meaning of the Fourth Amendment.

### B.  Execution of Invalid Warrant: Affidavit and Probable Cause

Plaintiffs argue that the warrant was invalid because it was not supported by an affidavit reflecting that there was probable cause to search the Cline/Fuller residence.  (*See* doc. 102, at 7-10). Plaintiffs indicate that the affidavit to the warrant contains no factual allegations linking Foster to the 347 South Main Street location, but only factual allegations linking Foster to 618 Burns Street. (Id. at 9-10).  They argue that since the affidavit does not even mention 347 South Main, and since

34

a court's determination of probable cause is limited to the four corners of the affidavit, there was no probable cause to search 347 South Main.  (*See* id. at 7-10).

Defendants make various arguments in response.  The Mansfield Defendants argue that, at most, the references to 618 Burns Street in the affidavit amount to a "clerical error," and that the references to the "residence" in the affidavit can reasonably be interpreted to mean "347 South Main."  (Doc. 107, at 15-19).  According to Mansfield, the reason the affidavit refers to 618 Burns Street is because police originally believed that Foster would be found at that location.  They later received information from the confidential informant that Foster was at 347 South Main, and Defendant Snavely explained all of this information to the magistrate.  The affidavit coupled with Snavely's assertions to the magistrate are sufficient to establish the required nexus between the place to be searched and the things to be seized.  (Id.).

The Ontario Defendants make a similar argument regarding the reference to the "residence" in paragraph four on page five of the search warrant packet and argue that it is undisputed that probable cause existed to search 347 South Main.  (*See* doc. 106).  The Ontario Defendants urge the court to find that the affidavit to the search warrant begins on page two of the warrant packet, under the heading "Affidavit for Search Warrant," where it states that Defendant Snavely has "good cause to believe" that Joseph Foster and the other items described in the warrant will be found at 347 South Main.  They argue that because there are multiple references to 347 South Main on page two and on page six of the packet, the only reasonable conclusion the court can reach is that the references to 618 Burns Street and "the residence" on page five were meant to refer to 347 South Main.  At oral argument, the Ontario Defendants urged the court to modify paragraph four on page five of the search warrant packet to reflect that the informant did not in fact go inside the residence, but rather

35

met Joe Foster outside the residence, to confirm that he was located at 347 South Main.  They also urged the court to excise paragraph six from page five, because that paragraph pertained to the intelligence linking the suspect to 618 Burns Street, and  there is no evidence in the record that "[t]he Ontario Police Department has received two tips from unknown callers stating Joseph Foster is staying at" 347 South Main.  However, the Ontario Defendants argued that the affidavit still reflects that there was probable cause to search 347 South Main because the references to "the residence," based on the totality of the search warrant packet, necessarily refer to 347 South Main.

The Shelby Defendants point out that the warrant in this case was not facially invalid since it referred to 347 South Main, the residence Defendants in fact wanted to search.  (See doc. 109, at 5).  They argue that Plaintiffs' arguments regarding the errors in the affidavit are misplaced, since neither Mack nor ASORT had a duty to read the affidavit.  (Id. at 5-7).  They further argue that just because the affidavit was located in close proximity to the warrant in the packet of warrant materials does not mean that Mack was required to read the affidavit — putting two documents close together does not make them the same document.  (Id. at 7-9).  Lastly, the Shelby Defendants argue that Plaintiffs have failed to establish that Mack or any of the ASORT Defendants presented false statements to the magistrate, and that therefore, they were entitled to rely in good faith on the facially valid warrant.  (Id. at 9-10).

"To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (internal citations and quotation marks omitted).  A court's "review of the sufficiency of evidence supporting probable cause is limited to the information presented in the four-corners of the affidavit." *Id.*

The factual basis for the affiant's belief that there existed probable cause to search 347 South

Main Street on the night of September 12, 2006, as asserted in the affidavit, is as follows:

1.   Upon his/her knowledge as a Law Enforcement Officer.
2.   (11) years of Law Enforcement Experience.
3.   Currently assigned to the (Detective) Bureau of the Ontario Police Department.
4.   A previously reliable informant was sent inside the residence to verify that Joseph Foster was inside the residence.  He confirmed that Joseph Foster was inside the residence.
5.   Surveillance was maintained of the 618 Burns Street Address to assure that Joseph Foster has not left the residence.
6.   The Ontario Police Department has received two tips from unknown callers stating that Joseph Foster is staying at 618 Burns Street.
7.   Joseph is believed to be armed as he was identified by the victim as having a weapon at the time of the Aggravated Robbery and Aggravated Burglary.

(*See* e.g., Doc. 71, Exhibit D, Search Warrant).

Plaintiffs cite *United States v. Laughton*, 409 F.3d 744, 747 (6th Cir. 2005) in support of their

argument that the warrant in this case lacked probable cause. In that case, the warrant listed the target

address, but the affidavit supporting the warrant did not contain any reference to the target address.

The *Laughton* court stated:

[t]he warrant in this case failed to make any connections between the residence to be searched and the facts of criminal activity that the officer set out in his affidavit. That affidavit also failed to indicate any connection between the defendant and the address given or between the defendant and any of the criminal activity that occurred there.  In order to establish probable cause, however, there must be a nexus between the place to be searched and the evidence sought.

Here, similarly, the affidavit simply contains no indication why the police should be able to

search 347 South Main.  (*See* e.g., Doc. 71, Exhibit D, Search Warrant).   The Ontario Defendants

argue that the court must look at the whole search warrant packet to see that the there was probable

cause to search 347 South Main; in particular, they claim that the affidavit begins on page two under

37

the heading "Affidavit for Search Warrant," and they emphasize the allegation on page two that Defendant Snavely had "good cause" to believe that the suspect and other items would be found at 347 South Main. But merely stating that there is good cause, without more, does not create probable cause. Importantly, none of the references to 347 South Main in the search warrant packet appears in a factual allegation relating to *why* the suspect and the other evidence sought will be found at 347 South Main, which is, after all, the purpose of the affidavit. "The standard of review for the sufficiency of an affidavit 'is whether the magistrate had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found *at the place cited*." *United States v. Greene*, 250 F.3d 471, 478 (6th Cir. 2001) (quoting *United States v. Davidson*, 936, F.2d 856, 859 (6th Cir. 1991)) (emphasis added). Whatever Defendants choose to call page two of the search warrant packet, the true affidavit appears on page five, under the heading "Affiant States the Factual Basis For Such Belief's (sic) Are:" because that is where the only facts purportedly establishing probable cause appear. Thus, the court must focus its review of whether or not there was probable cause to search 347 South Main on the allegations contained on page five of the search warrant packet.

Contrary to Defendants' suggestions, the factual allegations on page five are insufficient to establish probable cause. Although the Ontario Defendants would have the court believe that, based on the totality of the search warrant packet, the references to "the residence" on page five of the search warrant packet necessarily pertain to 347 South Main, the court does not find that such a conclusion is reasonable. In the two paragraphs immediately following paragraph four on page five, the references are to 618 Burns Street, not 347 South Main. There are no references to 347 South Main at all on page five. The references to 347 South Main instead appear on page two and page

38

six of the packet — several paragraphs away from the references to "the residence" on page five, in portions of the packet that do not contain any facts purportedly establishing probable cause. Additionally, the Ontario Defendants themselves point out that the confidential informant did not in fact go inside 347 South Main, contrary to the factual allegations contained within paragraph four. The Ontario Defendants also admit that the factual allegations in paragraph six regarding the two anonymous tips pertained exclusively to 618 Burns Street, and cannot be read based on the evidence in the record as applying to 347 South Main as well. These admissions make it even less likely that the references to "the residence" in paragraph four pertain to 347 South Main.[7]

As noted above, the court cannot look beyond the affidavit to determine whether the warrant was supported by probable cause. Since the factual allegations in the affidavit listed above appear to refer exclusively to 618 Burns Street and the affidavit on its face contains no information related to 347 South Main, the court agrees with Plaintiffs that the affidavit does not show that there was probable cause to conduct a search of 347 South Main. If the information contained within the affidavit does not amount to probable cause, the warrant is invalid. *U.S. v. Savoca*, 761 F.2d 292, 296 (6th Cir. 1985). Warrantless searches are presumptively unreasonable under the Fourth Amendment absent an exception to the warrant requirement. *Payton v. New York*, 445 U.S. 573 (1980). Defendants do not allege, and it does not appear to the court, that an exception to the warrant requirement applies in this case. Accordingly, the search in this case violated Plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures.

---

[7]The court also notes various other potential deficiencies with the warrant affidavit. For instance, although the affidavit states that "[a] previously reliable informant was sent inside the residence to verify that Joseph Foster was inside the residence," the affidavit does not give any indication of how or why the informant was reliable. The affidavit also fails to indicate when the facts purportedly establishing probable cause occurred.

Defendants assert that they are entitled to qualified immunity.  Plaintiffs argue that Defendants Mack, Snavely, and Myers are not entitled to qualified immunity because of their involvement with the invalid warrant and the subsequent warrantless search in this case; they do not appear to dispute the other Defendants' claims of qualified immunity with respect to the invalid warrant.  (*See* doc. 102, at 44-57).  Plaintiffs appear to present three different bases for the denial of qualified immunity as to Mack, Snavely and Myers, respectively.  The court addresses each argument in turn.

### 1. Defendant Mack

Plaintiffs argue that "Defendant Mack did not reasonably rely on the search warrant in this case because the affidavit was completely lacking in probable cause." (Doc. 102, at 45).  They cite *Laughton* for the proposition that "a determination of good-faith reliance, like a determination of probable cause, must be bound by the four corners of the affidavit. (*See* id. at 16) (citing *Laughton, 409 F.3d 744 (6th Cir. 2005)*).  They also argue that an executing officer cannot reasonably rely upon a search warrant (1) when he knows that the supporting affidavit the magistrate judge relied on is false or misleading; (2) the issuing judge wholly abandoned his judicial role; (3) the warrant is facially deficient; or (4) where the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." (Id. at 45) (citing *United States v. Leon*, 468 U.S. 897 (1984)).  Plaintiffs seem to argue that because the court may not look beyond the affidavit to determine whether good-faith exception to the warrant requirement applies, and because the affidavit in this case was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," Defendant Mack may not rely upon the good faith exception to the warrant requirement for purposes of obtaining qualified immunity.

40

The court first notes that it may, in certain circumstances, look beyond the affidavit to determine whether the good faith exception to the warrant requirement applies.  *Laughton* did hold that "a determination of good-faith reliance, like a determination of probable cause, must be bound by the four corners of the affidavit" and "[w]hether an objectively reasonable officer would have recognized that an affidavit was so lacking in indicia as to preclude good faith reliance on the warrant's issuance can be measured only by what is in that affidavit." *Laughton*, 409 F.3d at 751-52. The Sixth Circuit stated in a later case, however, that

> [b]ecause the Supreme Court has, in the past looked beyond the four corners of the warrant affidavit in assessing an officer's good faith, we do not read *Laughton* as prohibiting a court in *all* circumstances from considering evidence not included in the affidavit.

*United States v. Frazier*, 423 F.3d 526, 534 (6th Cir. 2005).

*Laughton*, the *Frazier* court explained, "gives no indication that the officer who applied for the search warrant provided the issuing magistrate with the information omitted from the affidavit." *Id.* at 535.  Thus, it did not address a situation where information that was presented to the magistrate was, for one reason or another, omitted from the affidavit.  In *Frazier*, by contrast, it was clear from the record that the agent applying for the search warrant *told* the magistrate judge information that would have established probable cause and swore to that information in five other related warrant affidavits presented contemporaneously to the magistrate judge.  *Id.*  Thus, the *Frazier* court held that the case before it was factually distinguishable from *Laughton*.  The Frazier court further explained that the failure of the agent to supplement the affidavit with the additional information establishing probable cause amounted to little more than a "scrivener's error," and that punishing the agent for "such a ministerial oversight would have no foreseeable deterrent effect on future police

41

misconduct." *Id.* The court continued, "[i]n fact, we are unable to envision any scenario in which a rule excluding from the *Leon* analysis[8] information known to the officer and revealed to the magistrate would deter police misconduct.

The court next addresses Plaintiffs' argument regarding the good faith exception as it relates to Defendant Mack.  In determining whether a police officer's reliance on the warrant was objectively reasonable, the court must decide "whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Weaver, 99 F.3d 1372, 1380 (6th Cir. 1996)*.  This case presents a different scenario from *Laughton*, *Frazier*, and the cases cited therein.  In those cases, the facts contained within the affidavit tended to reflect that there was probable cause to search the place listed in the warrant but fell short of actually establishing probable cause.  The issue in those cases was the *sufficiency* of the facts asserted in the affidavit and whether a reasonable officer would have known whether those facts in fact did not establish probable cause.  In this case, by contrast, it is clear that any reasonable officer who: (a) read the affidavit, and (b) happened to discover that it referred exclusively to 618 Burns Street would know that the affidavit did not reflect probable cause to search 347 South Main.  However, it appears that the real question to be answered in this case is whether an officer in Defendant Mack's position even had a duty to read the affidavit.

---

[8]Both *Frazier* and *Leon* concern the application of the good faith exception to the exclusionary rule in the context of a criminal case.  However, in *Groh v. Ramirez, 540 U.S. 551 (2004)*, the Supreme Court held that the question of whether the good faith exception under *Leon* applies to save evidence from exclusion is coextensive with the question of whether an officer is entitled to qualified immunity in a § 1983 action.  Thus, the analysis in *Frazier* is directly relevant to the court's analysis in this case.

42

It is undisputed that Mack played no role whatsoever in obtaining the warrant; the only Defendants who did so were Snavely and Myers.  Defendant Snavely prepared the warrant application and presented the materials to the magistrate.  (Doc. 87, Snavely Depo., at 13-16). Snavely testified that he told another officer, Lieutenant Hutchinson — who is not named as a Defendant in this action — to make the changes to the warrant application after he learned from the confidential informant that Foster's location had changed.  (Id. at 14-15).  Lieutenant Hutchinson called Snavely to tell him that he had faxed the paperwork for the warrant application over to the magistrate.  (Id. at 15).  Snavely testified that he went to the magistrate to present the materials and obtained the magistrate's signature on the warrant.  Defendant Myers filed the return on the warrant the day after the warrant was served.  (Doc. 85, Myers Depo., at 41-42).  He noticed the lingering references to 618 Burns Street in the accompanying affidavit and pointed them out to the magistrate. (Id. at 41-43).  The magistrate then crossed out references to "618 Burns Street" and wrote in "347 South Main."  (Id.).

Defendant Mack, on the other hand, served as ASORT Team Leader on the night of the September 12, 2006 raid at 347 South Main.  (Doc. 82, Mack Depo., at 40).  He testified that "[a]s team leader, it's [his] responsibility to do a drive by the residence or see that that gets done and to make sure a plan is put together prior to the mission," and that he accomplished those tasks.  (Id. at 19).  Specifically, Mack testified that he assembled the team members, verified the residence "with the officer in charge of the case," drove by the residence several times, prepared a written operation plan and briefed the team members. (Id.).  He stated that the officer in charge of investigating the case was Snavely of the Ontario Police Department.  (Id. at 21).  Mack also stated that because he had not worked closely with Ontario law enforcement before, he "wanted to make sure their

43

paperwork was in line before [he] proceeded" with executing the warrant.  (Id. at 22).  He looked at the warrant, "made sure it was signed," but he did not read the "whole document," and he did not read the affidavit.  (Id. at 24).

Plaintiffs claim that "[o]fficers who lead a team executing a search warrant are responsible for making sure they have a valid warrant."  They cite *Ramirez v. Butte Silver Bow County*, 298 F.3d 1022, 1027-28 (9th Cir. 2002) for the proposition that

> [t]he officers who lead the team that executes the search warrant are responsible for ensuring that they have lawful authority for their actions.  A key aspect of this responsibility is making sure that they have a proper warrant that in fact authorizes the search and seizure they are about to conduct.  The leaders of the expedition may not simply assume that the warrant authorizes the search and seizure.  Rather, they must actually read the warrant and satisfy themselves that they understand its scope and limitations and that it is not defective in some obvious way.

Plaintiffs present Defendant Mack's testimony that he did not read the entire search warrant packet prior to executing the search as evidence that Mack failed to comply with this requirement.  Defendant Mack stated, "I did not read the affidavit, I just read the search warrant and made sure it was signed . . . . I didn't read the whole document.  (Doc. 82, Mack Depo., at 24).

The key difference between this case and *Ramirez* is the location of the error in the warrant materials.  In *Ramirez*, the warrant was deficient on its face.  It lacked particularity because it failed to describe the things to be seized.  The court determined that any officer who read the warrant itself should have noticed the error.  In this case, by contrast, the error appears in the affidavit supporting the warrant.  The warrant is invalid only because it was not supported by probable cause, not because there is some deficiency on the face of the warrant. One who read only the warrant and not the affidavit would not be able to tell that the warrant was invalid.  Therefore, the case does not specifically answer the question of whether Defendant Mack had a duty to read the affidavit.

44

There is meager authority in the Sixth Circuit regarding which officers executing a search warrant have a duty to review the affidavit for probable cause. In *U.S. v. Washington*, 380 F.3d 236, 241-42 (6th Cir. 2004) (citing *U.S. v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004)), the court stated:

> Excluding evidence deters constitutional violations by providing incentives for the police to seek warrants before executing a search.  Thus, when the officers do in fact obtain a warrant, the purpose of the exclusionary has largely been served.  *While it is true that the police still have a duty to assess the affidavit upon which the warrant was based*, we will . . . exclude evidence in these situations only when the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."

The italicized language in *Washington*, above, suggests that the officers executing the warrant have a duty to make an independent assessment regarding the sufficiency of the affidavit after the warrant issues.  However, the court states only that "the police" have this duty; it does not specify whether all of the executing officers have this duty, or whether only some of them do, or if the latter is the case, which officers are responsible for reviewing the affidavit.

The court gleans from *Washington*, as well as the well-established precedent averted to in that case that an officer cannot rely on the good faith exception to the warrant requirement if the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," that at least some of the officers are obligated to review the affidavit to determine if there is probable cause.  Clearly, the officer presenting the affidavit to the magistrate has a duty to read the affidavit, otherwise he would not be aware of the factual allegations to which he was swearing.  Yet, from a common sense perspective, it does not follow necessarily that each and every officer, every time he assists in executing a search warrant, independently must review the affidavit for probable cause.  As Defendants point out, such a requirement could prove problematic, not to mention unnecessarily burdensome — especially in a case where the affidavit supporting the search

45

warrant is dozens or hundreds of pages long. On the other hand, Defendant Mack was not just any officer in the pack in this case — he was the ASORT team leader for the search of 347 South Main. Plaintiffs do not cite — and the court has not found — any authority indicating whether the leader of a SWAT-type tactical team has an obligation to review the affidavit for probable cause prior to executing a search warrant.

However, the court need not decide whether Defendant Mack was required to review the affidavit for purposes of determining whether he is entitled to qualified immunity. Under *Pearson*, district courts have discretion in "deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S.Ct. at 818. Based on the paucity of case law discussing whether or not SWAT team leaders should be required to review the affidavit for probable cause prior to executing the warrant, the court cannot say that such a requirement — if it exists at all — was clearly established as of September 12, 2006. Thus, it would not have been clear to a reasonable officer in Defendant Mack's position that he was legally required to read the affidavit, assuming for purposes of this analysis only that he in fact was required to do so.

Plaintiffs also claim that Defendant Mack is not entitled to rely on the good faith exception "because he had prior knowledge before executing the warrant that the wrong residence may have been targeted" or because he "was clearly on notice that the warrant could be defective." (Doc. 102, at 48-49). In support of these allegations, Plaintiffs point to the fact that many of the sections of the Operational Plan were left incomplete. They also point to Defendant Mack's testimony that he did not read the affidavit prior to executing the search. (Doc. 82, Mack Depo., at 24). Plaintiffs do not

point to any evidence indicating that Mack had actual knowledge that the warrant was defective prior to the search.

As noted above, Plaintiffs do not cite to any case law holding that an officer in Mack's position would have an obligation to review the affidavit prior to executing a search to determine whether probable cause exists.   If Mack was not required to read the affidavit, then he cannot be charged with notice — let alone prior knowledge — merely for failing to read the affidavit that the affidavit did not reflect probable cause for the warrant.

For the above reasons, Plaintiffs have not met their burden to show that Defendant Mack is not entitled to qualified immunity.

### 2.  Defendant Snavely

Plaintiffs argue that Defendant Snavely is not entitled to qualified immunity for his involvement with the invalid warrant because "[a] reasonable jury could conclude that Snavely lied or was reckless with respect to his representations to the magistrate."  (Doc. 102, at 55).

"In cases involving search warrants . . . the law is clear that an officer may be held liable under 42 U.S.C. § 1983 for an illegal search or seizure when the officer knowingly and deliberately, or with reckless disregard for the truth makes false statements or omissions that create a falsehood and such statements or omissions are material, or necessary, to the finding of probable cause." *Peet v. City of Detroit*, 502 F.3d 557, 570 (6th Cir. 2007) (internal quotation marks and citations omitted). Where "an affidavit contains false statements or material omissions, the question becomes whether, once the false statements are omitted and omitted facts are inserted, the 'corrected affidavit' is still sufficient to establish probable cause." *Id.* (citing *Wilson*, 212 F.3d at 789).

47

In support of their argument that Defendant Snavely either lied or acted in reckless disregard of the truth in his representations to the magistrate, Plaintiffs point out that the address in the affidavit is not the same as the address in the command portion of the warrant.  Plaintiffs argue that it clearly is a lie or a material misrepresentation to state, as Defendant Snavely did in the affidavit, that there exists probable cause to search 347 South Main because there is intelligence linking the suspect to 618 Burns Street.

Plaintiffs further suggest as evidence that Snavely was less than truthful before the magistrate that: (1) Snavely did not properly vet the confidential informant and could have used alternative means to test the informant's reliability and accuracy; (2) Snavely did not properly confirm that Foster was at the 347 South Main address because neither he, nor Defendant Myers, nor any of the other officers conducting surveillance ever actually saw Foster at 347 South Main; and (3) Snavely added additional facts to his story several times after appearing before the magistrate to support the conclusion that Foster was at 347 South Main Street.  (*See* doc. 102, at 52-55).

Plaintiffs do not present the above as evidence to challenge the reliability of the informant or the sufficiency of the investigation prior to the search.  Rather, Plaintiffs present this evidence in support of their claim that Defendant Snavely lied or acted in reckless disregard of the truth with respect to his representations to the magistrate.  Plaintiffs' claims with respect to, *inter alia*, Defendant Snavely's allegedly inadequate surveillance of 347 South Main and dealings with the confidential informant simply are irrelevant to the representations Defendant Snavely made to the magistrate.  Thus, the court focuses its inquiry regarding whether Snavely lied or acted with reckless disregard of the truth before the magistrate on the discrepancies between the affidavit and the

48

command portions of the warrant.  As the court has already determined, all the references on page

five of the search warrant application (where all of the factual allegations purportedly establishing

probable cause appear) are to 618 Burns Street, and any inference that the references on that page

to "the residence"pertain to 347 South Main is not reasonable.  Thus, the affidavit clearly did not

establish probable cause to search 347 South Main.

Yet, just because the affidavit lacks probable cause does not mean necessarily that Defendant

Snavely lied or acted in reckless disregard of this truth in presenting that affidavit to the magistrate.

Snavely, by all accounts, sought a warrant to search 347 South Main.  The court cannot see any

reason why Defendant Snavely would have wanted the magistrate to believe that probable cause

existed to search 618 Burns Street when the Defendant officers in fact wanted to search 347 South

Main.  The false information contained within the affidavit and the material omissions from it in this

case do not neatly provide evidence of Snavely's scienter, as they might in a case where an officer

had an incentive to bend the truth before the magistrate in order to get him to sign a warrant that was

not supported by probable cause.

Nevertheless, the court finds that there is sufficient evidence in this case from which a jury

could conclude that Defendant Snavely acted with reckless disregard for the truth in applying for the

warrant in this case.  Under *Groh*, it is "incumbent on the officer executing a search warrant to

ensure the search is lawfully authorized . . . . That is not a duty to proofread; it is, rather a duty to

ensure that the warrant conforms to constitutional requirements." *Groh*, 540 U.S. at 563, n.6.

Clearly, a warrant supported by an affidavit that asserts no facts tending to show that either Joseph

Foster or evidence of his criminal activities will be located at 347 South Main does not conform to

the requirement that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend IV.  As explained in *Washington*, officers executing a warrant have a duty to assess the affidavit upon which the warrant was based to ensure that it reflects probable cause for the search.

Although, as noted above, it is not entirely clear under Sixth Circuit law which officers are charged with the duty articulated in *Washington*, the court cannot say that Snavely was excused from reviewing the affidavit for probable cause.  By all accounts, Snavely was the lead investigator on this case.  Snavely himself testified in his deposition that he had been working "all by himself" on many of the efforts to get Foster into custody.  Snavely was the officer in contact with the confidential information and the officer who presented the warrant application to the magistrate.  While Lieutenant Hutchinson allegedly made the changes to the warrant materials, the changes were made at Snavely's request and based on Snavely's knowledge.  Under *Groh* and *Washington*, Snavely unquestionably had a duty to ensure that the affidavit reflected probable cause to search 347 South Main before executing the search warrant.

It also is clear to the court that Snavely failed adequately to fulfill his duty to review the affidavit for probable cause and that, contrary to Defendants' assertions, his failure to do so amounted to more than a mere "ministerial oversight."  The affidavit in this case contained no clear references to 347 South Main.  It was less than a page long.  Although Snavely testified that he did not "catch" the error before serving the warrant at 347 South Main, there is no affirmative indication in the record that he even read the affidavit prior to submitting it to the magistrate and swearing to the allegations contained within it.  (*See* doc. 87, Snavely Depo., at 37).  The *Groh* court's reproof

50

that "even a cursory reading of the warrant in this case — perhaps just a simple glance — would have revealed a glaring deficiency that any reasonable police officer would have known was constitutionally fatal" is similarly apt in the case at bar.  *See Groh*, 540 U.S. at 563.  The fact that *Groh* was concerned with errors on the face of the warrant — rather than errors contained within the affidavit — does not alter the analysis here.  As the court has already found, Snavely was required to review the affidavit for probable cause.  An officer in Snavely's position should not be able to claim in good faith that he is entitled to qualified immunity despite failing to "catch" the glaring errors in the affidavit here, when it was Snavely's responsibility — and perhaps his responsibility alone, at least among the police officers — to ensure that the affidavit was adequate.

For the reasons set forth above, the court finds that there is sufficient evidence from which a reasonable jury could conclude that Snavely acted with reckless disregard of the truth in applying for the warrant in this case.  Accordingly, Defendant Snavely is not entitled to qualified immunity, and the Ontario Defendants' Motion for Summary Judgment should be denied on that basis as to Defendant Snavely.

### 3.  Defendant Myers

Plaintiffs appear to argue that Defendant Myers is not entitled to qualified immunity for his involvement with the invalid warrant because he "returned to the Magistrate after the search and asked the Magistrate to change the affidavit of Snavely" even though "he did not know the basis for Defendant Snavely's belief that Foster was inside the Main Street residence until after the warrant was served." (Doc. 102, at 56).  As explained above, it is the plaintiff's burden to establish that a defendant is not entitled to qualified immunity.  "First, the plaintiff must plead a violation of a

51

constitutionally protected right; second, the plaintiff must plead that the right was so clearly established that a reasonable officer would have known that his behavior violated a right." *Stanley v. City of Norton*, 124 Fed.Appx. 305, 309, 2005 WL 65522 at *3 (6th Cir. Jan 6, 2005).  Plaintiffs neither specifically allege that Myers' actions, if proven, would amount to the violation of a constitutional right, nor do they indicate that the right was so clearly established that a reasonable officer in Myers' position would have known that what he did amounted to a violation.  Thus, Plaintiffs have failed to meet their burden to show why Defendant Myers is not entitled to qualified immunity for his involvement with the invalid warrant.

### C.  Use of Excessive Force in Executing the Search Warrant

Plaintiffs allege that one or more Defendants used excessive force against each of them in the execution of the search warrant.  The court addresses each of their claims separately below.

Excessive force claims must be analyzed under the Fourth Amendment reasonableness standard.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).  The reasonableness test "is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

However, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *McDowell v. Rogers*, 863 F.2d 1302, 1306 (6th Cir. 1988) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973).  Adopting the Second Circuit's approach, the Sixth Circuit in *McDowell* explained,

In determining whether the constitutional line has been crossed, a court must look to

52

such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the purpose of causing harm.

*McDowell v. Rogers*, 863 F.2d 1302, 1306 (6th Cir. 1988) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973).

### 1.  Plaintiff Fuller

Plaintiff Fuller alleges that Officer Myers grabbed an ASORT team member's shotgun, came over to Fuller, kicked him twice in the back, and said, "I told you don't move," when Fuller rolled onto his side to ask what was happening.  (Doc. 80, Fuller Depo., at 37, 88).  Fuller had been lying face down on the floor with his hands zip-tied behind his back just before the alleged kicks occurred. (*See* id.).  Although Fuller was restrained at the time of the alleged kicks, the Court cannot say that it was objectively unreasonable as a matter of law for Myers to make physical contact with Fuller in the manner Fuller describes.  The officers conducting the search in the Cline/Fuller household had a reasonable interest in keeping the occupants under control and in one place while they searched for Joseph Foster and the other things described in the search warrant.  Fuller admitted in his deposition that he moved onto his side and began questioning the officers prior to the alleged kicks. Although Fuller states that Myers told Fuller not to move as he was administering the alleged kicks, Fuller testified that he did not believe the alleged kicks constituted an attempt to get him to roll back onto his stomach and stated that, after being kicked, he told Myers not to worry because he had no intention of moving.  (*See* id. at 37).  Yet, by his own account, Fuller *was* in fact moving just prior to the alleged kicks.  Moreover, it may have appeared to a reasonable officer on the scene that, by rolling onto his side and asking what was going on, Fuller was likely to move around more and

53

possibly even attempt to get up to see what was happening around him.

Since Fuller was restrained, it may not have been absolutely necessary for Myers to make any physical contact with Fuller in order to make him keep still and in one place; yet the court cannot say that the alleged kicks were gratuitous.  Even when taken in the light most favorable to Plaintiff Fuller, the facts in this case differ significantly from those in the excessive force cases described above.  Fuller admitted in his deposition that the kicks caused him no injury and that he did not seek any medical treatment for the kicks.  Although a plaintiff need not allege a permanent injury to withstand qualified immunity in a 1983 claim, the qualified immunity inquiry is not co-extensive with a claim for battery, in which any alleged contact — however slight — is potentially actionable.  Put simply, two non-injurious kicks to an individual who may have appeared to a reasonable officer to be non-compliant are a far cry from an unprovoked blow to the mouth a handcuffed citizen or the continued beating of a subject that had long since been subdued.  The court does not find that these kicks, even if unnecessary under the circumstances, amounted to the infliction of excessive force.  Since the court finds that no constitutional violation occurred, Defendant Myers is entitled to qualified immunity on Fuller's claim of excessive force against him.  Fuller alleges no other incidents of excessive force against him.

## 2.  Plaintiff Cline

Plaintiff Cline alleges that she was asleep in her bed when suddenly she awoke to excruciating pain in her back and the feeling of something round, like the barrel of a gun, on her neck.  (Doc. 77, Cline Depo., at 25).  She claims that she did not know what was happening at first but later learned that Officer Bammann was responsible for the pressure applied to her back.  (Id. at 25-27, 51).  Cline further testified that it felt as if Bammann were standing on her back with both

feet — one foot on her neck and the other on her lower back —  putting all of his weight on her.  (Id. at 58-59).  She also stated that, once awake, she began to hear a lot of yelling, but she could not tell who was yelling or what they were saying.  (Id. at 26-27).  Bammann testified that he placed his foot on Plaintiff Cline's back to get her to comply with Defendant Mack's order to show her hands.  (Doc. 76, Bammann Depo., at 35).  According to Bammann, it looked like Cline was digging under something on the bed and he was afraid that she might come up with a weapon.  (Id. at 32-34).  He testified further that he used only so much force as was necessary to get her to comply.  (Id. at 38).

Taking the facts in the light most favorable to Cline, the court finds that Defendant Bammann's conduct was not objectively unreasonable under the circumstances.  Cline testified in her deposition that she was asleep at the time of the officers' entry into her bedroom and that she awoke only upon feeling the excruciating pain of someone standing on her back.  (Doc. 77, Cline Depo., at 25).  According to Cline's own account, therefore, Cline did not realize that someone was even in her room until after Bammann already had applied pressure to her back.  (Id. at 70).  Cline admits that she is a "deep sleeper."  (Id.).  Accordingly, it may have appeared to a reasonable officer on the scene that Cline, who was sleeping and therefore unresponsive, was in fact resisting or otherwise willfully non-compliant.

The court notes that it is "clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force," Champion v. Outlook Nashville, Inc., 380 F.3d 893, 903 (6th Cir. 2004).  However, in this case it may have appeared to an objectively reasonable officer on the scene that Plaintiff Cline was not in fact subdued or incapacitated, even though she was lying down prone in the bed.  Relevant to this point is the indication in Plaintiffs' opposition  that Cline

was "groping around for a shirt" just prior to feeling the pain in her back.  (Doc. 102, at 2).  Given the facts that "[b]lankets and bedding can conceal a weapon," *see* *L.A. County, Cal. v. Rettele*, 550 U.S. 609 (2007), and that the police officers in this case were searching for a suspect known to possess firearms, an objectively reasonable officer on the scene might reasonably have feared that Cline was "groping around" for a weapon, even though she in fact was not.  Moreover, Plaintiff Cline does not claim that the pressure Bammann applied to her back was asphyxiating — a principal danger associated with applying pressure to the back of someone in a face-down prone position.  Rather, Plaintiff Cline complains that she felt pain as Bammann applied pressure to her back and that her back was bruised afterward.  Under the circumstances of this case — in which Defendants were searching for a suspect believed to be armed and dangerous, Cline appeared to be "groping" around for something in the bed, and the pressure applied to Cline's back was not asphyxiating and did not cause long-term injury — the Court finds that the force used against Plaintiff Cline was not excessive.  Since no constitutional violation occurred, the court finds that Defendant Bammann is entitled to qualified immunity with respect to Cline's claim of excessive force against her.

### 3.  Plaintiff Smith

Plaintiff Smith states that she was upstairs in the Cline/Fuller residence when Defendant police officers entered the house.  (Doc. 86, Smith Depo., at 25).  She testified that when she was using the bathroom upstairs, she heard some people arguing outside, then a loud boom, and then she saw a blue light in the sky.  (Id. at 28).  She opened the door to go downstairs but then saw four people dressed in black run by the door.  (Id. at 30).  When she turned to close the door, an officer in the pack "turned on [her] with a rifle and told [her] to get down and put [her] face on the floor."  (Id. at 30).  Plaintiff Smith complied.  Plaintiff Smith further testified that the officer then told her

to get up, lift her shirt, and turn around in a circle so that he could check for weapons.  (Id. at 38-39).
Plaintiff Smith again complied.  The officer then allegedly told Plaintiff Smith to get back down on
the floor.  Plaintiff Smith testified that while she was on the floor, the officer allegedly kicked
Plaintiff Smith on her left hip and told her to go into the bedroom with Milanie.  (Id. at 42-43).

After the search, Plaintiff Smith sought medical treatment for her back at the emergency
room.  (Id. at 55-62).  She claims that she was diagnosed with a strained back.  (Id. at 63).  She did
not seek medical treatment for her hip, where she was allegedly kicked.  (Id. at 76).  She testified that
her hip was not hurt or bruised.  (Id. at 76-77).  Although Plaintiff Smith admits that the Defendant
police officers did not touch her back on the night of the search, she believes that the alleged kick
to her hip has been causing the pain in her back.  (Id. at 85-86).  Plaintiffs' opposition points to a
portion of Defendant Alfrey's deposition testimony as evidence that Defendant Alfrey was the officer
who kicked Plaintiff Smith.  (Doc. 102, at 57) (citing doc. 75, Alfrey Depo., at 26).  That deposition
testimony is as follows:

Q.    Describe what civilians you came in contact with when you went upstairs?

A.    I only remember coming into contact with the female.

Q.    In what room did you meet the female?

A.    It was in the hallway when she was being brought out.

Q.    What room was she exiting from?

A.    That I don't know. She was already out in the hallway when I got out there.

Q.    Describe the female.

A.    All I remember is, it was a black female.

Q.    What did she say to you and what did you say to her?

MR. DOWNEY:          Objection. You can answer.

A.          When she was being walked out, her nightgown was starting to come open a little bit and she asked if I could tie her nightgown for her, and I tied her nightgown for her and that's all that was said.

(Doc. 75, Alfrey Depo., at 26-27).

Although this court must take the facts in the light most favorable to Plaintiff Smith, "[i]t is well established that a plaintiff cannot recover in a § 1983 action if he [or she] does not identify the officer that caused the alleged deprivation of his [or her] constitutional rights." *Kepley v. Lantz*, 2007 WL 2085401 at *6 (N.D. Ohio June 18, 2007) (quoting *Kilgore v. City of Cincinnati*, 2006 WL 1580224 at *3 (S.D. Ohio June 5, 2006).  The cited portion of Defendant Alfrey's deposition makes clear that Alfrey is referring to Plaintiff Cline — who indisputably was wearing a nightgown that fell open as she was being detained — not Smith.  Smith has presented no evidence that she too was wearing a nightgown or that her nightgown fell open at any point.  The deposition testimony also makes clear that Alfrey encountered a woman in the *hall* and makes no mention of encountering a woman in the bathroom.  All of Smith's allegations related to her claim of excessive force occurred in the bathroom, not the hall.  Thus, the court concludes that Smith has not presented enough evidence from which a reasonable jury could infer that Alfrey or any other individual officer administered the kicks to Smith.  To allow a jury to so infer would amount to mere speculation, and "[i]t is not the intent of Rule 56 to preserve purely speculative issues of fact for trial." *Kepley*, 2007 WL 2085401 at *7 (internal quotation marks and citations omitted).  Thus, summary judgment should be granted as to all Defendants on Plaintiff Smith's excessive force claim.

### 4. Plaintiff Willis

Willis alleges that, as the officers made entry into the house, one of the officers ran at him

forcefully and tackled him to the ground.  (Doc. 88, Willis Depo., at 47-48).  He alleges that his ankle got twisted as a result of the tackle.  (Id. at 48, 59).  Plaintiffs have been unable to identify which of the officers allegedly tackled Willis.  The court again notes that "a plaintiff cannot recover in a  § 1983 action if he does not identify the officer that caused the alleged deprivation of his constitutional rights." *Kepley*, 2007 WL 2085401 at *6.  Since Plaintiff Willis has been unable to identify the officer that tackled him, he has not presented enough evidence from which a reasonable jury could conclude that any individual officer engaged in excessive force against him. To allow a jury to so infer would amount to mere speculation, and "[i]t is not the intent of Rule 56 to preserve purely speculative issues of fact for trial." *Kepley*, 2007 WL 2085401 at *7 (internal quotation marks and citations omitted).  Thus, summary judgment should be granted as to all Defendants on Plaintiff Willis' excessive force claim.

### 5. Kierre and Milanie

Plaintiffs allege that "Defendant Bammann grabbed four-year-old Kierre Fuller out of his bed and carried him downstairs" while still wearing his black face mask and "brandish[ing]" his rifle with the other arm.  (Doc. 102, at 13).  Plaintiffs claim that Bammann's actions were unreasonable under the circumstances because Kierre's mother, Cline, was not armed and posed no threat to the officers.  (Id.).  Therefore, she should have been allowed to take her son.  (Id.).  Plaintiffs allege no other incidents of excessive force as to Kierre.

Plaintiffs do not allege that Defendant police officers hurt or attempted to hurt Kierre; rather, they appear to claim that Defendant Bammann's course of action in carrying Kierre downstairs with one arm while toting his rifle in the other and failure to give Kierre to his mother right away somehow amounted to excessive force.  Taking the facts in the light most favorable to Plaintiffs, the

court concludes that Bammann did not use excessive force against Kierre.  First, it is undisputed that Defendant Bammann did not point his rifle at Kierre while carrying the boy downstairs, but merely held it with his other hand.  Second, as stated above, the officers in this case had a reasonable interest in keeping all the occupants of the Cline/Fuller residence under control and in one place while they were executing the search warrant.  They also had an interest in sweeping the house quickly and efficiently.  Given the fact that Kierre Fuller was four years old at the time of the search,[9] a reasonable officer under the circumstances might well have thought it would be safer and more efficient to carry Kierre downstairs than to pursue some other course of action, such as allowing Kierre to walk down by himself or giving him immediately to his mother, who had been put in handcuffs and, by Plaintiffs' account, was very emotional at the time.  Third, it is undisputed that once Plaintiff Cline arrived downstairs, her handcuffs were removed and Kierre was placed in her lap.  (Doc. 77, Cline Depo., at 31).  Thus, it appears from the undisputed facts that Kierre was reunited with his mother within moments of his removal from the bedroom.  The court cannot say that any of Defendant Bammann's actions with respect to Kierre was objectively unreasonable under the circumstances.

Plaintiffs do not specifically allege any incidents of excessive force as against Milanie Cline, but they aver in a conclusory fashion that the "armed men carried their *children* about the house" and that this activity amounted to excessive force.  (Doc. 102, at 44) (emphasis added).  Defendant Mager testified that he carried a little girl downstairs (doc. 83, Mager Depo., at 16); however, Plaintiff Smith believes that she was responsible for carrying Milanie downstairs (doc. 86, Smith Depo., at 49).  Assuming for the moment that Mager carried Milanie, merely carrying a small child

---

[9]The court notes Defendant Bammann's testimony that he thought the boy he encountered in Kierre's room was around eight or nine years old. (Doc. 76, Bammann Depo., at 42).

downstairs does not amount to excessive force under the circumstances of this case.  Therefore, to the extent Plaintiffs argue that Milanie was subjected to excessive force, summary judgment should be granted in favor of all Defendants on this claim.

### D.  Unreasonable Detention

Plaintiffs claim that they were detained in the Cline/Fuller residence for up to 30-45 minutes. They claim that they should have been released within 5-8 minutes of the officers' entry into the residence "because by then the defendants knew that Joe Foster was not present and they had stopped looking for him at 347 S. Main." (Doc. 102, at 19).  Plaintiffs allege that several of the individual police officers are not entitled to qualified immunity based on this issue.  They claim that "Myers was responsible for the extended detention of the plaintiffs in their own home.  He is not entitled to qualified immunity on that issue since he knew that Joe Foster was not present well before he removed all restraints on the plaintiff[s'] liberty." (Id. at 56).  They also state that "Officers Mager, Parella and Schmidt participated in and failed to end the excessive detention of the plaintiffs despite their knowledge that the suspect was not in the home." (Id. at 57).

Plaintiffs cite *Pray v. City of Sandusky*, 49 F.3d 1154 (6th Cir. 1995) for the proposition that it is a clearly established "violation of the Fourth Amendment to restrain a person's liberty after a search when there is no longer any law enforcement reason to justify such restraints." (Doc. 102, at 21).  In *Pray*, the defendant police officers had a warrant to search 716 ½ Erie Street, the upper level of a duplex home and the residence of a suspect wanted for various drug-related offences.  716 Erie Street corresponded to the lower level of the duplex and was the residence of the plaintiffs, an elderly couple.  The police forcibly entered and searched the lower level instead of the upper level. The plaintiffs presented evidence that at least some of the defendants recognized the mistake

immediately upon entry but continued to search the residence and "manhandle" the Prays.  The court found that there were genuine issues of material fact as to "which, if any, of the illegal searches and seizures took place after the officers discovered or reasonably should have discovered that they were in fact in the wrong residence." *Id.* at 1160.  "[A]ny search or seizure that took place after the officers knew or reasonably should have known that they were in the wrong residence would no longer be protected by qualified immunity." *Id.* at 1159.

The situation in *Pray* is different in some important respects from the situation in this case.  In *Pray*, the officers indisputably were in the wrong house, a fact which some of them allegedly recognized immediately upon breaking down the door and noticing that the house looked different than what was described in the warrant.  Yet, the officers who allegedly realized they were in the wrong place nevertheless stayed for several minutes, searching the residence and "manhandling" the Prays.  Contrary to Plaintiffs' suggestion, the officers in this case were not in the "wrong" house in the same sense.  There is substantial evidence in the record that the officers wanted to search 347 South Main, and they in fact did search 347 South Main.  Thus, Defendants could not have had a sudden realization that they were in the wrong place in the same way that some of the officers in Pray allegedly had because Defendants were *not* in the wrong place — at least according to their assertions and the face of the search warrant.

The relevant question in *Pray*, moreover, was which, if any, constitutional violations the defendant police officers committed against the Prays after realizing that they were in the wrong place.  Plaintiffs' sole allegation on this issue is that they were detained too long after Defendant police officers realized that Joseph Foster was not in the house.  The court sees a few problems with this argument.  First, Plaintiffs have not presented any evidence indicating that any individual

62

Defendants stayed and continued to commit constitutional violations against Plaintiffs despite *knowing* that Joseph Foster was *not* in the house. As a general matter, it certainly is more difficult to prove a negative — i.e., knowledge that something is *not*, as opposed to affirmative knowledge that something is. In *Pray*, there were clear signs that the defendants were in the wrong place — e.g., the layout of the house, and the fact that they were on the first, rather than second, floor — from which the defendants immediately could have gleaned knowledge that they were in the wrong place. Here, by contrast, the only way that Defendants could have learned that Joseph Foster was not in the house was by thoroughly searching the house. A thorough search necessarily takes time. Moreover, some of Defendants reasonably may have continued to harbor suspicions that Foster was either in the house or somewhere nearby even after ASORT's five to eight minute-long sweep of the house.

Second, even if some of Defendants remained on the premises after they believed Joseph Foster was not in the house, the court does not believe that such action on the part of the police would have been objectively unreasonable under the circumstances. Defendants had received authorization from the Prosecutor's Office to use ASORT because they believed that they were searching for an armed and dangerous felon. Given the suspect's apparent volatility, it would have been natural and reasonable in such a situation for Defendants to hesitate somewhat about leaving immediately after ASORT's brief sweep of the house. Additionally, Plaintiffs, by their own estimate were restrained for well under an hour, a good portion of which they spent sitting on furniture in the living room — as opposed to lying face down on the floor — and during which most of them were not wearing handcuffs. To the extent Plaintiffs claim that they were restrained during Myers' departure to obtain a copy of the search warrant — and especially to the extent they claim this time as a part of the 30-45 minute alleged detention period — such a claim is not reasonable. By this

time, all of Plaintiffs had been released from their restraints and all of the police officers had left the premises.  Given these facts, the court cannot say that there was no "law enforcement reason to justify such restraints" for 30-45 minutes or that Plaintiffs' alleged detention time of 30-45 minutes was excessive as a matter of law.

Plaintiffs also urge the court to find for purposes of their unreasonable detention claim that various time records related to the planning and execution of the search warrant at 347 South Main — which Plaintiff claims have not yet been produced in this case — would be unfavorable to Defendants.  Plaintiffs indicate that "[t]he trial court has broad discretion to permit a jury to draw adverse inferences from a party's failure to present evidence," and that based on the evidence in this case, "a reasonable jury could find that various officers remained at the residence and [that Plaintiffs'] liberty was restricted for 30 to 45 minutes."  (Doc. 102, at 26-28).  Therefore, the court "should accept Plaintiffs' timeline of events" which, according to Plaintiffs, clearly demonstrates that Plaintiffs' liberty was restricted for an excessive period of time.  (Id. at 28).  However, at the summary judgment stage, not only "should" the court "accept Plaintiffs' timeline of events," it *must* accept "Plaintiffs' time of events," and in fact, the court did so in the above analysis.  Whether a jury should be permitted to draw adverse inferences is irrelevant at this stage of the proceedings.  Thus, the court finds superfluous Plaintiffs' argument related to Defendants' alleged destruction and/or non-production of time records.


## VI.  MUNICIPAL LIABILITY THROUGH THE ACTIONS OF FINAL POLICYMAKERS

### A.  Richland County and the Cities of Shelby, Mansfield and Ontario

Plaintiffs argue that "[e]ach of the cities and local governments [named as Defendants in this

case] can be liable under 42 U.S.C. § 1983 based on one of three theories: (1) the action was taken

pursuant to a formal policy; (2) the action was taken pursuant to a longstanding practice or custom;

(3) the action was taken by a person serving as 'final policymaker.'" (Doc. 102, at 37-38) (citing

*Monell v. Dept. of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978)). They claim that in this

case Defendants "are bound by the actions taken at the direction of final policymakers, ASORT

Commander Lance Combs and ASORT Team Leader David Mack, with respect to the execution of

the search warrant at the Cline/Fuller home.  Plaintiffs do not appear to argue that the cities and local

governments named in this case are liable based on the first or second theories listed above.

The Supreme Court has concluded that Section 1983 cannot be interpreted to incorporate

doctrines of vicarious liability.  *Pembaur*, 475 U.S. at 479; *Monell*, 436 U.S. at 691.  Thus, for there

to be municipal liability under Section 1983, liability for wrongful conduct is limited to actions for

which the city is actually responsible.  *Pembaur*, 475 U.S. at 479.  The Court noted  that "it is plain

that municipal liability may be imposed for a single decision by municipal policymakers under

appropriate circumstances."  *Id.* at 480; *see also Feliciano v. City of Cleveland*, 988 F.2d 649, 655

(6th Cir.), *cert. denied*, 510 U.S. 826 (1993).

A plurality of the Court stated:

Municipal liability attaches only where the decisionmaker possesses final authority
to establish municipal policy with respect to the action ordered.  The fact that a
particular official – even a policymaking official – has discretion in the exercise of
particular functions does not, without more, give rise to municipal liability based on
an exercise of that discretion.  The official must also be responsible for establishing
final government policy respecting such activity before the municipality can be held
liable.  Authority to make municipal policy may be granted directly by a legislative
enactment or may be delegated by an official who possesses such authority, and of
course, whether an official had final policymaking authority is a question of state
law.

*Pembaur*, 475 U.S. at 481-483 (plurality opinion) (internal citations omitted). The focus is on the "final policymaking authority" for "the action alleged to have caused the particular constitutional or statutory violation at issue." *Jett v. Dallas Independent Sch. Dist.*, 491 U.S. 701, 737 (1989); *see also City of St. Louis v. Praprotnik,* 485 U.S. 112, 123 (1988) (plurality opinion).

"Mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials." *Feliciano*, 988 F.2d at 655 (citing *Praprotnik,* 485 U.S. at 127 (plurality)). Another consideration is "whether the employee . . . formulates plans for the implementation of broad goals." *Miller v. Calhoun County*, 408 F.3d 803, 814 (6th Cir. 2005).

A municipality is not liable merely because an official had authority to act on its behalf, rather, the official must have "final authority to establish municipal policy with respect to the [challenged] action." *Praprotnik,* 485 U.S. at 139 (Brennan, J., concurring) (quoting *Pembaur*, 475 U.S. at 481). The distinction between the discretion to act and policymaking authority is important because municipal liability for an official's discretionary acts "would be 'indistinguishable' from *respondeat superior* liability." *Feliciano*, 988 F.2d at 656 (citing *Praprotnik,* 485 U.S. at 126).

Plaintiffs contend that "the government entities that make up ASORT delegated to the ASORT commander and the team leaders unfettered discretion to direct the ASORT teams on operational missions." (Doc. 102, at 40). Plaintiffs rely on Richland County Sheriff Sheldon's deposition testimony to support that assertion:

> Q. And once Captain Combs or Officers Miller or Mack determined how to deploy the ASORT team they don't have to go to any other bosses in any of the other departments to get approval for their plan, right?

66

* * * * *

A.    They're the tactical people.  They make that decision.

Q.    As far as tactical policy goes, they're the top decision-makers, is that right?

A.    That's correct.

(Doc. 102, at 40, quoting doc. 96, Sheldon Depo., at 37-38.)

Plaintiffs also refer to the deposition testimony of Mansfield Police Chief Messer:

Q.    And dealing with that individual incident who has the authority to determine the assignment of the personnel and the actual operation plan?

A.    When you say assignment of personnel, specifically are you referring to ASORT members?

Q.    Yes.

A.    The commander or on-scene supervisor of the ASORT team.

(Doc. 102, at 41, quoting doc. 97, Messer Depo., at 12.)

Plaintiffs argue that the above evidence, when taken in the light most favorable to Plaintiffs,

demonstrates that Combs and Mack had "unfettered discretion in conducting ASORT operations."

(Doc. 102, at 41).  Specifically Plaintiffs argue that because the ASORT leaders "had authority to

deploy ASORT officers and develop operation plans and they did not need any additional approvals

to execute an operational plan," Combs and Mack were policymakers for the governments involved.

 As set forth above, municipal liability attaches only where the officer in question possesses

final authority to establish municipal policy with respect to the action ordered. Plaintiffs allege that

they were subjected to: (1) an unreasonable search because the search warrant authorizing the search

67

of the Cline/Fuller residence was supported by an affidavit lacking probable cause, (2) excessive force in the execution of the search warrant, (3) an unreasonable failure on the part of the officers to knock and announce themselves as police officers to all the occupants of the Cline/Fuller residence, (4) and an unreasonably long detention.  Thus, the Defendant municipalities should be held liable in this case only if Defendants Mack and Combs possessed final authority to establish municipal policies with respect to the actions resulting in the above alleged constitutional violations.  *Pembaur*, 475 U.S. at 481.  Plaintiffs make no argument and advance no evidence that either Defendants Combs or Mack possessed any authority whatsoever to set policies concerning the sufficiency of search warrants, use of force, knocking and announcing, or the nature and length of detentions.  The court agrees with Defendants that Plaintiffs' proffered evidence concerns tactical discretion only — that is, methods or procedures used for short-range objectives, rather than authority relating to long-term policy considerations.

Plaintiffs also allege in a conclusory fashion that "Defendant Snavely is the policy maker for [Ontario] with respect to presenting information on search warrants to judges and to tactical teams who will act on that information." (Doc. 102, at 51).  Plaintiffs set forth no evidence supporting this claim.  In the absence of any indication that Defendant Snavely had any input regarding these policies, let alone final policy-making authority, the court cannot agree with Plaintiffs that Defendant Snavely is a policy maker in any respect.  Plaintiffs also appear to claim that Defendant Myers is a policymaker for Ontario.  They state that "Myers was the acting Chief.  He did not get involved with the application for the warrant and left [the] matter to Snavely.  He did personally get involved in the detention of the Cline/Fuller family and is the policymaker for Ontario in that regard." (Id. at 51-52).  Here, again, Plaintiffs fail to present any evidence in support of their claim.  Although

Myers was "acting Chief," Plaintiffs have not affirmatively demonstrated that Myers had "final authority" with regard to the city's detention policies.  Bare allegations that particular individuals are "policymakers," without more, simply is not enough to establish municipal liability based on the actions of those individuals.

For the above reasons, the court finds that Plaintiffs have failed to set forth evidence sufficient to withstand summary judgment on their claims of municipal liability through the actions of policy-makers.

## B.  ASORT

The court has found ASORT to be an unincorporated association and therefore a "person" capable of being sued for purposes of Section 1983.  (*See supra*, at Sect. IV.A.).  The court now turns to the merits of Plaintiffs' claims against ASORT as an entity subject to suit.

Plaintiffs allege that Defendants violated Section 1983 by: (1) failing to knock and announce; (2) executing an invalid warrant; (3) using excessive force against Plaintiffs in executing the warrant; and (4) subjecting Plaintiffs to an unreasonably lengthy detention.  (*See* doc. 102).  They appear to argue that ASORT is liable for the first, third and fourth of these alleged constitutional violations because "policies set by ASORT policymakers caused the members of the Cline/Fuller household not to immediately identify the intruders as police" and "[t]hese policies were the moving force behind the unreasonable seizure and excessive force in this case;" and because ASORT "has a policy of stopping the knock and announcement after [it] initially enter[s] a residence," which "violated the rights of the Plaintiffs that were upstairs, Ms. Cline, Ms. Smith, and the children." (Id. at 17-19).  Plaintiffs also appear to argue that ASORT is bound by the actions of its final policymakers — Defendants Combs, Mack, and Snavely — for the same reasons that those individual Defendants

allegedly bind Richland County and the Cities of Mansfield, Shelby, and Ontario.  (*See* id. at 40-41, 51).

ASORT argues that Plaintiffs have failed to make a sufficient showing that the alleged constitutional violations listed above occurred at all, and that it therefore cannot be held liable on those claims.  (*See e.g.*, doc. 109, brief in support, at 5, 10, 14, 16).  ASORT further argues that to the extent Plaintiffs were subjected to the execution of an invalid warrant — the second constitutional violation alleged above —  Plaintiffs have failed to show that ASORT or any of its members caused that particular constitutional violation — i.e., that ASORT and/or its members were responsible for ensuring that the warrant affidavit reflected probable cause to search 347 South Main. (Id. at 6-10).  ASORT also argues that Plaintiffs have failed to establish a *Monell* claim against it. In support of this argument, ASORT claims that Plaintiffs have failed to establish either that any policies of ASORT violated Plaintiffs' constitutional rights or that Defendant Mack was a final policymaker for ASORT, capable of binding the entity through his allegedly unconstitutional actions. (Id. at 20-22).

In part, the parties' arguments regarding ASORT's liability center around the theory of municipal liability pursuant to *Monell* and related cases.  (Id. at 30-34).  However, ASORT does not contend that it is a municipality — *see generally* doc. 71, 109 — and the court agrees that ASORT is not a municipality.  Thus, an immunity analysis under *Monell* does not apply to ASORT.

The court finds merit to ASORT's argument that it cannot be liable for Plaintiffs' claims of excessive force, unreasonable detention, and failure to knock and announce.  For the reasons explained above, the court has found that Plaintiffs have failed to establish that they were subjected either to excessive force in the execution of the search warrant, to an unreasonably long detention,

or to any constitutional violation stemming from Defendants' failure to knock and announce their presence to all occupants of the residence.  If no constitutional violation occurred, there can be no cause of action under Section 1983 against ASORT.  *See e.g.*, *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *see generally* 42 U.S.C. § 1983.  Thus, ASORT cannot be held liable for these alleged constitutional violations because Plaintiffs have failed to establish sufficiently that the violations in fact occurred.

However, the court has found that Plaintiffs effectively were subjected to a warrantless search by virtue of the fact that the affidavit lacked probable cause to search 347 South Main.  Because the warrantless search amounts to a constitutional violation, the court cannot declare that ASORT is not liable for the invalid warrant simply because no violation occurred, and Defendants have not supplied any authority under which immunity would apply to an entity such as ASORT.  Nevertheless, the court finds that ASORT cannot be held liable for the execution of the invalid warrant in this case.  Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, *subjects*, or *causes to be subjected*, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . .

42 U.S.C. § 1983 (emphasis added).  Plaintiffs have established sufficiently to withstand summary judgment that Snavely was responsible for the invalid warrant.  However, Snavely is not a member of ASORT — *see generally* doc. 87, Snavely Depo.; doc. 82, Mack Depo. — and Plaintiffs have failed to set forth any facts suggesting that either ASORT or any of its members bore responsibility for ensuring that the warrant affidavit reflected probable cause to search 347 South Main.  In the absence of any such evidence, the court cannot conclude that ASORT or any of its members

71

subjected or caused Plaintiffs to be subjected to a warrantless search within the meaning of Section 1983.  Therefore, ASORT should be entitled to summary judgment on Plaintiff's Section 1983 claims against it.

## VII.  STATE LAW CLAIMS

The remaining claims (spoliation, assault and battery, negligent infliction of emotional distress, and intentional infliction of emotional distress) are based on Ohio law.  (*See* doc. 40, Am. Compl., at ¶¶ 71-74).  Since the federal cause of action should be dismissed, the state causes of action should be dismissed for lack of jurisdiction.  *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966).  This principle may be raised *sua sponte* by the court.  See *Abramson v. Abramson*, 991 F.2d 799, 1993 WL 130193 at *4 (7th Cir. 1993) (TABLE, text in WESTLAW); *Norton v. Cobb*, 744 F.Supp. 798, 800-801 (N.D. Ohio 1990).

## VIII.  CONCLUSION

The court finds that ASORT is a "person" capable of being sued under Section 1983.  Thus ASORT's motion for summary judgment (doc. 70) should be DENIED on that basis.  However, for the reasons set forth above, the court finds that ASORT did not subject Plaintiffs or cause Plaintiffs to be subjected to the deprivation of any right, privilege or immunity secured by the constitution and that Plaintiffs' Section 1983 claims against ASORT are therefore meritless.  Accordingly, ASORT's motion for summary judgment (doc. 71) should be GRANTED on that basis.

The court finds that Plaintiffs have failed to demonstrate that Defendants Combs, Mack, Snavely, and Myers are final policymakers capable of attaching liability to the government entities involved in ASORT through their actions. Therefore, the motions for summary judgment (doc. 69, 71, 72, and 94) should be GRANTED on the issue of municipal liability.

Defendant police officers Alfrey, Combs, Mack, Bammann, Schmidt, Parella, Mager, Myers, and Snavely have asserted qualified immunity.  The court finds that Plaintiffs have failed to demonstrate that the first eight of these Defendants should be denied qualified immunity.  Therefore, the motions for summary judgment (doc. 69, 71, 72, 94) should be GRANTED on that issue as to Defendants Alfrey, Combs, Mack, Bammann, Schmidt, Parella, Mager, and Myers.  However, for the reasons set forth above, the court finds that Defendant Snavely is not entitled to qualified immunity.  Therefore, the Ontario Defendants' motion for summary judgment should be DENIED as to Defendant Snavely on the issue of qualified immunity.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date: May 20, 2009.


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of mailing of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *see also United States v. Walter*s, 638 F.2d 947 (6th Cir. 1981).