# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **MELANIE CLINE,** *et al.***,** | : | **Case No.  1:07-CV-1070** |
| **Plaintiffs,** | : | |
| | : | **JUDGE KATHLEEN O'MALLEY** |
| **v.** | : | |
| **CITY OF MANSFIELD,** *et al.***,** | : | **MEMORANDUM AND ORDER** |
| **Defendants.** | : | |

Before the Court is the Report and Recommendation (R&R) of Magistrate Judge Kenneth S. McHargh ("Judge McHargh").  (Doc. 113.)  In his R&R, Judge McHargh considers the Defendants' Motions for Summary Judgment (Docs. 69-72), as well as the Plaintiffs' Motion to Exclude the Defendants' Expert Testimony (Doc. 64).  He recommends that this Court grant in part and deny in part the Defendants' motions.  The Plaintiffs have filed a timely objection to this R&R (Doc. 122), as have the Defendants (Docs. 114-120), and the Court **SUSTAINS IN PART AND OVERRULES IN PART** those objections (Docs. 114-120, 122).

As explained more fully below, the Motion to Exclude Testimony (Doc. 64) is **MOOT**, the Motions for Summary Judgment brought by Jeff Alfrey, Jason Bammann, Lance Combs, John Mager, Frank Parella, and Ed Schmit (Docs. 69, 72, 94) are **GRANTED** as to those Defendants, the Motions for Summary Judgment brought by the municipal defendants (Docs. 69, 71, 72, 94) are **GRANTED** as to those Defendants, the Motion for Summary Judgment brought by ASORT as to its capacity for suit (Doc. 70) is **DENIED**, the Motion for Summary Judgment brought by ASORT as to the substantive claims against it (Doc. 71) is **GRANTED IN PART AND DENIED IN PART**, Riley Snavely's Motion for Summary Judgment (Doc. 94) is **DENIED** as to him, and the Motions for Summary

Judgment brought by all other Defendants (Docs. 71, 72, 94) are **GRANTED IN PART AND DENIED IN PART** as to those Defendants.

## I. BACKGROUND

This lawsuit arises under 18 U.S.C. § 1983 as well as state law.  The gravamen of the complaint is straightforward: the Plaintiffs assert that the Defendants violated their rights under the Fourth and Fourteenth Amendments of the constitution:

> The Defendants have, under color of law, deprived Plaintiffs of clearly established rights, privileges and immunities secured by the Fourth and Fourteenth Amendments to the United States Constitution of which a reasonable person would have known. These rights include, but are not limited to, the right to due process of law and the right to be free of unreasonable searches and seizures and excessive force.

(Doc. 40 ("FAC") at ¶ 70.)

The particulars of this litigation are more complicated.  The Plaintiffs' claims have led to hundreds of pages of briefing, thousands of pages of record evidence, and a 73-page R&R.  It is, therefore, helpful to provide a broad summary of the facts of the case at the outset, although it is ultimately a full understanding of the details that are necessary to a proper resolution of the pending motions.

This litigation flows from unsuccessful efforts by law enforcement officials to apprehend a man named Joseph Foster, who had entered a home in Ontario, brandished a gun, and stolen certain property from the residents.  (Doc. 87 ("Snavely Dep.") at 5:21-22; *see also* Doc. 103-6 ("Snavely Nar.").)[1] Among the law enforcement officials searching for Foster was Ontario Police Detective Riley Snavely, who was approached by a previously unknown individual who claimed that Foster was hiding in a house on a particular street in Mansfield – Burns Street.  (*See* Snavely Dep. at 13:17-18; 8:15-24.)

---

[1] Ontario is a city within Richland County, Ohio.  All of the cities referenced in this opinion are located within that county, with the exception of Detroit.

For reasons not clear from the record, Detective Snavely and his supervisor, then-Acting Chief Dale Myers, decided to apprehend Foster with the help of the Allied Special Operations Response Team ("ASORT"), an organization that provides local municipalities with SWAT teams for assistance with high-risk search warrants.[2]  (Doc. 85 ("Myers Dep.") at 9:24-10:5.)  The team sent by ASORT to execute the warrant on Burns Street was led by Shelby Police Sergeant David Mack.  (*See* Doc. 82 ("Mack Dep.") at 19:2 – 19:22)

After beginning surveillance on Burns Street, the confidential informant reported that Foster had moved to a different location, South Main Street.  (*See* Snavely Dep. at 14:5-11.)  Detective Snavely then drove past the South Main location with the informant, another individual who was familiar with Foster, and Mansfield Detective Ed Schmidt.  (*See* Snavely Dep. at 11:4-14.)  The informant apparently reported seeing Foster standing on the front porch, although no law enforcement official corroborated that sighting, nor did the search warrant application include any reference to this sighting.  (*See id.*; *see generally* Doc. 103-3 ("Search Warrant").)

Detective Snavely then appeared before a Magistrate, who signed a "knock-and-announce" search warrant listing South Main Street as the place to be searched, but containing facts relating only to Burns Street.  (*See* Search Warrant at 2,5-6.)  This discrepancy would have been apparent to anyone who glanced at page five of the document because the warrant prepared by Detective Snavely listed the factual basis for his belief that Foster was located on Burns Street on the same page that began to describe Foster's physical characteristics.  (*See id.*)

After the warrant issued, ASORT arrived at South Main Street to search for Foster.  (R&R at 2-3.)  As ASORT approached the house, ASORT Team Member and Ontario Patrolman John Mager prepared to throw a flash grenade inside the house, consistent with the operational plan.  (Doc. 83

---

[2] ASORT describes itself as a SWAT-like team, but it seems more accurate to refer to ASORT as an organization that *provides* SWAT-like teams.  This does not impact the legal analysis, however.

("Mager Dep.") at 15:15-16.)  For some reason, the flash grenade detonated outside of the house moments after ASORT team members had begun to call out "police."  (*See* R&R at 3.)  ASORT then entered the house.

The Plaintiffs allege that, while in the house, ASORT members used force on them in a variety of ways.  Plaintiff Thomas Willis reports that he was thrown to the floor during ASORT's entry, causing him to sprain his ankle.  (R&R at 4.)  Plaintiff Earl Fuller reports that he was placed in handcuffs, and that one of the law enforcement officials then put a foot on Fuller's back and a gun to Fuller's neck.  (*Id.* at 5.)  He further testifies that, although cuffed and suspected of no crime, he was kicked by Chief Myers after the conclusion of the search.  (*See* Fuller Dep. at 37:11-21.)  Plaintiff Kiana Smith reports that an officer held her at gun point, made her lift up her shirt and turn around to ensure that she didn't have any weapons, told Smith to get face down on the floor, and then kicked Smith once she was on the floor.  (*See* Doc. 86 ("Smith Dep.") at 35:3-41:20.)  Plaintiff Melanie Cline alleges that she was awakened by an "excruciating[ly] sharp pain running up [her] back and heavy pressure on top of [her] and [the feeling of] the barrel of a gun in the back of [her neck]."  (R&R at 6.)  She states that she was then placed in handcuffs and kept naked from the waist up while ASORT members searched her room.  (R&R at 6.)  There are also allegations concerning the use of force on two minor children, which the Court will discuss below.

Finally, the Plaintiffs assert that they were restrained for 25-30 minutes after the conclusion of the search, well past the point where the Defendants had determined that Foster was not present at their residence.  (*See* Doc. 86 ("Smith Dep.") at 50:6-19; R&R at 4-5.)  This description of the timeline is consistent with testimony from one of the Defendants (*see* Doc. 98 ("Parella Dep.") at 8:8-11), but disputed vigorously by others.  (*See, e.g.*, Myers Dep. at 24:1-23.)

Based on the above events, the Plaintiffs have asserted four discrete constitutional claims against the Defendants.  The Plaintiffs argue that the Defendants: (1) obtained and executed an invalid warrant;

(2) failed to "knock-and-announce" prior to commencing their search; (3) employed excessive force when executing the search; and (4) detained the Plaintiffs for a constitutionally unreasonable length of time after realizing that the Plaintiffs had not committed any crime.  (*See* Doc. 122 ("Plaintiffs' Obj.") at 1-2.)  The Plaintiffs also assert a number of claims arising under state law, which are discussed in more detail below.

## II.  STANDARD OF REVIEW

### A.  Summary Judgment

Defendants have moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  Under Rule 56(c), summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

 In reviewing summary judgment motions, this Court must view evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.  Thus, in most civil cases, the Court will decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict."  *Anderson*, 398 U.S. at 252.

Upon filing a motion for summary judgment, the moving party has the initial burden of establishing that there are no genuine issues of material fact as to an essential element of the non-moving party's claim.  *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citation omitted); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 & n.12 (6th Cir. 1989).  The moving

party, however, is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the moving party relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In response, if the moving party establishes the absence of a genuine issue of material fact, to defeat summary judgment, the non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (citation omitted).  In this regard, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment"; rather, "Rule 56 allocates that duty to the opponent of the motion, who is required to point out the evidence, albeit evidence that is already in the record, that creates an issue of fact."  *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379-80 (6th Cir. 2007) (citation omitted); *see also Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008) (citation omitted).  Moreover, the non-moving party must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87; *see also Barr v. Lafon*, 538 F.3d 554, 574 (6th Cir. 2008).

Accordingly, the ultimate inquiry is whether the record, as a whole, and upon viewing it in the light most favorable to the non-moving party, could lead a rational trier of fact to find in favor of the non-moving party.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87; *see also Anderson*, 477 U.S. at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict – whether there is

[evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." (emphasis in original) (internal quotations omitted)).

### B.  Report and Recommendation

On March 17, 2008, the Court referred this case to Judge McHargh for pretrial administration, pursuant to Title 28 of the United States Code, Section 636, and Local Rule 72.1.  In cases that are referred to a magistrate judge for preparation of an R&R, the district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *McClendon v. Challenge Fin. Investors Corp.*, No. 08-1189, 2009 U.S. Dist. LEXIS 17908, at *6-7 (N.D. Ohio Mar. 9, 2009) (quoting 28 U.S.C. § 636(b)(1)(C)).  A court is only required to conduct a *de novo* review of the portions of an R&R to which the parties have made an objection, and the parties have a "duty to pinpoint those portions of the magistrate's report that the district court must specially consider."  *Cincinnati Ins. Co. v. Grand Pointe, LLC*, 501 F. Supp. 2d 1145, 1153 (E.D. Tenn. 2007) (quoting *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. Ohio 1986)).  In the absence of specific objections, a court may adopt conclusions reached by the magistrate judge without discussion.  *See Thomas v. Arn*, 474 U.S. 140, 149-52, (1985); *Crum v. Sullivan*, 921 F.2d 642, 645 n.1 (6th Cir. 1990). While this principle is universal, it is particularly appropriate here, given that Judge McHargh issued a thoughtful 73-page R&R in response to many thousands of pages of briefing and exhibits.

### III. THE DEGREE TO WHICH THE COURT WILL REVIEW THE R&R

The Parties have filed various briefs in response to the R&R.  (*See* Docs. 114-120, 122.)  These briefs, however, are problematic: it is difficult to characterize much of what is in them as actually responding to the R&R.  At the most extreme end, for example, Defendant Riley Snavely does not even cite the R&R in briefing that he captions as "objections" to it.  (*See* Doc. 117.)  The Parties also attempt to incorporate their initial motions for summary judgment into their objections, essentially defeating the purpose of the referral in the first instance:

7

> If a party files a general objection and incorporates other papers by reference and that approach undermines the purposes of the Magistrate's Act, that party will have waived the right to appeal.  *Neuman v. Rivers*, 125 F. 3d 315 (6th Cir. 1997).  While a district judge plainly has authority to go back through the record to determine whether a report and recommendation[] should be adopted, that approach would undermine the purpose of the Magistrate's Act to provide assistance of subordinate judicial officers to Article III judges.  If an Article III judge must repeat the process in which the magistrate judge engaged, instead of being directed to specific objections, what use is the reference?

*Gonzales v. Wolfe*, No. 1:04cv208, 2006 U.S. Dist. LEXIS 73370, at *3-4 (S.D. Ohio July 5, 2006), *adopted*, 2006 U.S. Dist. LEXIS 69073 (S.D. Ohio, Sept. 26, 2006), *aff'd*, 290 Fed. Appx. 799 (6th Cir. 2008); *cf. Gonzales*, 290 Fed. Appx. at 814 (accepting the unremarkable argument that a district court, rather than a Magistrate Judge, must ultimately review properly raised objections).  Obviously, not every incorporation by reference will be inappropriate, but given the vastness of the record and the degree to which the parties in this case have sometimes argued about that record without actually citing to it, the parties have failed to preserve a number of potential objections.[3]

## IV. REQUIREMENTS FOR ESTABLISHING LIABILITY UNDER § 1983

All of the Plaintiffs' federal claims arise under 42 U.S.C. § 1983, which requires the Plaintiff to "establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law."  *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (citations omitted).  The Defendants in this action do not dispute that they acted under color of state law during any of the relevant events – accordingly, the question is simply whether the Plaintiffs suffered a depravation "of a right secured by the Constitution or laws of the United States" and were harmed thereby.  *Id.*  With respect to that question, not all unfair, unwise, or imprudent actions are constitutionally unreasonable.  *See Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001).  Law

---

[3] When the parties in this case do cite the record, they frequently do so without quotation or explanation.  The Plaintiffs, as well, compound this problem by placing their citations in footnotes so that it is not immediately apparent to which documents they are citing.  While these are never particularly strong choices, they are particularly troublesome here, given the sprawling nature of the record in this action.

enforcement officials are allowed "latitude for honest mistakes," even when those mistakes are difficult to understand with the benefit of hindsight.  *See Maryland v. Garrison*, 480 U.S. 79, 87 (1987). Nevertheless, each and every citizen has meaningful constitutional rights that law enforcement officials may not violate.  *See Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004).  These rights are not lessened merely because law enforcement officials elect to execute a search warrant with a SWAT team.  *Holland v. Harrington*, 268 F.3d 1179, 1194-95 (10th Cir. 2001) ("At all times, SWAT officers no less than others . . . must keep it clearly in mind that we are not at war with our own people."); (*contra* Doc. 76 ("Bammann Dep.") at 61:12-62:9 ("If I'm at your house in a SWAT capacity we're not dealing with a normal law-abiding citizen I would say at that point.").)

If the Plaintiffs can show such a violation, they must then establish the propriety of recovery from any particular party.  *See Petty v. County of Franklin, Ohio*, 478 F.3d 341, 349 (6th Cir. 2007). Although this analysis begins with the familiar requirement that a specific defendant proximately caused the constitutional deprivation, establishing proximate cause within the context of § 1983 is sometimes quite "murky."  *Wright v. City of Canton*, 138 F. Supp. 2d 955, 965 (N.D. Ohio 2001).  So, too, even when an individual law enforcement official has proximately caused the deprivation of a constitutional right, that official will not be held liable unless that right was "clearly established" and that official has caused the deprivation in an "objectively unreasonable manner."  *See Champion*, 380 F.3d at 901.

### A.  Individual Liability

While lawsuits under § 1983 frequently provide "the only realistic avenue for vindication of constitutional guarantees," *Champion*, 380 F.3d at 901 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982)), those lawsuits also impose a cost on society, "including 'the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office.'"  *Id.*  It has long been recognized that officials cannot perform their jobs safely or effectively if their every split-second decision is analyzed with knowledge gained only through

hindsight. *See Kostrzewa*, 247 F.3d at 639 (citing *Graham v. Connor*, 490 U.S. 386 (1989)). Actions taken by law enforcement officials that appear unreasonable to a court weighing those actions over a period of months were not necessarily unreasonable when made in a matter of seconds under life-threatening pressure. *See id*. The doctrine of qualified immunity provides a balance: it holds that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Champion*, 380 F.3d at 901.

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court established a two-prong test for evaluating the claim of qualified immunity. First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201. Second, "if a violation could be made out on a favorable view of the parties' submissions, the next . . . step is to ask whether the right was clearly established." *Id.* A motion for summary judgment on qualified immunity grounds must be granted unless the plaintiff can satisfy both prongs of the *Saucier* test.[4] A court is not required to address the first question if it is evident that, even if a right was

---

[4] Various panels of the Sixth Circuit have broken the two-prong Saucier test for qualified immunity into three-prongs:

> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence "to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights."

*Champion*, 380 F.3d at 901 (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)). The first two prongs of this test, of course, mirror the two prongs of *Saucier*. The third prong explicitly examines the reasonableness requirement that other courts find implicit in *Saucier*. *See Sample v. Bailey*, 409 F.3d 689, 696 n.3 (6th Cir. 2005). Some Sixth Circuit panels have held, however, that the three-prong approach is unnecessary in most cases, because "[i]n many factual contexts . . . the fact that a right is 'clearly established' sufficiently implies that its violation is objectively unreasonable." *Causey v. City of Bay City*, 442 F.3d 524, 528 n.2 (6th Cir. 2006).

This Court believes the two-prong approach to be particularly appropriate in cases, such as this one, in which neither party addresses the three-prong approach in briefing.

violated, that right was not clearly established at the time of the violation.  *See Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

The idea captured by the second prong of *Saucier* is that "an official could not . . . fairly be said to 'know' that the law forbade conduct not previously identified as unlawful."  *Harlow*, 457 U.S. at 818. For this reason, plaintiffs bringing suit under § 1983 must show that "in the light of pre-existing law," a reasonable officer would have understood that the actions for which he now faces suit were unlawful. *Champion*, 380 F.3d at 902.[5]  This inquiry must be undertaken with respect to the specific situation that an individual defendant faced.  *See id*.  It is not enough, for example, to show that an officer's use of force exceeded the objective standard for reasonable force under *Graham*, rather, a plaintiff must show that any reasonable officer would have understood that the particular force he was using in that particular situation was excessive.  *See id*.  The Supreme Court and the Sixth Circuit have, however, rejected the contention that a right is only clearly established if the plaintiff can demonstrate the existence of a "fundamentally similar" or "materially similar" case.  *Grawey v. Drury*, 567 F.3d 02, 313-14 (6th Cir. 2009) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).  They have explained:

> the question is whether the defendants had fair warning that their actions were unconstitutional.  Thus, officials can still be on notice that their conduct violates established law even in novel factual circumstances.  The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

*Id.* (citations and quotation markings omitted); *see also Champion*, 380 F.3d at 902 ("[T]he fact that various courts have 'not agreed on one verbal formulation of the controlling standard' does not by itself entitle an officer to qualified immunity." (quoting *Saucier*, 533 U.S. at 203)).  Because the focus is on

---

[5] To determine whether a right is clearly established, this Court must consider the decisions of the Supreme Court, followed by the decisions of this Circuit, followed by the decisions of other district courts within this Circuit, and finally the decisions of other circuits.  *Champion*, 380 F.3d at  902.

whether the officer had fair notice that his conduct was lawful, reasonableness is judged against the backdrop of the law at the time of the conduct.

### B.  Municipal Liability

When plaintiffs seek to recover from a municipality, there is no requirement that a particular right be "clearly established," but the plaintiffs must show that the municipality itself was the proximate cause of any deprivation.  *See Collins v. City of Harker Heights*, 503 U.S. 115, 122, (1992); *Ford v. County of Grand Traverse*, 535 F.3d 483, 495-96 (6th Cir. 2008).  There is no vicarious liability under § 1983 for the alleged torts of a municipality's agents, rather:

> It is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government entity is responsible under § 1983.

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *see also Board of County Comm'rs v. Brown*, 520 U.S. 397, 405 (1997) ("Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.") (citation omitted).  Simply put, to impose § 1983 liability upon a local governmental body, a plaintiff must show that the municipality itself is the wrongdoer.  *Collins v. City of Harker Heights*, 503 U.S. 115, 122, (1992).[6]

A plaintiff can establish that a municipality is the proximate cause of a violation under any of five theories: (1) express municipal policy, *Monell*, 436 U.S. at 660-61, (2) "widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage' with the force of law," *City of St. Louis v. Praprotnick*, 485 U.S. 112,

---

[6] This rule applies equally to private organizations that provide law enforcement: the Plaintiffs need not show that the right of which they were deprived was "clearly established," but they must demonstrate that the organization itself proximately caused any violation.  *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999) (collecting cases); *Street v. Corrections Corp. of Am.*, 102 F.3d 810, 817-18 (6th Cir. 1996).

127 (1988) (quotation omitted), (3) the decision of a person with final policy making authority, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-83 (1986), (4) the failure to act where the "inadequacy [of the existing practice is] so likely to result in the violation of constitutional rights, that the policymaker . . . can reasonably be said to have been deliberately indifferent to the [plaintiff's rights]," *City of Canton v. Harris*, 489 U.S. 378, 390 (1989),[7] or (5) ratification by a municipality of its employee's unconstitutional acts by failing to meaningfully investigate and punish allegations of unconstitutional conduct, *Fuller v. City of Oakland*, 47 F.3d 1522, 1535 (9th Cir. 1995); *see also Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1247 (6th Cir. 1989); *Wright*, 138 F. Supp. 2d at 966 ("[Plaintiff] can establish his municipal liability claim by showing . . . [that] a final municipal policymaker approved an investigation . . . that was so inadequate as to constitute a ratification of their alleged use of excessive force.").

## V.  THE LEGAL STATUS OF ASORT

Prior to considering the substantive merits of the Plaintiffs' claims, this Court must consider whether one of the Defendants, ASORT, is subject to suit at all.  ASORT asserts that it is immune from suit under the same principles that immunize municipal police departments, whereas the Plaintiffs assert, and Judge McHargh found, that "ASORT is an unincorporated association which is amenable to suit under federal law."  (R&R at 25.)  The Court analyzes this issue somewhat differently than either the Plaintiffs or the Defendants suggest, but ultimately adopts Judge McHargh's recommendation as to ASORT's legal status.

### A.  The Structure and Scope of ASORT

---

[7] This category includes deliberately indifferent training or supervision, *Canton*, 489 U.S. at 390; *see also Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006), deliberately indifferent hiring, *Brown*, 520 U.S. at 410-11; *see also Doe v. Magoffin County Fiscal Court*, 174 Fed. Appx. 962, 967 (6th Cir. 2006), and deliberately indifferent failure to adopt policies necessary to prevent constitutional violations, *Conn v. City of Reno*, 572 F.3d 1047, 1064 (9th Cir. 2009); *see also Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir. 1992).

ASORT was formed by a private entity, the Richland County Chiefs of Police Association (RCCPA).  (R&R at 14-15.)[8]  ASORT's designated 30(b)(6) deponent explained that the RCCPA:

> meet[s] every Wednesday morning at 7:30 basically for breakfast and just [to] have general discussion about what is going on in the community.  We probably are more of a social organization than anything.

(Doc. 84 ("Messer Dep.") at 20:11-20) (emphasis added).  This "social organization" sets at least some aspects of ASORT policy.  (*See* Doc. 78 ("Combs Dep.") 22:14–15 ("The [RCCPA] really makes decisions concerning personnel and/or training.").  Although ASORT has been represented by counsel throughout this litigation, that counsel does not appear to know how he came to be retained.  (*See* 9/24/09 Hrg. Tr. at 9:23 – 10:15.)[9]

---

[8] The ASORT manual refers to the Richland County Association of Chiefs of Police, which it abbreviates "RCACP."  (*Rush*, *et al*. v. *City of Mansfield*, *et al*., Case No. 07-1068 (Doc. 169-5) (N.D. Ohio) at 9).  The Court gathers from the record evidence that the "RCACP" referenced in the ASORT manual is the same as the "RCCPA" referenced by the Defendants in depositions.  For consistency, the Court will refer to this organization as the "RCCPA" throughout this opinion, even when referencing the ASORT manual.

[9] The Court's exchange with counsel on this point follows:

| THE COURT: | Okay.  Let me ask you, who retained you to act on behalf of ASORT? Who is your client? |
| COUNSEL: | Well, the client would be the home departments ultimately that we represent, but – |
| THE COURT: | Do you have a representation agreement with every home department that's been sued?  Is that how you represent ASORT? |
| COUNSEL: | I don't believe so, Your Honor.  I can't specifically answer that question here today. |
| THE COURT: | You don't know who your client is? |
| COUNSEL: | Well, I understood who my clients were as far as the municipalities, the officers involved, but my understanding was there was an agreement that we would represent ASORT in this matter through our representation of those municipalities. |
| THE COURT: | All right.  But you don't know if you actually represent the municipalities? |
| COUNSEL: | Oh, I represent the City of Lexington and the City of Shelby. |

. . . .

14

The Commander of ASORT reports to the RCCPA.  (*Rush*, *et al.* v. *City of Mansfield*, *et al.*, Case No. 07-1068 (N.D. Ohio) (Doc. 169-5) ("ASORT Manual") at 9.)[10]  The ASORT Commander at the time of the events in question, Lance Combs, testified, however, that he has never actually attended an "official" RCCPA meeting.  (Combs Dep. at 24:16–17 ("I've had to attend Chiefs' breakfasts as opposed to really official Chiefs' meetings.").)  Indeed, Commander Combs testified that he does not know how it is he became the Commander of ASORT:

> QUESTION:  And how did you get selected as the commander?
>
> ANSWER:    My guess is that the [RCCPA] made that selection.  I wasn't privy to the selection process.
>
> QUESTION:  Did you apply for it?
>
> ANSWER:    No.

(Combs Dep. at 21:5-11.)  In sum, then, ASORT, which provides SWAT-type teams to area municipalities, was formed by a private social organization and is governed to some extent by that private social organization.  This is a marked departure from the usual structure for multijurisdictional law enforcement agencies or teams.  *See, e.g., Petty v. United States*, 80 Fed. Appx. 986, 987 (6th Cir. 2003) (describing "a multi-jurisdictional task force directed by the Federal Bureau of Investigation . . . ."); ED WITTENBERG, EUCLID, SHAKER HEIGHTS, SOUTH EUCLID, UNIVERSITY HEIGHTS EYE JOINT SWAT TEAM (April 8, 2010, available on-line at http://www.cleveland.com) ("The councils of all four

| THE COURT: | So is it Shelby and Lexington that is paying for you to represent ASORT? |
|---|---|
| COUNSEL: | I think ultimately it comes through an insurance defense agreement through an insurance carrier. |
| THE COURT: | Does ASORT have independent insurance? |
| . . . . | |
| COUNSEL: | I'm not exactly sure, Your Honor. |

(9/24/09 Hrg. Tr. at 9:23-11:9.)

[10] ASORT Team Members report to their ASORT Team Leaders, who in turn report to the ASORT Commander.  (ASORT Manual at 9.)

cities will need to approve legislation . . . for the plan [forming a regional SWAT team] to take effect."); TRENTON, OHIO COUNCIL MEETING MINUTES (January 15, 2009) ("An Ordinance Authorizing the City Manager of the City of Trenton, Ohio to Enter Into a Memorandum of Understanding for Regional S.W.A.T. Team . . . ." (capitalization changed throughout)).

Membership in ASORT is voluntary, but limited to law enforcement officials from the various police departments in Richland County. While ASORT itself is regulated by the RCCPA, the members of ASORT are subject to a variety of benefits and restrictions that are specific to their "home" police departments. Each municipality in Richland County has agreed to fund the cost of training and equipment for any one of their law enforcement officials that joins ASORT. (*Id*. at 15-16; Messer Dep. at 20:12-23:8.)[11] ASORT members, as well, are governed by both ASORT policies and the policies of their home law enforcement agencies when on ASORT assignment. (Combs Dep. at 54:24-55:2.) Finally, ASORT asserts that home departments are responsible for discipline of their members (R&R at 15), although record indicates that no home department has ever disciplined a member of ASORT for actions taken when deployed by ASORT.[12]

If ASORT members are bound in scope by certain requirements of their home departments, ASORT itself is not. ASORT may choose to accept or reject requests for assistance from any of the area municipalities. (Combs Dep. at 91:16-17 ("The [ASORT] team leader has the authority to accept or deny [a] mission.").) So, too, ASORT may enter a municipality even when no official from that

---

[11] Each municipality determines how many ASORT Team Members it can afford to fund, which sets a limit on how many law enforcement officials from a given municipality may volunteer to join ASORT.

[12] ASORT argues that individual departments are responsible for the training of their own members (R&R at 15), but this assertion conflicts with testimony from ASORT Commander Combs (Combs Dep. at 22:18-19 ("[W]hen it came time for decision-making, that authority, especially for training, the authority rested with me.")). For purposes of summary judgment, then, the Court assumes that ASORT training is provided through ASORT itself.

municipality has requested their help directly and even without notice to any official in that municipality.  (*See* 9/24/09 Hrg. Tr. at 48:21 – 49:8.)

**B.  The Parties' Arguments**

ASORT argues that it is not subject to suit because it is a "government unit."  ASORT asserts that it:

> is a statutorily authorized cooperative between municipalities, specifically assembled for the purposes of furthering law enforcement.  Were [ASORT] simply a police unit of a single municipality, the police unit would not have capacity to be sued, and Plaintiffs' claims would be treated as against the municipality.  Indeed, the Magistrate Judge implied that if the incident in question involved an impromptu, collective response from various police departments, there would be not capacity to sue the collective.  [ASORT's] cooperative configuration does not present a situation so different as to apply Fed.R.Civ.P. 17(b) where it would not normally be applied to governmental units.

(Doc. 114 ("ASORT Obj.") at 3) (citations omitted) (emphasis added).  ASORT, however, is not part of any underlined municipality, which raises the question as to whom, if anyone, ASORT believes is subject to suit if an ASORT policy (as distinct from home department policies) proximately causes the deprivation of a constitutional right.

ASORT adopted a somewhat cryptic stance when confronted with that question:

> THE COURT:  Okay.  If in fact I find that a constitutional violation occurred, so say hypothetically Mansfield calls out ASORT for a search in Mansfield and I find that members of the ASORT team, not necessarily Mansfield officers, but members of the ASORT team engaged in conduct that would constitute a constitutional violation . . . is then Mansfield [potentially] liable for their activities because they have called them in and therefore deputized them for purposes of their own governmental activity, or do you believe that each entity that sent someone there is responsible for their activities, or is nobody responsible for their activities?
>
> ASORT COUNSEL:  Well, Your Honor, we would argue that it is the home department municipality that is ultimately bearing the responsibility for the officers.  It is a collective group of those police departments and those municipalities, and we would consider that they are dictated by their own policies.  Therefore, if the officer from a specific home department acts outside the scope of those policies or creates a constitutional violation through his actions, that home department municipality employer would be the entity that is actually capable of being sued.

. . . .

| | |
|---|---|
| THE COURT: | All right.  So you don't believe in the hypothetical that I have posed that Mansfield would have any responsibility for calling out these members, other than for the activities of its own officers, if they happen to even be on the team? |
| ASORT COUNSEL: | That's correct, Your Honor  I would propose to you that again, the ASORT team members are voluntarily signing up to be part of this, and each collective home department allows them to volunteer for that purpose.  Based upon that, I guess, volunteering of the officers, the home department policy still dictates . . . . |

(9/24/09 Hrg. Tr. at 4:9-6:4) (emphasis added).

ASORT seems to argue that it does not truly have its own policies when it contends that ASORT "would consider [team members' actions to be] dictated by their" home department policies.  But there is substantial testimony and evidence indicating that ASORT *does* have its own policies, for example, there is an ASORT manual that contains policies (*See Rush*, *et al*. v. *City of Mansfield*, *et al*., Case No. 07-1068 (Doc. 169-5) ("ASORT Manual"), Commander Combs testified that he is responsible for ASORT training (Combs Dep. at 22:18-19), and ASORT counsel argued that the RCCPA is responsible for ASORT training (4/9/09 Hrg. Tr. at 44:5-8 ("THE COURT: So this social organization [the RCCPA], as you call it, sets the standards for the training?  COUNSEL:  Correct.  And it is actually in the ASORT policy manual."); *contra Eversole v. Steele*, 59 F.3d 710, 717 (7th Cir. 1995) ("Because the Task Force was nothing more than a joint effort of four counties in the State of Indiana to implement existing law enforcement policies, no new or unique policies were needed.").  ASORT, then, does not provide a plausible argument as to what entity it believes is subject to suit if one of ASORT's policies leads to a constitutional violation.[13]

---

[13] The Court has considered the possibility that a home department should be understood to "adopt" ASORT policies whenever its officers are deployed by ASORT.  The municipal defendants specifically declaim that they have designated any policymaking authority to ASORT, however.  (*See* Doc. 72-1 ("Mansfield MSJ") at 35 ("[T]here is no showing a final policymaker of Mansfield directed any of the actions on the raid that night . . . .").)

The Plaintiffs dispute the Defendants' characterization of ASORT and contend that Judge McHargh was correct to conclude that ASORT is subject to suit as an unincorporated association.  *See* Fed. R. Civ. P. 17(b)(3)(A) ("[A] partnership or other unincorporated association with no such capacity under that state's law may sue or be sued in its common name to enforce a substantive right existing under the United States Constitution or laws."); (*see also* R&R at 11.)  The Plaintiffs offer a number of reasons in support of this assertion, most straightforwardly that ASORT cannot be said to be a part of any particular municipal or state agency and that ASORT must be *something*.  (*Cf.* R&R at 14 ("ASORT does not contend that it is a subdivision of a governmental agency or that it is itself a police department.").)

### A.  Analysis

The implication that follows from ASORT's arguments – that the Plaintiffs have no recourse if ASORT's policies and procedures have proximately caused the deprivation of their constitutional rights – is a radical one.  ASORT's attempt to minimize this contention by way of analogy to a municipal police department misses the point.  A suit against that police department is simply a suit against the municipality, because a tort "by the police department" is actually a tort by the municipality.  In contrast, ASORT appears to contend that citizens who are subjected to a tort "by ASORT" have no identifiable recourse.

The Defendants' contention is particularly troubling because ASORT was formed by a private organization.  The suggestion that a private social organization could form a SWAT-type team that would be immune from suit certainly goes against the original intent behind § 1983, which was enacted to allow recourse against a private "law enforcement" entity whose policies, practices, and procedures deprived citizens of their civil rights.  *See Gay-Straight Alliance v. Sch. Bd.*, 477 F. Supp. 2d 1246, 1250 (S.D. Fla. 2007) (discussing the history of § 1983); *cf. Romanski v. Detroit Entm't, L.L.C.*, 428 F.3d 629, 637 (6th Cir. 2005) ("[W]hen the state delegates a power traditionally reserved to it alone - the police

power - to private actors in order that they may provide police services to institutions that need it, a plaintiff's ability to claim relief under § 1983 [for abuses of that power] should be unaffected.'" (citations omitted)).[14]

ASORT's claim that it is not subject to suit as an "unincorporated association" because it is a "government unit" is based upon a mistaken understanding of Rule 17 and is not well-taken: ASORT is governed by a private entity, and it appears that no municipality exercises any control over ASORT or its activities.  ASORT meets the definition of an unincorporated association under Rule 17(b)(3)(A) and is subject to suit as such.  So, too, although ASORT contends various forms of immunity under Ohio law, no provision of state law alters this conclusion.[15]  The Court explains this analysis below.

### 1.  Whether ASORT is a "Government Unit"

As previously explained, ASORT contends that it is not subject to suit because it is a "government unit."  (ASORT Obj. at 2 (quoting *Dean v. Barber*, 951 F.2d 1210, 1215 n.4 (11th Cir. 1992).)  To evaluate this contention, the Court must begin by considering the meaning of the term "government unit."  It is not found within the Federal Rules, but is, rather, a term employed by the Eleventh Circuit to explain that a state or municipal entity otherwise not amendable to suit is not made subject to suit in that circuit through the operation of Rule 17(b)(3)(A).  *See id*.  In particular, the Eleventh Circuit has reasoned that only private parties can be unincorporated associations within the meaning of Rule 17(b)(3)(A).  *See Dean*, 951 F.2d at 1215 n4; *but see North Carolina League of Municipalities v. Clarendon Nat'l Ins. Co.*, 733 F. Supp. 1009 (E.D.N.C. 1990) ("Plaintiff . . . is an unincorporated association of various units of local government within North Carolina . . . .").

---

[14] The Court does not intend to imply any other similarity between ASORT and the organization that led to the passage of § 1983.

[15] To be precise, as explained below, *either* ASORT is subject to suit under Rule 17(b)(3) because it is subject to suit under Ohio law *or* ASORT is subject to suit under Rule 17(b)(3)(A) because it is not.

The problem for ASORT, even assuming that the Sixth Circuit would follow the Eleventh on this issue, is that ASORT is not a "government unit[], subdivision[,] or agenc[y]." ASORT is governed by a *private* organization, and, to the extent there is evidence in the record that the leader of ASORT reports to any authority higher than himself for purposes of setting ASORT's policy, practices, or procedures, that authority is vested in this same *private* organization. This alone would seem to establish that ASORT is not a "government unit[], subdivision[,] or agenc[y]."

Although ASORT points this Court to an Ohio statute that allows municipalities to form multijurisdictional police task forces, that statute does not somehow transform ASORT into a unit of government. The relevant statute, which authorizes municipalities to "allow [their] police officers to work in multijurisdictional . . . task forces," provides in full:

> The legislative authority of any municipal corporation, in order to obtain police protection or to obtain additional police protection, or to allow its police officers to work in multijurisdictional drug, gang, or career criminal task forces . . . may enter into contracts . . . for services of police departments or the use of police equipment or for the interchange of services of police departments or police equipment within the several territories of the contracting subdivisions.

O.R.C. § 737.04. This statute does not address the public or private character of the tasks forces themselves, however. The agreement between the municipal defendants in this case, conspicuously absent from ASORT's briefing, emphasizes this:

> [T]he law enforcement agencies of Richland County agree to be called upon to send available units to assist in emergency calls for service in the other Richland County law enforcement jurisdictions, and all law enforcement agencies request immediate assistance through 911/ or Mansfield, Shelby, Ontario, and Lexington dispatch if any dispatching agency is unable to reach the affected agency's contact points. In the event an agency receives an emergency call for service for another agency's jurisdiction and can't reach the agency's contact point, that agency shall notify the closest unit(s) available to respond to the emergency call for service. The dispatching agency shall continue to try to contact the affected agency jurisdiction until that agency is notified and responds and/or handles all follow-up investigation.

> All law enforcement agencies of Richland County also agree to send specialized unit [sic], (e.g., <u>Allied Special Response Team members</u>, K-9 Officers, Dive Team members) when available, to assist with emergency calls for service. Agencies may call for mutual aid for other calls as agreed upon at the time of calls.

(Doc. 103-3 at 1) (emphasis added).  While this agreement provides that the various municipalities in Richland County will allow members of ASORT to participate in ASORT when called, it does not describe the creation of a joint task force within the meaning of § 737.04 and does not describe ASORT as a unit of government.[16]

ASORT also seems to argue that it is a government entity because it is performing a traditional municipal function, but this is exactly wrong: that ASORT is performing a traditional municipal function is what makes it *subject* to suit under § 1983, not what makes it *immune* from it.  *See Romanski*, 428 F.3d at 637 ("[W]hen the state delegates a power traditionally reserved to it alone - the police power - to private actors in order that they may provide police services to institutions that need it, a plaintiff's ability to claim relief under § 1983 [for abuses of that power] should be unaffected.'" (citations omitted)).  It is true, of course, that the members of ASORT are themselves public officials who receive their equipment and salaries from local municipalities, but this does not automatically make ASORT a part of those municipalities.  As the Eighth Circuit explained in an analogous context:

> the [defendant entity] was not created by the Constitution or by any statute . . . and . . . it is not 'the State' or an 'agency of the State' as are agencies like the . . . Highway Department, or the . . . Game & Fish Commission . . . .  Rather, the [defendant is] established and supported by local school systems . . . on a voluntary basis.  Thus, it is not immune from suit.

---

[16] If contracting municipalities *had* formed a public task force, the contracting municipalities would presumably be exposed to liability to the extent they have "contracted" for the use of personnel or equipment within their jurisdiction – i.e., the task force members would become contract employees of the jurisdiction or jurisdictions seeking their services.  Precisely which municipality or municipalities would be subject to liability if such a task force proximately caused the deprivation of a constitutional right is an important question, but one that is reserved for another case.

22

*Wright v. Arkansas Activities Ass'n*, 501 F.2d 25, 27 (8th Cir. 1974) (quoting the district court)).  This same distinction applies here: that ASORT is supported by municipalities does not make it a part of those municipalities.[17]

In sum, the Court concludes that, because ASORT is formed and governed by a private organization, it is not a government unit, subdivision, or agency.  Whatever the reach of the Eleventh Circuit's reasoning in *Dean,* it does not extend to an entity such as ASORT, which is not part of a state, municipality, or group of municipalities.

### 2.  Whether ASORT is an Unincorporated Association Under Rule 17(b)(3)(A)

Given that ASORT is not a government unit, the Court must still define what, precisely, it might be.  The Plaintiffs suggest, and the R&R found, that ASORT is an "unincorporated association" under Rule 17(b)(3)(A).  This Court agrees.

Although the term "unincorporated association" is not defined in the Federal Rules, the "Supreme Court has defined an unincorporated association as 'a body of persons united without a charter, but upon the methods and forms used by incorporated bodies for the prosecution of some common enterprise.'" *Hazel v. Beta Omicron Chptr. of Sigma Nu Fraternity House Corp.*, Case No. 4:08cv46, 2009 U.S. Dist. LEXIS 19878, at *6-7 (E.D. Tenn. Mar. 12, 2009) (citations omitted).  It has been said that "voluntary and knowing membership is the hallmark of" such an association.  *Boynton v. Headwaters, Inc.*, 252 F.R.D. 397, 401 (W.D. Tenn. 2008).

As Judge McHargh explained, this definition is apt here:

> In the case before this court, the formation and purpose of ASORT, and the structure and composition of ASORT and its teams, was not "left to chance."  A structure and manual were put into place to govern the composition and procedures of ASORT and its teams.  Similarly, the decision to deploy ASORT to serve the search warrant, and the

---

[17] Similarly, that ASORT members are guided by certain municipal policies even when performing a mission for ASORT, does not make ASORT itself in some way governed by municipalities.  The record seems to indicate the opposite: ASORT operates in a manner that appears fully autonomous from any official municipal supervision whatsoever.

> composition, role, and procedures of the ASORT team which served the warrant were not random events, but deliberate choices, guided by ASORT policies.  The ASORT team which served the warrant was a pre-existing group (with two additions from the other ASORT team), organized in advance for the very purpose of serving warrants, not a random group of police officers from different jurisdictions spontaneously composed for mutual assistance, for example, to respond to an unexpected disaster or riot.

(R&R at 24) (internal citations omitted).  ASORT itself notes that it "was formed by [a private entity] in order to respond to tactical operations and high risk situations" and that membership in ASORT "is purely voluntary."  (Doc. 70-1 ("ASORT MSJ") at 1.)  In other words, ASORT is "a body of persons united without a charter," each of whom is a "voluntary and knowing" member.  *See Boynton*, 252 F.R.D. at 401.[18]  Indeed, ASORT all but concedes that it meets this definition: it simply argues that it should be considered a government unit and that government units are by definition not unincorporated associations.[19]  As discussed above, ASORT is not a government unit and there are no grounds to concluded that it is; ASORT, rather, is an unincorporated association.[20]

---

[18] ASORT argues "that if the incident in question involved an impromptu, collective response from various police departments, there would be no capacity to sue the collective [, and ASORT's] cooperative configuration does not present a situation so different as to apply Fed.R.Civ.P. 17(b)."  (Doc. 114 ("ASORT Obj.") at 3.)  This is incorrect.  First, it is difficult to see how any ad hoc group could ever be subject to suit under Rule 17(b)(3)(A), because "voluntary and knowing membership is the hallmark of an unincorporated association."  *Boynton*, 252 F.R.D. at 401.  Second, such a group would have been formed by municipalities, not a private organization.  Finally, at least some of the municipalities in such a hypothetical would be liable to the extent that the policies of those municipalities or that task force proximately caused a constitutional violation.  *See Neace v. Perry Twp.*, No. 04cv545, 2006 U.S. Dist. LEXIS 65678, at *32-33 (N.D. Ohio Sept. 14, 2006).

[19] This Court adopts, as well, Judge McHargh's well-reasoned departure from those cases holding that intergovernmental task forces may only be sued when there is some specific grant of statutory authority from the relevant state.  *Contra Harris v. City of Hammond*, Case No. 07-3890, 2008 U.S. Dist. LEXIS 110881, at *7 (E.D. La. Sept. 30, 2008) ("[T]here are several cases relating to intergovernmental drug task forces, which stand for the general proposition that a plaintiff must point to some grant of statutory authority to show that such task forces may be sued." (collecting cases)).  Although the disposition of those cases may well have been correct on the facts presented there, to the extent that those cases could be read to create an exception to Rule 17(b)(3)(A) whenever an entity refers to itself as an intergovernmental task force, regardless of the underlying characteristics of that entity, such a reading is unsupportable.

[20] ASORT does not dispute that unincorporated associations are amenable to suit under § 1983 when they engage in state action.  *See Jund v. Hempstead*, 941 F.2d 1271, 1279 (2d Cir. 1991) ("The Supreme Court has repeatedly recognized that unincorporated associations may be held liable . . . . [w]e

### 3.   Ohio Law Does Not Immunize ASORT from Suit in Federal Court

ASORT contends that, if it is an unincorporated association, Ohio law acts to immunize ASORT from suit.  While Ohio law allows suits against unincorporated associations, *see* O.R.C. §1745,  ASORT contends that it is impermissible to sue both an unincorporated association and its members under that law.[21]  There are three reasons why this argument is not well-taken.  First, state procedural law ordinarily does not govern the right to sue in federal court.  *Solectron United States, Inc. v. FedEx Ground Package Sys.*, 520 F. Supp. 2d 904, 910 (W.D. Tenn. 2007) ("[T]he right to sue in federal court is different from the right to sue in state court, and the [right to sue in federal court] is governed by federal [procedural law] rather than state law." (quoting *Long v. Richardson*, 525 F.2d 74, 79 (6th Cir. 1975))).  Even if the courts of Ohio were to force state litigants to choose between suits against an unincorporated association and its members in all cases, it is not clear that such a rule would have any force in federal court.

Second, it does not appear that Ohio procedural law bars a plaintiff from bringing suit against both an unincorporated association and its members as ASORT contends.  The statute itself certainly contains no such express limitation.  It is unlikely, moreover, that the dicta in the 1961 Ohio Supreme Court case upon which ASORT relies for this proposition, *Lyons v. American Legion Post Realty Co.*, could override the plain reading of the statute.  The question before the court in *Lyons* was whether O.R.C. § 1745.01 abrogated the right to sue individual members of an unincorporated association, a question that court answered in the negative: "[w]e think the new statutes are no more than cumulative and do not abrogate the right to sue the members of the associations if the suitor chooses to proceed in

---

find no barrier to application of [that] reasoning . . . in the context of a section 1983 claim."); *see also Mark v. Borough of Hatboro*, 51 F.3d 1137, 1144 (3d Cir. 1995) (collecting cases in which volunteer fire associations, some of which are unincorporated, have been held liable under § 1983 when they act under color of law).

[21] ASORT contends that the definition of "unincorporated association" in O.R.C. § 1745 mirrors that of "unincorporated association" in Rule 17(b)(3)(A).  (Doc. 108 at 4.)  The Court assumes, without deciding, that this is correct.

that way." *Lyons v. American Legion Post Realty Co.*, 175 N.E.2d 733, 736 (Ohio 1961). The 1961 court also wrote, however, that "[w]here a statute gives a new remedy without impairing or denying one already known to the law, the rule is, to consider it as cumulative, allowing either the new <u>or</u> the old remedy to be pursued at the option of the party seeking redress." *Id.* at 735 (emphasis added) (quotation marks and citation omitted). There was no particular reason for the *Lyons* court to consider the question of whether the remedies where mutually exclusive, however, since the unincorporated association was not a named defendant in that case. It does not seem, moreover, that any court has ever read the *Lyons* dicta as does ASORT. Subsequent Ohio courts, in fact, have allowed plaintiffs to sue both an unincorporated association and its members. *See East Canton Educ. Ass'n v. McIntosh*, Case No. 96-CA-0293, 1997 Ohio App. LEXIS 3957, at *37 (Ohio Ct. App. Aug. 18, 1997); *Recknagel vs. Bd. of Managers of Edenwood Condominium Owners Association*, No. 1736, 1983 Ohio App. LEXIS 14099, at *1 (Ohio Ct. App. May 9, 1983).

Finally, to the extent that the dicta in *Lyons* might require an election of remedies in some circumstances, it would not do so on these facts, where the basis of liability against the unincorporated association is different from the basis of liability against the unincorporated association's members. ASORT is only liable to the extent that it, *as distinct from its individual members*, proximately caused the deprivation of a constitutional right. *See Petty*, 478 F.3d at 349; *Austin*, 195 F.3d at 728. The individual members of ASORT, for their part, are only liable to the extent that they, *as distinct from ASORT itself*, proximately caused the deprivation of a clearly established constitutional right. *See Petty*, 478 F.3d at 349; *Champion*, 380 F.3d at 901. Conversely, *Lyons* involved a situation in which the basis for liability against the unincorporated association and its members was identical.

For each of these three reasons, the argument that *Lyons* acts to immunize ASORT from suit is not well-taken.

### C.  ASORT is Subject to Suit as an Unincorporated Association

In sum, the Court agrees with Judge McHargh that ASORT is subject to suit as an unincorporated association and **<u>DENIES</u>** ASORT's Motion for Summary Judgment (Doc. 70) to the extent that it is based on the argument that ASORT is not *sui juris*.  ASORT is not a government entity, meets the definition of an unincorporated association under Rule 17(b)(3)(A), and is not somehow shielded from suit by Ohio law.  Whether ASORT is actually liable in this action, of course, will depend upon whether it proximately caused a violation of a constitutional right.  *See Petty*, 478 F.3d at 349; *Austin*, 195 F.3d at 728.

### VI. WHETHER THERE IS LIABILITY UNDER § 1983 BECAUSE THE WARRANT WAS INVALID

The Court begins its examination of the Plaintiffs' substantive claims by reviewing the allegation that the warrant was invalid.  There is, as Judge McHargh observed, no contention that this case falls within some exception to the warrant requirement, nor would the assertion of some exception appear to be well-taken.  (R&R at 39.)  In this case, accordingly, if the warrant was invalid, the Plaintiffs were subjected to an unconstitutional search.  (*See id*.)  The converse, of course, is not true, it is possible for a warrant to be valid and for aspects of the search to be unreasonable, but that is an "entirely different matter."  *Baranski v. Fifteen Unknown Agents of the BATF*, 452 F.3d 433, 441 (6th Cir. 2006) (en banc) (quoting *United States v. Basham*, 268 F.3d 1199, 1204 (10th Cir. 2001)).  At this stage of the analysis, the Court considers only the warrant itself.

### A.  Relevant Facts

On September 12, 2006, Detective Riley Snavely was approached by an individual who claimed to know that Joseph Foster, a suspect in one of Detective Snavely's investigations, was staying at a home on Burns Street.  (Snavely Dep. at 13:17-18.)  Although Snavely had not previously interacted with this person and did not know whether any other law enforcement official ever had, he believed the

individual to be trustworthy because this person's "cellular phone number was used in communications with Joe Foster."  (*Id.* at 8:15-24.)[22]  Detective Snavely explained what happened next:

> The informant advised me that he had planned and set up to meet with or could set up to meet with Joe if, you know, we could provide some relocation funds for him to relocate. . . . And at some point, we locked in with, yes, we can do it and it will be Furtherance of Justice funds. . . . At that point in time, [the informant] said he would make contact with [Foster] and [the informant] would get back with me.  He recontacted me – this is early in the afternoon – and said that he had set up the meet with [Foster] very soon.  And I told [the informant] I couldn't meet just very soon; it takes time to make these things happen, and he would have to work off of the schedule that I could work with; but I couldn't make things happen any faster than what was reasonable for me to establish a perimeter and enough people for a perimeter and things of that nature.

> Several hours had gone by where [the informant] had been on and off the phone with me and Joseph Foster and indicated that Joe was starting to get very jumpy and edgy and didn't stay in one place very long and if we didn't hustle up he was going to move on and he may not be able to reach him, he may not be able to locate him.  But at that point in time, he believed that [Foster] was at 618 Burns. . . . I explained to Lieutenant Hutchinson and Officer Hill that . . . we were going to be setting up surveillance on 618 Burns and that the informant was going to make contact with him at 618 Burns and if anything changed I'd call back, but I would need them to print the search warrant when I was ready.

(*Id.* at 12:9 – 14:4) (questions omitted).

After setting up surveillance on 618 Burns Street, the confidential informant reported that Foster had moved to 347 South Main Street.  (Snavely Dep. at 14:5-11.)  For this reason, Snavely asked Captain Myers (then-Acting Chief Myers) to surveil that location.  Myers explains:

> ANSWER:  . . . . I arrived back at the station at approximately 8:00 p.m. At that point, Detective Snavely told me that he needed me as far as the surveillance team to watch the house while the ASORT team arrived for a briefing. And then I responded to the area of the residence in question and conducted surveillance of the residence.

> QUESTION:  About what time did you start your surveillance?

> ANSWER:  I don't know what time I started here, but it wasn't very long.[23]

---

[22] The record does not reveal how Snavely verified this, but the Plaintiffs do not challenge his method of verification at this stage of the proceedings.

[23] Myers later explained that it was "[m]aybe dusk" when he began his surveillance, (Myers Dep. at 18:4), and the Court takes judicial notice that the sun set at 7:47 pm on September 12, 2006 in Detroit,

QUESTION:     "Here" being?

ANSWER:       Here at the police station while it was discussed.  And then we decided
              that we needed to surveil the residence while we gathered the ASORT
              team and conducted a briefing so they could serve the search warrant. . . . I
              know I was there for a while at my location.

QUESTION:     Okay. Then what happened?  So you go and do your surveillance.

ANSWER:       We watched the house.  Several conversations with Detective Snavely
              over the cell phone. They made a couple drive-bys to ensure the proper
              location of the residence they were going to hit.

. . . .

QUESTION:     Was there anything obstructing – anything between you and your view of
              the front of 347 South Main?

ANSWER:       No, I had a clear shot. . . .

(Myers Dep. at 14:18-15:14; 17:2-4.)

        After Myers set-up surveillance, Snavely drove past 347 South Main with the informant, another

individual who was familiar with Foster, and Mansfield Detective Ed Schmidt.[24]  Snavely testifies:

---

Michigan (*see* http:// www.timeanddate.com), which is slightly west of the events in question.  This
lends further support to Myers' description of surveillance as beginning shortly after 8:00 pm.

        [24] There is ambiguity in the record regarding when Myers was in place relative to the drive-by
with the confidential informant.  The Ontario Defendants, in fact, specifically assert that Myers was in
place *after* that drive-by.  (Doc. 124 ("Ontario Rep.") at 3.)  They argue that "[t]he record is clear that
Det. Snavely did not contact the other officers that were to conduct surveillance . . . until after he had
driven by 347 South Main Street with the informant."  (*Id.* at 3.)  The Ontario Defendants, however, are
mistaken.  There is testimony indicating Myers was there after the drive-by (*see* Snavely Dep. at 14:17-
20 (indicating that Snavely only called for surveillance after the drive-by)) and other testimony
indicating that Myers was in position prior to the drive-by.  As explained above, Myers states that he
was in position shortly after 8:00 pm (supported by the time of sunset on the relevant day) and Snavely
estimates that the drive-by occurred between 8:30 and 9:00 (an estimate adopted by the Mansfield
Defendants (*see* Doc. 72-1 at 4)).  In oral argument, the Ontario Defendants made the point that:

        These officers were testifying from, you know, memory from well over a year and a half
        ago as to when events occurred, but at no time did Captain Myers testify that yes, I was
        conducting surveillance when Detective Sanvely drove by with the informant and the
        informant identified Joe Foster being on the porch.

29

> I did a drive-by of the residence with Detective Ed Schmidt and two of the persons that
> provided the information that day as to Joe Foster's whereabouts.  And the informant said
> something to the effect of, oh, poop, for lack of better terms, there he is right there in the
> doorway.  And I'm driving, and I had traffic.  And I didn't look left to see Joe Foster
> standing in the driveway -- I mean in the doorway.  But I had him, another subject, and
> Detective Schmidt in the car with me.  It's my understanding that Detective Schmidt saw
> the subject standing in the doorway, but I'm not certain of that.

(Snavely Dep. at 11:4-14.)  As the Plaintiffs note, moreover, "the records made contemporaneously with

the events do not [even] mention Foster being on the front porch."  (Plaintiffs' Opp. at 61; *see also*

Snavely Nar.)

> QUESTION:  What time was that?
>
> ANSWER:    As far as time, I don't recall.  It was, you know, probably 8:30, 9 o'clock.
>            I'm just . . . kind of guesstimating at the time.

(*Id*. at 14:14-17.)  There is currently no testimony that Myers, Snavely, Schmidt, or any other law

enforcement official ever observed Foster at 347 South Main, even though Myers, Snavely, and Schmidt

were all performing some level of surveillance at the time that the confidential informant reported seeing

Foster.

After his conversation with the informant, Snavely appeared before a Magistrate and sought a

warrant for 347 South Main Street, located in Mansfield, Ohio.  Detective Snavely explained his

conversation with the Magistrate:

> I told him that, you know, we had been trying to locate Joe Foster and we really
> exhausted our efforts trying to get him into custody.  Due to the fact that he used a
> handgun in the commission of this crime, we were concerned about another crime taking
> place with a handgun and that, you know, we had been pretty much through a rat race
> that day trying to get him in custody.  A lot of things had changed, and it was just hectic.
> And I was trying to juggle a lot of things, actually, all by myself. . . . I told him [we
> wanted a warrant for] 347 South Main.  That's where we were headed. . . . I believe I
> explained to [the Magistrate] that [the informant] was originally going to meet [Foster] at
> 618 and then found out that [Foster] moved to South Main.

---

(9/24/09 Hrg. Tr. at 67:17-22)  The Defendants are not wrong, but they misunderstand the importance of
their arguments at this stage of proceedings.  That memories fade over the course of 18 months is an
argument that must be made to a jury: viewing the evidence in the light most favorable to the non-
moving party, as the Court must, the Court assumes that Myers was in place prior to the drive-by.

(*Id.* 18:11-19:5.)  Notwithstanding this testimony, the warrant that actually issued included an affidavit attesting only to facts relating to 618 Burns Street.  (Search Warrant at 5.)  Indeed, viewing the facts in the light most favorable to the Plaintiffs, the only non-conclusory fact to which Detective Snavely could have testified with respect to 347 South Main is that an individual, unknown to Snavely prior to the events of this case, had exchanged phone calls with Foster in which Foster claimed to be at the Burns road address and alleged that he [the informant] glimpsed Foster in the doorway of the South Main Street address.  (*See* Snavely Dep. at 11:4-23:13; Doc. 94-1 ("Snavely Aff.") at ¶ 12.)[25]

It appears that neither Snavely nor any other officer ever reviewed the affidavit included with the warrant, even though the affidavit was on the same page that included the beginning of what the Defendants argue was the "true" warrant.  (*See* Search Warrant at 5 (including the "factual basis" for the warrant on the same page authorizing "nighttime" entry).)  For example, ASORT Team Leader Mack, who lead the team executing the warrant, stated: "due to the fact that I have not worked with Ontario that closely on warrants before that I wanted to make sure their paperwork was in line before I

---

[25] Snavely now alleges that he had an additional indicia of reliability.  He has submitted an affidavit attesting: "the informant told me that Foster was staying at a local motel.  When I went to the motel I found that Foster was no longer there, but had likely been present."  (Snavely Aff. at ¶ 7.)  This conclusory statement is insufficient to sway a court's analysis on summary judgment.  *See Taylor Acquisitions, L.L.C. v. City of Taylor*, 313 Fed. Appx. 826, 835 (6th Cir. 2009) ("[A]n affidavit that contains only general and conclusory statements or lacks any details or specificity is insufficient under Rule 56(f)."  (citing *Ball v. Union Carbide Corp.*, 385 F.3d 713, 720 (6th Cir. 2004)); *see also Doren v. Battle Creek Health Sys.,* 187 F.3d 595, 599 (6th Cir. 1999).

The Court observes, moreover, that Snavely's affidavit is problematic because: (1) Snavely did not mention this visit during the deposition when asked about the confidential informant's reliability (*see* Snavely Dep. at 8:17-24.); (2) Snavely considered Foster so dangerous that he found it necessary to use a SWAT team to apprehend him, making it somewhat curious that Snavely now attests that he attempted to go to Foster's location alone.  While the Court would not disregard Snavely's affidavit for these reasons alone, *see O'Brien v. Ed Donnelly Enters.*, 575 F.3d 567 (6th Cir. 2009), they help to emphasize the conclusory nature of it.

While it may be true that Snavely went to a local motel in search of Foster and found evidence at that motel that would lead a reasonable police officer to conclude that Foster may have been there, the Court cannot use Snavely's belated and conclusory affidavit to conclude that he did so for purposes of summary judgment.

proceeded." (Mack Dep. at 22:3-6.) Nevertheless, he "just read the search warrant and made sure it was signed" (*id.* at 24:2-4), apparently without ever glancing at the middle of page five.

## B. Applicable Law

The Court looks first to the affidavit supporting the warrant when assessing a warrant's validity. *See United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) ("To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate 'a fair probability that evidence of a crime will be located on the premises of the proposed search.'" (quoting *United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir. 2005))). A search warrant issued pursuant to an invalid affidavit is itself invalid, and officers may not execute a search warrant when the supporting affidavit is "'so lacking in probable cause as to render official belief in its existence entirely unreasonable' or . . . where the officer's reliance on the warrant was neither in good faith nor objectively reasonable." *United States v. McPhearson*, 469 F.3d 518, 533 (6th Cir. 2006) (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)); *see also United States v. Hodson*, 543 F.3d 286, 293 (6th Cir. 2008) ("[A] reasonably well trained officer in the field, upon looking at this warrant, would have realized that the search described . . . did not match the probable cause described . . . ."); *cf. United States v. Washington*, 380 F.3d 236, 241 (6th Cir. 2004) ("[I]t is entirely possible that an affidavit could be insufficient for probable cause but sufficient for 'good-faith' reliance.").[26]

"When determining whether an affidavit establishes probable cause, we look only to the four corners of the affidavit; information known to the officer but not conveyed to the magistrate is irrelevant." *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010) (citing *United States v. Pinson*,

---

[26] The Ontario Defendants assert that "[s]o long as 'the issuing magistrate . . . . was able to identify in the averring officer's affidavit some connection, **regardless of how remote it may have been**, between the criminal activity at issue and the place to be searched,' sufficient probable cause exists for the search warrant." (Ontario Rep. at 10 (quoting, selectively, *United States v. Laughton* 409 F.3d 744, 750 (6th Cir. 2005)) (emphasis in Defendant's briefing).) This is incorrect. *Laughton* does not explain that probable cause exists in such a situation – rather, the cases counsel that an officer will not be found to have acted in bad faith when he relies upon a search warrant in such a situation.

321 F.3d 558, 565 (6th Cir. 2003)).[27]  Despite the best efforts of law enforcement, of course, mistakes do happen, and not all mistakes will render a warrant invalid.  *See United States v. Johnson*, 558 F. Supp. 2d 807, 812 (E.D. Tenn. 2008)  ("The Supreme Court and the Sixth Circuit have recognized that despite best efforts, inaccurate information, such as a wrong address, may get into the affidavits for search warrants. . . ." (citing *United States v. Pelayo-Landero*, 285 F.3d 491 (6th Cir. 2002)).  This principle, however, does not apply to major discrepancies.  *See Knott v. Sullivan*, 418 F.3d 561, 569 (6th Cir. 2005) ("[I]n this case, the errors in the search warrant and affidavit were so extensive that there was a reasonable probability that the wrong vehicle could have been mistakenly searched.").

### C.  Whether the Plaintiffs Suffered a Depravation of a Constitutional Right

#### A.  R&R and Objections

Judge McHargh has recommended that this Court conclude that the warrant in this case was invalid.  He explains:

> [T]he affidavit simply contains no indication why the police should be able to search 347 South Main.  The Ontario Defendants argue that the court must look at the whole search warrant packet to see that there was probable cause to search 347 South Main . . . and they emphasize the allegation on page two that Defendant Snavely had "good cause" to believe that the suspect and other items would be found at 347 South Main.  But merely stating that there is good cause, without more, does not create probable cause. Importantly, none of the references to 347 South Main in the search warrant packet appears in a factual allegation relating to *why* the suspect and other evidence sought will be found at 347 South Main, which is, after all, the purpose of the affidavit. . . .  [T]he true affidavit appears on page five, under the heading "Affiant States the Factual Basis for Such Belief's [sic] are:" because that is where the only facts purportedly establishing probable cause appear. . . .  Contrary to Defendants' suggestions, the factual allegations [in this affidavit] are insufficient to establish probable cause. . . . There are no references to 347 South Main at all on page five . . . .  Since the factual allegations in the affidavit listed above appear to refer exclusively to 618 Burns Street and the affidavit on its face contains no information relating to 347 South Main, the court agrees with Plaintiffs that the affidavit does not show that there was probable cause to conduct a search of 347 South Main. . . . Defendants do not allege, and it does not appear to the court, that an exception to the warrant requirement applies in this case.  Accordingly, the search in this

---

[27] Of course, "[a] magistrate judge's determination of probable cause should be paid great deference by a reviewing court." *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc). Indeed, "an issuing magistrate's discretion should only be reversed if it was arbitrarily exercised." *Id.*

case violated Plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures.

(R&R at 37-39.)

One of the Defendants, although not objecting to any particular portion of the R&R, argues that the warrant was valid because:

> The address and description of the residence to be searched [identified] 347 South Main . . . The Affidavit further stated that Det. Snavely had good cause to believe that Foster was located in the residence at 347 South Main . . . . Thus, the search warrant affidavit clearly stated in the very beginning that Det. Snavely attested that he had good cause to believe that Joseph Foster was at the residence located at 347 South Main Street.  Further information supporting this belief was contained on p. 5 of the application. . . . Det. Snavely later learned that the address on p. 5 of the search warrant application had mistakenly not been changed from 618 Burns Street to 347 South Main Street . . . . However, this typographical error did not change the validity of the search warrant.

(Doc. 116 "Snavely Obj." at 5-7.)

## B.  Analysis

As discussed below, Detective Snavely has not preserved his right to additional review. Nevertheless, because the Plaintiffs assert this claim against defendants other than Snavely, and because the Plaintiffs have preserved their objections against those defendants, it is helpful for the Court to review the reasons that this warrant did not appear to have been supported by probable cause.  This question is not a close one: as Judge McHargh explained, "the affidavit simply contains no indication why the police should be able to search 347 South Main."  (R&R at 37.)[28]

Detective Snavely's contention that the references to South Main were a "typographical error" is not persuasive.  To the contrary, it is evident that the "factual basis" for the affidavit referenced 618 Burns Street because those facts referred to 618 Burns Street.  (*See* Search Warrant at 5.)  For example, no "informant was sent inside" 347 South Main Street "to verify that Joseph Foster was inside" that house.  (*Cf. id*. (describing that event occurring at 618 Burns Street).)  There are no facts in the affidavit

---

[28] On this point, "only one reasonable determination [is] possible." *Garner*, 328 Fed. Appx. at 327 (quoting *Parsons v. City of Pontiac*, 533 F.3d 492, 501).

that reference 347 South Main Street, and no reasonable police officer taking even the most cursory glance at this affidavit could believe that he was authorized to search that location. *Hodson*, 543 F.3d at 292-93 ("[T]he warrant was so lacking in indicia of probable cause that . . . belief in its existence was unreasonable."); *United States v. Pruitt*, 458 F.3d 477, 481 (6th Cir. 2006) ("[S]uch a bare bones affidavit cannot support a reasonable belief on the part of law enforcement officials that a warrant is valid." (citation omitted)).

On this issue, the Sixth Circuit's decision in *United States v. Laughton*. 409 F.3d 744 (6th Cir. 2005) is instructive. In *Laughton*, the Court held that police were not entitled to rely upon an affidavit that did not "turn[] up some modicum of evidence, however slight, to connect the criminal activity described in the affidavit to the place to be searched." *Id*. at 749. The face of the warrant in that case, like the face of the warrant in this one, listed the correct address to be searched. *See id*. at 753. In *Laughton*, however, the affidavit did not contain any specific reference to the particular address on the face of the warrant, using only generic references to a "home" and a "residence." The Court found that such a "warrant fail[s] to establish any nexus whatsoever between the residence to be searched and the criminal activity attributed to the defendant in the affidavit." *Id*. at 746. Judge Ronald Lee Gilman dissented from this conclusion, reasoning that references to a "home" and "residence" in the affidavit self-evidently referred to the location listed on the face of the warrant. *Id*. at 753 (Gilman, J., dissenting) ("To not link the affidavit's references to 'the home' and 'the residence' to Laughton and the stated address strikes me as an unwarranted hypertechnicality . . . .").

*Laughton* is a problem for the Defendants in two respects. First, Snavely relies upon the very argument made by Judge Gillman, that references to any "residence" in the affidavit at issue in this case should be understood to refer to the address on the face of the warrant.[29] Only an *en banc* panel of the

---

[29] As emphasized below, Snavely has not preserved any right of review. The Court addresses Snavely's argument solely to provide context for the Court's review of the Plaintiff's objections.

Sixth Circuit could accept that argument:  Judge Gillman did not carry the day in *Laughton*, and, no matter how much it respects Judge Gillman, this Court cannot simply pretend that he did.  Second, even if some future *en banc* panel of the Sixth Circuit were to overrule *Laughton*, it would not impact this case because reliance on the affidavit in this case is less reasonable than reliance on the affidavit in *Laughton* by a substantial measure.  The affidavit in *Laughton* simply referred to a "home" and a "residence," whereas the affidavit in this case contains an *entirely different address* than the one the police sought to search.  It is unlikely that Judge Gillman would conclude that it is reasonable to infer that references to 618 Burns Street in the affidavit were meant to reference 347 South Main Street: the *Laughton* majority certainly would not.

In short, there is little question that the affidavit in this case was "so lacking in probable cause as to render official belief in its existence entirely unreasonable."  *McPhearson*, 469 F.3d at 533 (citation omitted); *see also Hodson*, 543 F.3d at 293 ("[A] reasonably well trained officer in the field, upon looking at this warrant, would have realized that the search described . . . did not match the probable cause described . . . .").  As Judge McHargh noted:

> In determining whether a police officer's reliance on the warrant was objectively reasonable, the court must decide "whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1996).  This case presents a different scenario from Laughton, Frazier, and the cases cited therein.  In those cases, the facts contained within the affidavit tended to reflect that there was probable cause to search the place listed in the warrant but fell short of actually establishing probable cause.  The issue in those cases was the sufficiency of the facts asserted in the affidavit and whether a reasonable officer would have known whether those facts in fact did not establish probable cause. In this case, by contrast, it is clear that any reasonable officer who: (a) read the affidavit, and (b) happened to discover that it referred exclusively to 618 Burns Street would know that the affidavit did not reflect probable cause to search 347 South Main.

(R&R at 42.)

### D.  The Propriety of Recovering Against Any Particular Defendant

#### 1.  The Individual Officers

As correctly explained by Judge McHargh, "officers executing [a search] warrant have a duty to make an independent assessment regarding the sufficiency of the affidavit after the warrant issues." (R&R at 45 (citing *Washington*, 380 F.3d at 241)); *cf. United States v. McPhearson*, 469 F.3d 518, 526 (6th Cir. 2006) ("The affidavit in this case was so bare bones as to preclude any reasonable belief in the search warrant that the affidavit supported."); *Laughton*, 409 F.3d at 751 ("No reasonable officer could have believed that the affidavit was not so lacking in indicia of probable cause as to be reliable."). While an officer may usually rely on the assurances of a neutral magistrate, it is still "incumbent on the officer executing a search warrant to ensure the search is lawfully authorized and lawfully conducted." *United States v. Watson*, 498 F.3d 429, 433 (6th Cir. 2007) (quoting *Groh v. Ramirez*, 540 U.S. 551, 563 (2004)); *cf. Millender v. County of L.A.*, 564 F.3d 1143, 1155 (9th Cir. 2009) (Ikuta, J., dissenting), *vacated* 583 F.3d 669 (en banc) ("Officers do not get a pass from complying with the Fourth Amendment's warrant requirements because they are investigating an unsavory character."). This is especially true when the supporting affidavit is actually attached to the warrant. *See United States v. SDI Future Health, Inc.*, 568 F.3d 684, 690 (9th Cir. 2009) ("[I]n Washington State, contrary to the practice we usually see in federal court, the issuing judge routinely attaches the supporting affidavit . . . to the warrant, and that the issuing judge and the officers executing the warrant view the warrant and affidavit as one integrated document." (quotation omitted)).

#### a.  Detective Riley Snavely

##### i.  R&R and Objections

Judge McHargh recommended that Detective Snavely be denied summary judgment. He wrote:

> Snavely was the lead investigator on this case. Snavely himself testified in his deposition that he had been working "all by himself" on many of the efforts to get Foster into custody. Snavely was the officer in contact with the confidential information and the officer who presented the warrant application to the magistrate. While Lieutenant

37

Hutchinson allegedly made the changes to the warrant materials, the changes were made at Snavely's request and based on Snavely's knowledge. . . . Snavely unquestionably had a duty to ensure that the affidavit reflected probable cause to search 347 South Main before executing the search warrant.  It also is clear to the court that Snavely failed adequately to fulfill his duty to review the affidavit for probable cause and that, contrary to Defendants' assertions, his failure to do so amounted to more than a mere "ministerial oversight."  The affidavit in this case contained no clear references to 347 South Main.  It was less than a page long.  Although Snavely testified that he did not "catch" the error before serving the warrant at 347 South Main, there is no affirmative indication in the record that he even read the affidavit prior to submitting it to the magistrate and swearing to the allegations contained within it. (See doc. 87, Snavely Depo., at 37). . . . Snavely was required to review the affidavit for probable cause.  An officer in Snavely's position should not be able to claim in good faith that he is entitled to qualified immunity despite failing to "catch" the glaring errors in the affidavit here, when it was Snavely's responsibility . . . to ensure that the affidavit was adequate.

(R&R at 49-50.)

Snavely, as previously indicated, has filed a response to Judge McHargh's R&R.  He argues:

[T]here is no evidence that Det. Snavely deliberately stated falsehoods or demonstrated willingness to affirmatively distort the truth regarding whether Snavely had good cause to believe that Joseph Foster was located at 347 South Main Street. . . . Given the fact that the address and description of the residence to be searched had been correctly changed in both the beginning of the affidavit and in the search warrant itself, it was reasonable for Det. Snavely to assume, albeit mistakenly, that the address had been changed throughout the search warrant application. . . . [M]istakes by police regarding search warrant applications do not constitute violations of the Fourth Amendment . . . .  The Fourth Amendment by its terms request particularity in the warrant, not in the supporting documents.

(Snavely Obj. at 8-9) (citations omitted).

### ii.  Analysis

Detective Snavely's objections are not-well taken.  As an initial matter, no party's objections fall further short of the "duty to pinpoint those portions of the magistrate's report that the district court must specially consider" than do Snavely's, which do not even cite to the R&R at all.  *See Cincinnati Ins. Co.*, 501 F. Supp. 2d at 1153 (quoting *Mira*, 806 F.2d at 637).  He has not preserved the right to further review.  *See Thomas*, 474 U.S. at 149-52; *Crum*, 921 F.2d at 645 n.1; *Gonzales*, 2006 U.S. Dist. LEXIS 73370, at *3-4.  Accordingly, Defendant Riley Snavely's Motion for Summary Judgment (Doc. 94) must

be **DENIED** as to this count of the Plaintiffs' complaint on those grounds alone.  Even if the Court were

to reach Snavely's arguments, moreover, they would fail on the merits.

There are two related theories of liability against Detective Snavely.  First, there is the allegation

that Snavely acted with reckless disregard for the truth when he *obtained* the warrant, because "there is

no affirmative indication in the record that [Snavely] even read the affidavit prior to submitting it to the

magistrate and swearing to the allegations contained within it" (R&R at 50) and because, as discussed

below, when the facts are considered in the light most favorable to the Plaintiffs, a reasonable jury could

conclude that Snavely knew (or at least suspected) that, if he included the facts relating to South Main

Street in the affidavit and omitted those regarding 618 Burns Street, the warrant would not have been

issued.  Second, there is the allegation that Snavely *executed* the warrant without "assess[ing] the

affidavit upon which the warrant was based."  *United States v. Washington*, 380 F.3d 236, 241-42 (6th

Cir. 2004) (citations omitted); *see also United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1996)

("[The question is] whether a reasonable well-trained officer would have known that the search was

illegal despite the magistrate's authorization.").

First, there is evidence that would allow a reasonable jury to conclude that Detective Snavely

acted with reckless disregard for the truth in causing the warrant in this case to issue.  Even setting aside

the reasonable inference that Snavely swore to allegations in an affidavit without reading the allegations

to which he was swearing (*see* R&R at 50), a reasonable jury could conclude that Detective Snavely did

not have probable cause to search 347 South Main Street and that he *chose* not to change the supporting

affidavit so that he could ensure that a warrant would issue.  Of course, if Snavely caused the warrant to

issue with reckless disregard for the truth, he did so in violation of clearly established law in an

objectively unreasonable manner.  *See Vakilian v. Shaw*, 355 F. 3d 509, 517 (6th Cir. 2003); *Cotton v.

Sassak*, Case No. 2:06-cv-15208, 2009 U.S. Dist. LEXIS 49918, at *19 (E.D. Mich. June 15, 2009)

("[I]n this Circuit, an officer accused of violating the Fourth Amendment by obtaining a warrant through

an affidavit known to be false can enjoy qualified immunity from suit under § 1983 only if he in fact did not violate the Fourth Amendment." (analyzing cases)).

Second, Detective Snavely has not contended that he reviewed the affidavit prior to seeking to execute the search warrant, nor does Snavely even appear to contest that he had a clearly established duty to do so under *Washington*.  Snavely's entire argument on this point appears to be that he was not required to notice mere typographical errors.  (*See, e.g.*, Doc. 106 at 2-5.)  This contention is true, but inapplicable here, where a mere glance at the affidavit would have revealed its defective nature and where, as already explained, the errors were not just ministerial or typographical.  The Court observes, then, that a reasonable jury could find that Snavely violated clearly established law in an objectively unreasonable manner under this theory as well.  *See Weaver*, 99 F.3d at 1380; *Washington*, 380 F.3d 236, 241-42.

### b.  Team Leader David Mack

### i.  R&R and Objections

The R&R concludes that Mack cannot be liable for a failure to "assess the affidavit upon which the warrant was based," *id*., because it is not clearly established that anyone other than Snavely had an obligation to read the affidavit attached to a warrant.  It reasons:

> The court gleans from *Washington*, as well as the well-established precedent averted to in that case that an officer cannot rely on the good faith exception to the warrant requirement if the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," that at least some of the officers are obligated to review the affidavit to determine if there is probable cause. Clearly, the officer presenting the affidavit to the magistrate has a duty to read the affidavit, otherwise he would not be aware of the factual allegations to which he was swearing. Yet, from a common sense perspective, it does not follow necessarily that each and every officer, every time he assists in executing a search warrant, independently must review the affidavit for probable cause.  As Defendants point out, such a requirement could prove problematic, not to mention unnecessarily burdensome — especially in a case where the affidavit supporting the search warrant is dozens or hundreds of pages long. On the other hand, Defendant Mack was not just any officer in the pack in this case — he was the ASORT team leader for the search of 347 South Main.  Plaintiffs do not cite — and the court has not found — any authority indicating whether the leader of a SWAT-type tactical team has an obligation to review the affidavit for probable cause prior to

executing a search warrant. . . . Based on the paucity of case law discussing whether or not SWAT team leaders should be required to review the affidavit for probable cause prior to executing the warrant, the court cannot say that such a requirement — if it exists at all — was clearly established as of September 12, 2006.

(R&R at 45-46.)

The Plaintiffs have properly objected to this portion of the R&R.  They argue that clearly established law explained to Team Leader Mack that he had an obligation to review the warrant, particularly given that Mack was aware that there were problems in obtaining the warrant.  (Doc. 122 "Plaintiffs' Obj." at 17-20.)

### ii.  Analysis

Team Leader Mack is not entitled to Summary Judgment in his favor.  First, the Court is not persuaded by the distinction the Defendants attempt to make between the warrant and the supporting affidavit on the facts of this case.  Second, even if the Court were persuaded by that distinction, it believes that prior Sixth Circuit law makes clear that Team Leader Mack had an obligation to ensure that some member of his team reviewed the affidavit.

### a.  There is No Distinction Between the "Warrant" and "Affidavit" Under the Facts of This Case

The Defendants concede, as they must, that Mack had a clearly established obligation to review the search warrant prior to executing that warrant:

[There is no] qualified immunity for the leader of a search who fails to read the warrant and satisfy [himself] that [he] understand[s] its scope and limitations, and that it is not defective in some obvious way. . . . [T]he leaders of the search team must also make sure that a copy of the warrant is available to give to the person whose property is being searched at the commencement of the search, and that such copy has no missing pages or other obvious defects.

*Groh*, 540 U.S. at 556 (quoting the circuit court with approval) (quotation marks omitted).  The Defendants argue, however, that the obligation to review the warrant does not extend to the section of the warrant captioned "factual basis" because "[t]he Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents."  *Id*. at 557.  There are two problems with

41

the Defendants' argument.  First, the Defendants cite *Groh* out of context.  *Groh* does not obviate the need for law enforcement officials to review the affidavit to ensure that it contains at least some indicia of probable cause; *Groh* simply explains that a valid affidavit cannot save an invalid warrant.  But it is also true that an invalid affidavit renders the warrant invalid.  *See, e.g., McPhearson*, 469 F.3d at 533.

Second, the warrant in this case is not like the warrants typically seen in federal court: what the Defendants are calling a "warrant" and "affidavit" are contained in a single, six-page, integrated document.  *Accord SDI Future Health*, 568 F.3d at 690 ("[I]n Washington State, contrary to the practice we usually see in federal court . . . . [T]he issuing judge and the officers executing the warrant view the warrant and affidavit as one integrated document." (quotation omitted)).  The weakness of the distinction Defendants propose is apparent on the face of page five of the document, which contains both what Defendants call the "affidavit" and a portion of what the Defendants consider the "true warrant."  (*See* Search Warrant at 5.)[30]  Thus, what the Defendants call the "supporting affidavit" is located *on the very same page as the beginning of the command portion of the warrant*.  (*Id*.)[31]  The Defendants argue that *Groh* required Mack to read the bottom of page five, but not the middle.  That argument is not well-taken.[32]

---

[30] *Groh's* instruction that task force leaders must "make sure that a copy of the warrant is available to give to the person whose property is being searched . . . and that such copy has no missing pages or other obvious defects," *Groh*, 540 U.S. at 556, makes no sense if it excludes the middle of the document to be handed to the person whose property is to be searched.

[31] Notably, the Defendants ask the Court to characterize the "entire document" as the affidavit when assessing the strength of the facts presented, but ask the Court to separate the one instrument into two when assessing Mack's obligation to examine it.  (4/30/09 Hrg. Tr. at 73:17-20.)

[32] This reasoning, of course, applies only when the affidavit and warrant are a single integrated document.  *Cf. Baranski*, 452 F.3d at 443 ("While the decision of officers not to present an incorporated affidavit to the occupant upon request may be a relevant factor in determining the reasonableness of a search, it does not make a warrant-supported search a warrantless one."); *cf. also Sanders v. Parrish*, 141 Fed. Appx. 412, 416 (6th Cir. 2005) ("[U]nlike in *Groh* and *Baranski*, the curative documents in this case were attached to the warrant during the search.  Accordingly, an analysis of the cure by incorporation principle is appropriate.").

In assessing Mack's Objections, it is material that the "factual basis" for the warrant was so defective that even a cursory glance would have revealed it's invalidity.  *See Groh*, 540 U.S. at 564 ("[E]ven a cursory reading of the warrant in this case – perhaps just a simple glance – would have revealed a glaring deficiency that any reasonable police officer would have known was constitutionally fatal.").  This is not a case where "only a police officer with extraordinary legal training would have detected any deficiencies in that document."  *United States v. Van Shutters*, 163 F.3d 331 (6th Cir. 1998).  Indeed, this is not a case in which <u>any</u> knowledge of the law was necessary to understand that the warrant contained reasons to believe that Joseph Foster would be at Burns Street, rather than reasons that Foster would be at Main Street.  Many of the Defendants have contended that a finding that Mack is subject to suit will impose an obligation on SWAT-team leaders to become legal technicians: this is simply untrue.  There is no requirement that police officers independently review a warrant for probable cause to escape liability, but there is a requirement that they look at the document to ensure that there are no <u>glaring</u> deficiencies.  *See Groh*, 540 U.S. at 564; *cf. Laughton*, 409 F.3d at 751 ("No reasonable officer could have believed that the affidavit was not so lacking in indicia of probable cause as to be reliable.").  A reasonable jury could conclude that Mack violated *Groh* in an objectively unreasonable manner when he failed to fulfill that requirement here.

### b. SWAT-Team Leaders Must Review the Supporting Affidavit Prior to Executing a Search Warrant

It is the clearly established law of this Circuit that police officers must review an affidavit prior to executing a search warrant, whether that affidavit is integrated into the warrant or not.  *Washington*, 380 F.3d at 241 ("[P]olice . . . have a duty to assess the affidavit upon which [a] warrant [is] based.").  Although it is true, as the R&R reasoned, that there is a "paucity of case law discussing whether or not SWAT team leaders should be required to review the affidavit for probable cause prior to executing the warrant," (R&R at 46), "[a] court need not have held that the very action in question is unlawful if, in light of pre-existing law, the unlawfulness is apparent," *Sallier v. Brooks*, 343 F.3d 868, 878 (6th Cir.

43

2003) (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996)); *see also Griffith v. Coburn*, 473 F.3d 650, 659 (6th Cir. 2007) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).  In this case, that prior Sixth Circuit caselaw does not name *which* specific law enforcement official must review the affidavit underlying a search warrant does not immunize the very person responsible for planning and executing a search.  It was clearly established that <u>some</u> member of Mack's team needed to perform that review and it is reasonable to conclude that Mack was charged with either doing it himself or assuring it was done.  *See Washington*, 380 F.3d at 24.[33]  There need not be a Sixth Circuit or Supreme Court case specifically stating that a supervisor has the responsibility to supervise to make it so.  *See Sallier*, 343 F.3d at 878; *Griffith*, 473 F.3d at 659.[34]  To the contrary, it was clearly established as of September 12, 2006 that <u>some</u> officer needed to at least look at the affidavit attached to this search warrant, *see Washington*, 380 F.3d at 24, and it was objectively unreasonable in view of that clearly

---

[33] It is well-established that police officers may rely on each other, and the Court does not suggest, for example, that Mack would have needed to review the affidavit himself if some other officer assured Mack it had been done.

[34] The Plaintiffs also point this Court to *Elliott v. City of Clarksville*, Case No. 3:05-0138, 2007 U.S. Dist. LEXIS 9616 (M.D. Tenn. Feb. 9, 2007).  In that case:

> [B]efore the warrant was executed, Gipson, the [SWAT] Team commander, possessed information that should have raised his suspicion. . . . Where an officer recognizes that a search warrant is potentially ambiguous before execution of the warrant, he must immediately stop execution and seek the necessary clarification to ensure that the warrant particularly describes the place to be searched, as required by the Fourth Amendment.

*Id*. at *47-48 (citations omitted).  This case certainly has some similarities to *Elliott*.  In *Elliott*, the SWAT team commander had affirmative information that he might be going to the wrong location.  Similarly, here, Mack clearly had concerns that something was not right with this warrant.  As his own counsel argued:

> Lieutenant Mack . . . had the operation slowed down, demanded the signed warrant, took the warrant, observed the premises, made sure the premises matched that described in the warrant.

(4/30/09 Hrg. Tr. at 87:6-11.)

*Elliott* standing alone, however, would not likely compel the result reached by the Court today. *Elliott* and the cases relied upon by that Court discuss the obligations of a police officer once that officer gains affirmative information that he may be going to the wrong residence, whereas this case is arguably better described as one that considers what affirmative action must be taken by an officer to obtain that information in the first instance.

44

established law for Team Leader Mack to fail to ensure that someone did so.  *Accord Ramirez v. Butte Silver Bow County*, 298 F.3d 1022, 1027-28 (9th Cir. 2002) (Kozinski, J.), *aff'd*, 540 U.S. 551 (2004) ("The officers who leads the team that executes a warrant are responsible for ensuring that they have lawful authority for their actions."); *Hartsfield v. Lemacks*, 50 F.3d 950, 955 (11th Cir. 1995) ("Because Newton did nothing to make sure that he was leading the other officers to the correct residence, we conclude that the district court erred in holding that he was protected by qualified immunity.").  Again, the Court's determination rests squarely on the fact that even a simple glance would have revealed the defect in this document.  *See Laughton*, 409 F.3d at 751.

### c.  Conclusion

In sum, for the two separate and independently sufficient reasons discussed above, Defendant David Mack's Motion for Summary Judgment (Doc. 71) as to this claim is **<u>DENIED</u>**.

### c.  Dale Myers

#### i.  R&R and Objections

The R&R suggests that this Court grant Defendant Myers' Motion for Summary Judgment:

> Plaintiffs appear to argue that Defendant Myers is not entitled to qualified immunity for his involvement with the invalid warrant because he "returned to the Magistrate after the search and asked the Magistrate to change the affidavit of Snavely" even though "he did not know the basis for Defendant Snavely's belief that Foster was inside the Main Street residence until after the warrant was served. . . .  Plaintiffs neither specifically allege that Myers' actions, if proven, would amount to the violation of a constitutional right, nor do they indicate that the right was so clearly established that a reasonable officer in Myers' position would have known that what he did amounted to a violation.  Thus, Plaintiffs have failed to meet their burden to show why Defendant Myers is not entitled to qualified immunity for his involvement with the invalid warrant.

(R&R at 51-52)  (citations omitted).

The Plaintiffs have objected to this portion of the R&R.  They argue:

> Defendant Myers knew that the officers had tips regarding Foster's location and that Foster was allegedly at 618 Burns Street.  Defendant Myers knew that Defendant Snavely was using an informant and the informant told him Joe Foster had moved to 347 S. Main. Defendant Myers discussed proper procedures with Defendant Snavely for calling out ASORT and obtaining a search warrant.  He then participated in surveiling [sic] the

45

residence.  He left the police station shortly after 8:00 p.m.  At around 8:30 p.m. Defendant Snavely and the informant did a drive-by of the residence.  Although Defendant Snavely claims that the informant saw Mr. Foster during the drive-by, neither Meyers nor the other officers doing surveillance saw Joe Foster at 347 S. Main.  Myers surveilled the front of the house until ASORT served the search warrant.  Even though his own observations at 347 S. Main contradicted the informant's alleged observations, Defendant Myers gave Defendant Snavely the final go ahead to serve the warrant. . . .  A brief outline of the intelligence shows that Myers knew or should have known that Snavely did not have probable cause. . . .  Defendant Myers participated in the misconduct by failing to stop the execution of the search warrant despite his knowledge that Mr. Foster was not inside 347 S. Main.  After the execution of the search warrant, he acquiesced in Defendant Snavely's unconstitutional conduct by asking the local magistrate to cross out the references to 618 Burns Street. . . . If a supervisory officer has as much information about lack of probable cause as the officer who obtained an invalid search warrant, the supervisory officer is not entitled to qualified immunity.

(Plaintiffs' Obj. at 13-17) (citations omitted).

### ii.  Analysis

Captain Myers' behavior, viewing the facts in the light most favorable to the nonmoving party, was far from exemplary.  That he failed to question whether there was probable cause to search 347 South Main Street was at the least negligent, and it is troubling that Myers filed a warrant that was changed after it was executed.  Nevertheless, the Plaintiffs' have not pointed the Court to enough evidence to overcome qualified immunity.  In particular, although the Plaintiffs rightly argue that Myers would not be entitled to qualified immunity if he had "as much information about lack of probable cause as [Snavely]," the Plaintiffs have not shown that this was the case.  *See Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999) ("In order for liability to attach to [a supervisor] for the alleged actions of [a subordinate], Plaintiff must prove that [the Supervisor] did more than play a passive role in the alleged violation or showed mere tacit approval of the goings on.  Plaintiff must show that [the Supervisor] otherwise encouraged or condoned the actions of [the subordinate]." (citations omitted)).

The Defendants point out that Captain Myers was not involved in securing the search warrant, never reviewed that warrant prior to its issuance, and did not brief the ASORT team about the warrant.  (Myers Dep. at 7:11-9:19; *see also id*. at 22:12-17 ("QUESTION: [How were you] confident that the

46

confidential informant was reliable when the confidential informant said Joe Foster was at 347 South Main?  ANSWER: He wasn't my informant.  I didn't apply for the search warrant.  So I wasn't involved in developing his credibility.").)  In other words, although the "Plaintiff[s] must show that [Myers] somehow encouraged or condoned" Snavely's actions, they have "present[ed] evidence only that [Myers] . . . failed to review [Snavely's] work."  *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006).

Finally, although the Plaintiffs contend that Myers is liable because the Magistrate altered the warrant at Myers' request, the Plaintiffs fail to connect this admittedly troubling event to some definitive theory of personal liability for Myers.  This evidence does not show that Myers knew or should have known that Snavely had not provided testimony to the Magistrate regarding 347 South Main at the time the warrant was issued (Myers Dep. at 45:2-5 ("QUESTION: Do you have any knowledge as to whether [the Magistrate] was presented 3 facts about 347 South Main or whether he was presented facts about 618 Burns?  ANSWER: No.")), and it does not establish that Meyers was aware of the defects in the warrant before it was executed.  At best, it is evidence that Myers became aware of the defects in the warrant after the fact and attempted to cover them up in a post-hoc effort to justify the search.  If this is true, Myers' conduct was inexcusable and would be evidence that is relevant to the reasonableness of the search, but it would not be independently actionable under § 1983.

For these reasons, the Court **<u>GRANTS</u>** Defendant Dale Myers' Motion for Summary Judgment (Doc. 94) on this count.

### 2.  The City of Ontario

Judge McHargh recommends granting the City of Ontario's Motion for Summary Judgment, a conclusion to which the Plaintiffs have objected.  The Plaintiffs base their objection exclusively on the theory that Defendant Myers bound the city as a policymaker.  (*See* Plaintiffs' Obj. at 15 ("Defendant Myers made the final decision to green light the ASORT raid and to have the warrant altered by the

47

Magistrate.  He is a policymaker.  His actions bind Defendant City of Ontario.").  These objections are not well-taken, both because the Plaintiffs have not shown that Myers is a policymaker in the relevant sense, and because, even if Myers were a policymaker, Myers cannot be said to have proximately caused the deprivation of the Plaintiffs' rights.

The first problem for the Plaintiffs is that they have not shown that Myers was acting as a municipal policymaker when he allegedly deprived them of their constitutional rights.  The Sixth Circuit has emphasized that final policymaking authority is defined "narrowly" for purposes of § 1983.  *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 515 (6th Cir. 1991).  It is not always evident where discretion ends and final policymaking authority begins, but it is clear that one is not a final policymaker for purposes of § 1983 solely because one is granted some discretion by a municipality.  *Williams v. Butler*, 863 F.2d 1398, 1403 (8th Cir. 1988) (en banc) ("[Only] a very fine line exists between delegating final policymaking authority to an official . . . and entrusting discretionary authority to that official.").  A final policymaker is one whose "decisions are final and unreviewable and are not constrained by the official policies of superior officials."  *Adair v. Charter County of Wayne*, 452 F.3d 482, 493 (6th Cir. 2006) (citing *Waters v. City of Morristown*, 242 F.3d 353, 362 (6th Cir. 2001)).

A municipality, moreover, is not necessarily liable even when a final policymaker exercises discretion in a way that violates a plaintiff's constitutional rights: liability will only attach when that policymaker violates a plaintiff's rights <u>through the exercise of policymaking authority</u>.  *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-83 (1986) ("The fact that a particular official – even a policymaking official – has discretion  in the exercise of particular functions does not, without more, give rise to [§ 1983] municipal liability based on an exercise of that discretion.  The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.");  *Walsh v. Erie County Dep't of Job & Family Servs.*, 240 F. Supp. 2d 731, 763 (N.D.

Ohio 2003) ("[E]ven if [the police chief] exercised his  discretion to violate plaintiffs' Fourth Amendment rights, his was not a decision of the [municipality] . . . .").

In this case, the Plaintiffs have not shown that, even if Myers exercised his discretion to violate Plaintiffs' Fourth Amendment rights, he did so acting in the capacity of a final policymaker.  *See Walsh*, 240 F. Supp. 2d at 763.  Myers was the acting police chief, and, as the acting police chief, it is certainly possible that he was the city's final policymaker for any number of purposes.  But the Plaintiffs have not pointed to any evidence that he was the final policymaker for any purpose relating to obtaining or executing the warrant at issue in this case – indeed, in the section of their objections arguing that Myers was a final policymaker, the Plaintiffs barely point to the record at all.  (Plaintiffs' Obj. at 18-20; *see* R&R at 69 ("Bare allegations that particular individuals are "policymakers," without more, simply is not enough to establish municipal liability based on the actions of those individuals.").)[35]

Even if the Plaintiffs had been able to show that Myers was acting as a final policymaker, moreover, the claim against the City of Ontario still would not be well-taken.  As explained above, the Plaintiffs have not shown that Myers himself could be said to have been the proximate cause of any deprivation of the Plaintiffs rights, and there is no basis upon which liability could attach through his actions.

Accordingly, the City of Ontario's Motion for Summary Judgment (Doc. 94) with respect to the invalid warrant is **<u>GRANTED</u>**.[36]

---

[35] Beyond Myers' title, the Plaintiffs only cite to a portion of the record where Myers tells Snavely that Snavely was entitled to serve the search warrant and a portion of the record where Myers tells Plaintiff Fuller that Fuller should call Myers with any questions about the warrant.  Nothing about these citations explains how Myers was acting in some type of policymaking capacity during either exchange.  *See Walsh*, 240 F. Supp. 2d at 763.

[36] Although the Plaintiffs refer to objecting to Judge McHargh's conclusions regarding the "entities," it does not appear that they object to any conclusion in connection with the warrant itself aside from those that relate to the City of Ontario.  On the facts as developed by the record, this makes sense: in particular, there is no indication that ASORT, as distinct from Defendant David Mack, could be said to have proximately caused the execution of a search pursuant to an invalid warrant.

## VII. WHETHER THERE IS LIABILITY UNDER § 1983 BECAUSE LAW ENFORCEMENT OFFICIALS FAILED TO "KNOCK-AND-ANNOUNCE"

The next discrete constitutional allegation concerns the requirement that police "knock-and-announce" their presence prior to executing a search warrant.  The Defendants, for their part:

> do not seriously argue that they explicitly complied with the knock and announce requirement.  Rather, Defendants argue that they were excused from complying because they had a reasonable suspicion that doing so would be futile.

(R&R at 29.)  The Plaintiffs may only sustain their claim if a reasonable jury could disagree.  *See Richards v. Wisconsin*, 520 U.S. 385, 394 (1997).

There is a threshold problem facing the Plaintiffs with respect to this claim.  During oral argument, the Court engaged in the following colloquy with the Plaintiffs' counsel:

| | |
|---|---|
| THE COURT: | So the constitutional violations in this case . . . |
| COUNSEL: | Search without probable cause, excessive force with respect to some of the individuals, prolonged detention. |
| THE COURT: | And are you attacking the knock and announce? |
| COUNSEL: | We have that listed, and I don't have a separate argument on it at the moment. Pardon? Oh, upstairs. Okay. There is an argument, Judge, that the officers did not identify themselves as they went upstairs, so in that sense, they failed to continue to announce their presence as they went through the house. |
| THE COURT: | But the initial entry you are not – |
| COUNSEL: | We are not challenging the initial entry. |

(9/24/09 Hrg. Tr. at 65:9 – 66:2.)[37]

In light of this unequivocal waiver, the Court concludes that it would be improper to review this issue further, even though the Court had previously understood the objections to challenge the R&R's

---

[37] The Plaintiffs do argue that the officers should have continued to announce their presence even after entry.  This argument is not well-taken on the merits: there is no independent constitutional requirement that police continue to announce their presence after they have already entered a dwelling, although the failure to announce may ultimately factor into the analysis of a claim that the police used excessive force.  *See Yates v. Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991).

conclusions with respect to entry.  (*See* Plaintiffs' Obj. at 20 ("The most important aspect of serving a knock and announce warrant is to "announce" in a manner that allows the residents to identify those at the door as police and not as criminal intruders.  Defendant Mack testified that during the execution of a knock and announce search warrant the police should identify themselves prior to making entry into the residence, giving the occupants a reasonable time to answer the door.").)[38]  Accordingly, all Defendants' Motions for Summary Judgment (Docs. 69, 71, 72, 94) are **GRANTED** as to this claim.

## VIII. WHETHER THERE IS LIABILITY UNDER § 1983 BECAUSE LAW ENFORCMENT OFFICIALS EMPLOYED EXCESSIVE FORCE

The Plaintiffs' third type of claim is that the Defendants violated their Fourth Amendment rights by employing excessive force during the execution of the search.  These claims are distinct from the Plaintiffs' claims that the search was unreasonable from inception.  The question here is whether, even assuming the search was reasonable, law enforcement officials employed excessive force during its execution.

It is well-established that individuals have a constitutional right not to be subjected to excessive force during a search.  *See Graham v. Connor*, 490 U.S. 386, 388 (1989); *Ciminillo v. Streicher*, 434 F.3d 461, 465 (6th Cir. 2006).  This being said, a law enforcement official will only be found to have subjected a plaintiff to excessive force if his actions were ""objectively unreasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *St.*

---

[38] The evidence in this case indicates that one of the Defendants, John Mager, threw a flash grenade at Plaintiff Fuller and that Fuller only closed the door in reaction to that grenade.  ((R&R at 3; Doc. 88 ("Willis Dep.") at 43:5 ("I know [the flash grenade] hit the screen door"); *see also* Fuller Dep. at 31:16-19.).  It is axiomatic that throwing a grenade at someone's home does not give that person the opportunity to "allow peaceable entry," *United States v. Hardin*, 106 Fed. Appx. 442, 444 (6th Cir. 2004) (quoting *United States v. Dice*, 200 F.3d 978, 983 (6th Cir. 2000)) (internal quotations omitted) and "respond to and cooperate with the police presence in lieu of having to face an unexpected and threatening intrusion" *United States v. Buchanan*, 78 Fed. Appx. 933, 935 (5th Cir. 2003): the grenade *is* the unexpected and threatening intrusion, *see, e.g.*, *United States v. Jones*, 214 F.3d 836, 837 (7th Cir. 2000) (Easterbrook, J.) ("[P]olice cannot automatically throw bombs into . . . houses, even if the bomb goes by the euphemism 'flash-bang device.'").  Nevertheless, the Plaintiffs have waived this issue expressly, and the Court may not consider it further.

*John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005) (quoting *Graham*, 490 U.S. at 397).  The Sixth Circuit has explained that "the proper application of the reasonableness inquiry requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham*, 490 U.S. at 396.)  Those factors are not exhaustive, however, and the fundamental question that a court must answer is "whether the totality of the circumstances justifies a particular sort of seizure." *Graham*,  490 U.S. at 396.  Reasonableness must be judged "from the perspective of the reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Because each plaintiffs' excessive force claim springs from its own unique set of facts, the Court will consider each claim separately.

### A.  Plaintiff Thomas Willis

#### 1.  Factual Background

Plaintiff Willis was the first person ASORT members encountered as they entered the residence.  Team Leader Mack testified that, after the flash grenade exploded, ASORT was "almost let into that residence.  I mean [Willis] was there at the door." (Mack Dep. at 41:3-4.)[39]  After being "almost let into the residence" by Willis, an unidentified officer tackled Willis to the floor, causing Willis to sprain his ankle.  (R&R at 4.)  After he was tackled, Willis was handcuffed with zip-ties and an officer asked him if his name was "Thomas Winbush." (*Id.*)  Willis was then searched for weapons and then placed in a love seat, still handcuffed, for thirty minutes. (*Id.*; *see also* Willis Dep. at 54:21-55:2.)  During this

---

[39] The R&R explains that Plaintiff Willis yelled into the house that it was the police and that Plaintiff Fuller believed Willis to be joking. (R&R at 3-4.)  The only question, however, is what the officers reasonably perceived.  To that end, it is neither helpful to the Defendants that Willis yelled out that it was the police (*see* Doc. 72-1 ("Mansfield MSJ") at 14 (arguing that Willis admits that he knew it was the police, but not pointing to any testimony from the officers regarding how they perceived Willis' actions)), nor harmful to the Defendants that Fuller did not believe Willis (because the Defendants would have no reason to know this).

period, an officer asked Willis to stand up and proceeded to perform a pat-down search of Willis'
person.  (R&R at 4.)  Willis was never asked any questions about Foster.  (Willis Dep. at 95:9-11
("Question: That whole night you never heard the words Joe Foster?  Answer: No.").)

### 2.  The R&R and Objections

The R&R concludes that Willis is not able to sustain his claim of excessive force:

> Willis alleges that, as the officers made entry into the house, one of the officers ran at
> him forcefully and tackled him to the ground.  He alleges that his ankle got twisted as a
> result of the tackle.  Plaintiffs have been unable to identify which of the officers allegedly
> tackled Willis.  The court again notes that "a plaintiff cannot recover in a § 1983 action if
> he does not identify the officer that caused the alleged deprivation of his constitutional
> rights."  Since Plaintiff Willis has been unable to identify the officer that tackled him, he
> has not presented enough evidence from which a reasonable jury could conclude that any
> individual officer engaged in excessive force against him.

(R&R at 58-59.)

### 3.  Analysis

The Plaintiffs did not file an objection to this conclusion.  Accordingly, they have not preserved
the right to further review.  *See Thomas*, 474 U.S. at 149-52; *Crum*, 921 F.2d at 645 n.1; *Gonzales*, 2006
U.S. Dist. LEXIS 73370, at *3-4.  The Court, accordingly, **<u>GRANTS</u>** all of the Defendants' Motions for
Summary Judgment with respect to Willis' claim of excessive force.

### B.  Plaintiff Earl Fuller

### 1.  Factual Background

Plaintiff Earl Fuller was sitting at his computer when the flash grenade went off, and he got
down on the floor when he heard the police.  (*Id.* at 5.)  Evans then handcuffed Fuller.  (*Id.*; *see also*
Evans Dep. at 23-23; Fuller Dep. at 8-10.)  Fuller testifies that, after cuffing him, one of the officers put
a gun to his neck and a foot on his back.  (R&R at 5.)[40]  Fuller states that some time later:

---

[40] It appears that, if this occurred, it was done by Evans, who passed away during the pendency
of this litigation.

53

Captain Myers, if he's a captain, I don't know if he's a captain, a detective, he walks in and this time he had on his black jacket, a black windbreaker, you know, with a ball cap on and I rolled over, I was laying like this and I rolled over like this and I said, "Sir, could you tell me what's going on?"  And he snatched one of the SWAT team member's shotgun and came over to me and he kicked me twice in my back and he said, "I told you don't move."  And I said, "Sir, you don't have to worry about it, I'm not going to move."

(Fuller Dep. at 37:11-21.)  While Captain Myers denies that he ever kicked Fuller (Myers Dep. at 39:10-11),  Fuller was left handcuffed and face down on the ground for twenty-five to thirty minutes (R&R at 5).  Ultimately, Fuller testifies that Parella and Schmidt helped Fuller up.  (Fuller Dep. at 42:16-21.)  At this point, Parella asked Fuller if Fuller knew Foster, and Fuller responded that he did not.  (*Id.* at 43:10-13.)

## 2.  The R&R and Objections

The R&R concluded that Fuller was not subjected to excessive force:

Plaintiff Fuller alleges that Officer Myers grabbed an ASORT team member's shotgun, came over to Fuller, kicked him twice in the back, and said, "I told you don't move," when Fuller rolled onto his side to ask what was happening.  Fuller had been lying face down on the floor with his hands zip-tied behind his back just before the alleged kicks occurred.

Although Fuller was restrained at the time of the alleged kicks, the Court cannot say that it was objectively unreasonable as a matter of law for Myers to make physical contact with Fuller in the manner Fuller describes. The officers conducting the search in the Cline/Fuller household had a reasonable interest in keeping the occupants under control and in one place while they searched for Joseph Foster and the other things described in the search warrant.  Fuller admitted in his deposition that he moved onto his side and began questioning the officers prior to the alleged kicks.

Although Fuller states that Myers told Fuller not to move as he was administering the alleged kicks, Fuller testified that he did not believe the alleged kicks constituted an attempt to get him to roll back onto his stomach and stated that, after being kicked, he told Myers not to worry because he had no intention of moving.  Yet, by his own account, Fuller was in fact moving just prior to the alleged kicks.  Moreover, it may have appeared to a reasonable officer on the scene that, by rolling onto his side and asking what was going on, Fuller was likely to move around more and possibly even attempt to get up to see what was happening around him.

Since Fuller was restrained, it may not have been absolutely necessary for Myers to make any physical contact with Fuller in order to make him keep still and in one place; yet the court cannot say that the alleged kicks were gratuitous. . . .  Fuller admitted in his deposition that the kicks caused him no injury and that he did not seek any medical

treatment for the kicks. . . . Put simply, two non-injurious kicks . . . . even if unnecessary under the circumstances, [did not] amount[] to the infliction of excessive force.

(R&R at 53-54) (citations omitted).

The Plaintiffs have objected to these conclusions:

Defendant Myers subjected Plaintiff Earl Fuller to excessive force when he kicked Mr. Fuller twice in the back while he was restrained on the ground and posed no threat to the officers.  According to Mr. Fuller, when he heard the ASORT team yell "police" he immediately laid face down on the floor.  The ASORT team entered the house and put guns to Mr. Fuller's head. While Mr. Fuller was laying down, the officers put a zip-tie handcuff on him.  Defendant Parella asked him if he knew the suspect, Joe Foster, and Mr. Fuller answered no.  Mr. Fuller estimates that he was on the ground handcuffed for twenty minutes.  During this time, Defendant Myers arrived and kicked Mr. Fuller while he was restrained. . . . Defendant Myers denies kicking Mr. Fuller or putting a foot on his back.

Instead of accepting Mr. Fuller's testimony as true, the Magistrate [Judge] gave a hypothetical reason that kicking Mr. Fuller was justifiable. . . . The Magistrate[] [Judge's] speculation that Mr. Fuller might stand up and start wandering around is contradicted by Defendant Myers' testimony that he entered the house after ASORT had already secured the house and left.  Thus the search for Joe Foster was already complete.  At the time Defendant Myers went into the house, he knew Joe Foster was not located inside and "there wasn't any need for us to be there anymore." . . . A jury could find that Defendant Myers' use of force was not objectively reasonable.

(Plaintiffs' Obj. at 23-24) (citations omitted).

### 3.  Analysis

Myers, of course, asserts that he did not kick Fuller at all.  On summary judgment, however, the Court must take Fuller's testimony as true: the question is only whether a reasonable officer in Myers' position would have understood that he could not deliver two kicks to a handcuffed suspect.  This is a close question, but one that the Court ultimately answers in the affirmative.

It is well-established that the use of additional force on a handcuffed suspect constitutes excessive force if that suspect does not pose a safety threat, is not a flight risk, or is not somehow resisting arrest.  *See Bultema v. Benzie County*, 146 Fed. Appx. 28, 35 (6th Cir. 2005) (citing *Champion*, 380 F.3d at 901); *St. John v. Hickey*, 411 F.3d 762, 774-75 (6th Cir. 2005); *Greene v. Barber*, 310 F.3d 889, 898 (6th Cir. 2002); *Vaughn v. City of Lebanon*, 18 Fed. Appx. 252, 265 (6th Cir. 2001);  *Adams v.*

*Metiva*, 31 F.3d 375, 386 (6th Cir. 1994); *Michaels v. City of Vermillion*, 539 F. Supp. 2d 975, 986 (N.D. Ohio 2008) (collecting cases).  Put simply, "there undoubtedly is a clearly established legal norm precluding the use of violent physical force against a criminal suspect who already has been subdued and does not present a danger to himself or others."  *Harris v. City of Circleville*, 583 F.3d 356, 367 (6th Cir. 2009) (collecting cases).

There is, as well, no "*de minimis* injury requirement for excessive force claims."  *Morrison v. Bd. of Trs.*, 583 F.3d 394, 406 (6th Cir. 2009).  Indeed, the Sixth Circuit has "gone so far as to state that the 'extent of the injury inflicted' is not 'crucial to an analysis of a claim for excessive force in violation of the Fourth Amendment.'"  *Id.* at 407 (quoting *Pigram ex rel. Pigram v. Chaudoin*, 199 F. Appx. 509, 513 (6th Cir. 2006)).  The Defendants do cite to a number of cases finding that there is no claim for excessive force when a plaintiff's injuries are minor by citing to cases in which the Plaintiff was not in handcuffs, but these cases are not:

> factually similar to the issue presented here, as none of them concerned the application of force by an officer after the plaintiff had already been placed in handcuffs. . . . In contrast, the present action involves the use of force after plaintiff was already subdued, where even a minor use of force may be found to have been unreasonable.  Accordingly, evidence of the injury suffered by plaintiff is not particularly instructive.

*Hamilton v. City of New York*, Case No. CV-07-3633, 2009 U.S. Dist. LEXIS 63432, at *30-31 (E.D.N.Y. July 23, 2009) (citations omitted).[41]

---

[41] It is for this reason that the Defendants' attempt to characterize the kicks as too minor to be considered kicks is not material on the question of liability:

| COUNSEL: | The Magistrate Judge . . . . accepted Mr. Fuller's testimony that Captain Myers did have contact with Mr. Fuller in his back area by means of his foot.  The only – |
|---|---|
| THE COURT: | Wait.  Did you really just say that? |
| COUNSEL: | That's just it.  It is only because – |
| THE COURT: | "Contact in his back area by means of his foot"? |
| COUNSEL: | Because it is only because Fuller used the term "kick," used the word "kick," that plaintiffs feel they have an excessive force case, |

At bottom, Myers does not contend that Fuller posed any threat or flight risk at the time that Fuller alleges that he was kicked by Myers.  So, too, there is nothing in the record to indicate that Fuller could have been considered some type of risk, given that Fuller was handcuffed and on the floor at the time of the purported kick.  (Fuller Dep. at 37:11-21.)  Fuller, moreover, was not suspected of any crime, much less under arrest, which makes the application of force much more problematic from the perspective of a reasonable officer.  *See Graham*, 490 U.S. at 396 (explaining that less force is generally reasonable when an individual does not pose an immediate threat, is not actively resisting arrest, or is not suspected of a particular severe crime); *Bashir v. Rockdale County*, 445 F.3d 1323, 1332 (11th Cir. 2006) ("[T]he plaintiffs were not suspected of committing a serious crime, did not pose an immediate threat to anyone, and did not resist arrest." (explaining *Thornton v. City of Macon*, 132 F.3d 1395, 1400 (11th Cir. 1998)); *Ikerd v. Blair*, 101 F.3d 430, 435 (5th Cir. 1996) ("[T]he facts that the plaintiff was nine-years-old, was not under arrest, and posed no threat to the officers or the general community were 'the very ingredients relevant to an excessive force inquiry'" (quoting *McDonald, III v. Haskins*, 966 F.2d 292, 292-95 (7th Cir. 1992)); *Hockenberry v. Village of Carrollton*, 110 F. Supp. 2d 597, 601 (N.D. Ohio 2000) ("The decedent was not suspected of any serious criminal wrongdoing.").

---

but when you break it down as to what Myers allegedly did, Fuller rolled over while, you know, while cuffed with the Ziplock plastic cuffs on the ground.  He had been told to stay there, but he rolled over, and Myers came up to him and with his foot, you know, kicked, pushed, whatever you want to, had contact with his back area twice, and Fuller rolled over onto his stomach, and at the same time Myers said, "I told you not to move."  That does not constitute excessive force.  He had no – no pain, no injury, nothing other than contact of the foot in his back area, under circumstances under which a search warrant was being executed for a dangerous armed felon.

(9/24/09 Hrg. Tr. at 68:12-69:21.)

57

In sum, although the R&R *hypothesized* that it "may have appeared to a reasonable officer on the scene that, by rolling onto his side and asking what was going on, Fuller was likely to move around more and possibly even attempt to get up to see what was happening around him" (R&R at 54), there is nothing *in the record* to support the belief that any force was necessary at all.  *See Morrison,* 583 F.3d at 407 ("[U]nder specific circumstances, a slap may constitute a sufficiently obvious constitutional violation . . . ." (quoting *Pigram*, 199 F. Appx. at 513).[42]  This was clearly established on September 12, 2006.  *Id.* at 408 ("[O]bvious . . . as of October 30, 2002." (quotation marks omitted) (citations omitted)).  Accordingly, Defendant Dale Myers' Motion for Summary Judgment (Doc. 94) on this claim is **DENIED**.

### C.  Plaintiff Kiana Smith

#### 1.  Factual Background

Smith was in the bathroom when ASORT entered the residence.  She describes events with an unidentified officer:

> He told me to turn around and put my face on the floor. . . . [which I immediately did]. . . .  I had my purse strapped across me and there was some clothes on the floor, someone had just got out of the tub getting ready for bed, so I was laying on those clothes, I was laying on clothes and my purse was strapped across me and I kind of threw it on my back. . . . [then, after approximately a minute and a half] he asked me to get up.  He made me lift my shirt to see if I had any weapons. . . . I have no idea what he was looking at.  I lifted my shirt and I turned around in a circle.  I did everything he asked me to do. . . .  I had a bra [and nothing else] [under my shirt]. . . . He was just holding [his gun pointed at me during this]. . . . [Then] [h]e asked me to get back on the floor.  I got back on the floor.  Then the voice that I heard say clear, the guy asked me to get up again.  He kicked me, then he told me to go in there with [one of the children] which is the first bedroom as you walk up the steps.

---

[42] There is arguably a second, independent, basis for denying qualified immunity.  Viewing the facts in the light most favorable to the nonmoving party, the search had concluded some time before Fuller was kicked.  As explained below, a reasonable jury could conclude that, as a matter of clearly established law, the Plaintiffs were detained for an unreasonable length of time after the conclusion of the search.  If this is true and any reasonable officer would have understood that Fuller should not have been detained *at all*, it follows that it was objectively unreasonable to use force to keep him that way.

(Doc. 86 ("Smith Dep.") at 35:3-41:20.)  Smith was then taken into the room with Cline's 6-year old daughter, where Smith observed two officers, one of whom "was standing at the foot of [the child's] bed with the gun holding it on her."  (*Id.* at 47:1-3.)[43]  Smith then went and held the child (*id.* at 47:12-16), and an unidentified officer took Smith's purse from her neck and dumped out the contents (*id.* at 47:17-22).  Smith was then allowed to collect the contents of her purse and walk downstairs with the child, where she was allowed to sit next to her still-handcuffed husband, Thomas Willis.  (*Id.* at 48:19 – 49:5.) At some point, Smith was asked if she knew Foster, and she replied that, although she had known him as a child, she did not know him any longer.  (*Id.* at 81:16-23.)

## 2.  R&R and Objections

The R&R concluded that Plaintiff Smith cannot sustain her claim because she cannot identify the officer who allegedly used excessive force upon her:

> Plaintiff Smith states that she was upstairs in the Cline/Fuller residence when Defendant police officers entered the house.  She testified that when she was using the bathroom upstairs, she heard some people arguing outside, then a loud boom, and then she saw a blue light in the sky.  She opened the door to go downstairs but then saw four people dressed in black run by the door.  When she turned to close the door, an officer in the pack "turned on [her] with a rifle and told [her] to get down and put [her] face on the floor."  Plaintiff Smith complied. Plaintiff Smith further testified that the officer then told her to get up, lift her shirt, and turn around in a circle so that he could check for weapons.
>
> Plaintiff Smith again complied. The officer then allegedly told Plaintiff Smith to get back down on the floor.  Plaintiff Smith testified that while she was on the floor, the officer allegedly kicked Plaintiff Smith on her left hip . . . .  she believes that the alleged kick to her hip has been causing the pain in her back. . . .
>
> Although this court must take the facts in the light most favorable to Plaintiff Smith, "[i]t is well established that a plaintiff cannot recover in a § 1983 action if he [or she] does not identify the officer that caused the alleged deprivation of his [or her] constitutional rights." . . . Smith has not presented enough evidence from which a reasonable jury could infer that Alfrey or any other individual officer administered the kicks to Smith. To allow a jury to so infer would amount to mere speculation . . . .

---

[43] This testimony, if true, would appear to support a claim under § 1983, but for the failure to identify the officer or officers involved.  *See, e.g., Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009) (Wood, J.) ("[P]ointing guns at persons who are compliant and present no danger is a constitutional violation." (collecting cases)).

(R&R at 56-58) (citations omitted).

### 3.  Analysis

The Plaintiffs did object to this portion of the R&R, but they do not point to anywhere in the record where Smith purports to identify the officer who she describes above.  Indeed, as the Court indicated in its recitation of the facts, even when viewed in the light most favorable to the non-moving party, there simply is no indication who this law enforcement official might have been.  The Court, accordingly, adopts the reasoning articulated in the R&R in full, and **<u>GRANTS</u>** all of the Defendants' Motions for Summary Judgment (Docs. 69, 71, 72, 94) with respect to Smith's excessive force claim.

### D.  Plaintiff Melanie Cline

### 1.  Factual Background

While the other Plaintiffs were being detained, ASORT Team Member (and Mansfield Police Officer) Jason Bammann and Team Leader Mack entered Plaintiff Melanie Cline's room.[44]  Cline was sleeping, unclothed, and exposed from her waste up.  (R&R at 6; *see also* Bammann Dep. at 33:10-15.) Bammann testifies that, after he ordered Cline to put her hands behind her back, Cline "was digging underneath – there was two mattresses laying on the floor and I remember some blankets and stuff laying all over the place.  She was digging, putting her hands underneath something there." (Bammann Dep. at 32:7-11.)  He asserts that he feared she was reaching for a weapon and felt that she, therefore, posed a danger to him and the other officers.  (*See id.* at 32:7-38:5.)  Bammann does concede that no objects were ever found under the mattresses or blankets.  (*Id.* at 33:7-34:21.)  On the other hand, he testifies that it "felt like an eternity" when they were asking Cline to show her hands.  (*Id.*)  Bammann testified that he ultimately put his foot on Cline's back because he felt it was necessary to do so to make her comply with his order to show her hands.  (*See id.* at 32:7-38:5.)

---

[44] Neither party seems to point the Court to any testimony from Mack on the sequence of events in Cline's room, and the Court could find none.

Cline's testimony is arguably in conflict with Bammann's.  She testifies that she was asleep, lying face down in her bed, when she woke up suddenly with an "excruciating sharp pain running up [her] back and heavy pressure on top of [her] and [felt] the barrel of a gun in the back of [her neck]." (R&R at 6; Doc. 25 ("Cline Dep.") at 25:16-20 ("QUESTION:  How did you first learn that the police had come to your home?  ANSWER: I woke up in pain . . . ."); *see also* Cline Dep. at 26:6-10 ("QUESTION: And how was the person on top of you, were they laying on top of you?  ANSWER: I don't know because I was on my stomach flat.  All I felt was excruciating pain and an extreme amount of pressure on my neck and my back.").)  Cline testifies that she was then "jerked roughly up out of [her] bed." (Cline Dep. at 27:24-28:1.)  Later that evening, Cline would call 911 because she said that she "was having spasms in [her] back and shaking uncontrollably and . . . [her] back was in excruciating pain [as was her] neck." (*Id*. at 34:4-6.)

After being put in handcuffs, Cline started to cry and ask about her children.  (Cline Dep. at 28:19-29:5.)  The officers apparently did not answer her, but, rather, told her that they "would proceed on to the rooms." (*Id.* at 29:8-9.)  She then stood for five minutes, still naked from the waste up, while Mack and Bammann searched her room.  (R&R at 6.)  After Mack and Bammann completed the search, they escorted Cline from the room.  (*Id.*)  Cline then asked ASORT Team Member (and Richland County Deputy) Jeffery Alfrey if he could cover her up, and he complied.  (*Id.*)

Cline, Mack, Bammann, and Alfrey went to her 2-year old son's room, and Bammann picked up Cline's son and began carrying him.  (*Id.*; *see also* Bammann Dep. at 40:20-24.)  As they walked past Cline's daughter's room, Cline looked in and realized that no one was there, which caused her to become upset.  (Cline Dep. at 30:10-24.)  The officers escorted Cline downstairs, however, and once there, Cline saw her daughter sitting on Plaintiff Kiana Smith's lap.  (*Id.* at 31:1-10.)  The officers then removed Cline's handcuffs, told her to "shut up and sit down," and put her son in her lap.  (*Id.* at 31:1-32:6.)  No officer ever asked Cline about Foster.  (*Id.* at 32:17-19.)

61

### 2.  R&R and Objections

The R&R concluded that Plaintiff Cline cannot sustain her excessive force claim because she

was asleep and cannot contradict law enforcement officials versions of events:

> Plaintiff Cline alleges that she was asleep in her bed when suddenly she awoke to
> excruciating pain in her back and the feeling of something round, like the barrel of a gun,
> on her neck.  She claims that she did not know what was happening at first but later
> learned that Officer Bammann was responsible for the pressure applied to her back.
> Cline further testified that it felt as if Bammann were standing on her back with both feet
> — one foot on her neck and the other on her lower back — putting all of his weight on
> her. . . .  Bammann testified that he placed his foot on Plaintiff Cline's back to get her to
> comply with Defendant Mack's order to show her hands.  According to Bammann, it
> looked like Cline was digging under something on the bed and he was afraid that she
> might come up with a weapon.  He testified further that he used only so much force as
> was necessary to get her to comply.
>
> Taking the facts in the light most favorable to Cline, the court finds that Defendant
> Bammann's conduct was not objectively unreasonable under the circumstances.  Cline
> testified in her deposition that she was asleep at the time of the officers' entry into her
> bedroom and that she awoke only upon feeling the excruciating pain of someone standing
> on her back.  According to Cline's own account, therefore, Cline did not realize that
> someone was even in her room until after Bammann already had applied pressure to her
> back.  Cline admits that she is a "deep sleeper."  Accordingly, it may have appeared to a
> reasonable officer on the scene that Cline, who was sleeping and therefore unresponsive,
> was in fact resisting or otherwise willfully non-compliant.
>
> The court notes that it is "clearly established that putting substantial or significant
> pressure on a suspect's back while that suspect is in a face-down prone position after
> being subdued and/or incapacitated constitutes excessive force[.]"  However, in this case
> it may have appeared to an objectively reasonable officer on the scene that Plaintiff Cline
> was not in fact subdued or incapacitated, even though she was lying down prone in the
> bed.  Relevant to this point is the indication in Plaintiffs' opposition that Cline was
> "groping around for a shirt" just prior to feeling the pain in her back.  Given the facts that
> "[b]lankets and bedding can conceal a weapon," and that the police officers in this case
> were searching for a suspect known to possess firearms, an objectively reasonable officer
> on the scene might reasonably have feared that Cline was "groping around" for a weapon,
> even though she in fact was not.  Moreover, Plaintiff Cline does not claim that the
> pressure Bammann applied to her back was asphyxiating — a principal danger associated
> with applying pressure to the back of someone in a face-down prone position.  Rather,
> Plaintiff Cline complains that she felt pain as Bammann applied pressure to her back and
> that her back was bruised afterward.  Under the circumstances of this case — in which
> Defendants were searching for a suspect believed to be armed and dangerous, Cline
> appeared to be "groping" around for something in the bed, and the pressure applied to
> Cline's back was not asphyxiating and did not cause long-term injury — the Court finds
> that the force used against Plaintiff Cline was not excessive.  Since no constitutional

62

violation occurred, the court finds that Defendant Bammann is entitled to qualified immunity with respect to Cline's claim of excessive force against her.

(R&R at 55-56) (citations omitted).

The Plaintiffs respond:

Ms. Cline was upstairs asleep when she was attacked by the Defendant officers. "I woke up in pain, in excruciating sharp pain running up my back and heavy pressure on top of me and I felt the barrel of a gun in the back of my neck." Defendant Bammann had pressed his knee into her back. While Defendant Bammann kept his knee on her back, Defendant Mack grabbed her hands and handcuffed them behind her back while she was face down on the bed. A third unknown officer pointed a gun at her head. Ms. Cline could not physically resist the officers because they had her completely subdued: "I opened my eyes up and I'm hearing all this yelling, I'm just laying there with my hands spread out across the bed." She testified that she was not given an opportunity to get out of her bed. Instead she was "jerked roughly up" and placed in handcuffs. Her breasts were exposed.

(Plaintiffs' Obj. at 32-33) (citations omitted).

### 3.  Analysis

While Ms. Cline's experience was certainly a traumatic one by any account, the problem with her claims is that she is unable to refute Bammann's testimony that he believed that the amount of force used was appropriate under the circumstances. Bammann's testimony here is clear:

QUESTION:  What did you say to her and what did she say to you?

ANSWER:  We were ordering her to put her hands behind her back and ended up physically having to put her hands behind her back.

QUESTION:  When you ordered her to put her hands behind her back, what did she do?

ANSWER:  She initially was digging underneath – there was two mattresses laying on the floor and I remember some blankets and stuff laying all over the place. She was digging, putting her hands underneath something there.

. . . .

QUESTION:  And what was Mack doing?

ANSWER:  Mack was standing there ordering her to show her hands.

. . . .

63

QUESTION:   How long did this go on where she's digging and she's being ordered to show her hands?

ANSWER:   Felt like an eternity but I can't give you a specific time.

. . . .

QUESTION:   I mean generally when you're in that kind of situation and having experienced that, I take it that you wouldn't let it go on for more than a minute when somebody's actually digging, right?  Because your fear was that she was going to come up with a weapon, correct?

ANSWER:   Right.

(Bammann Dep. at 31:25 – 34:12.)  He explained further that he placed his foot on Cline's back for mere "seconds" and used "[j]ust enough force to get her to comply."  (*Id*. at 37:10 – 38:5.)

Fundamentally, Bammann's testimony that he perceived Cline to be a threat to him at the time that he applied force to her and that he used only such force as necessary to get her to comply with his orders and ensure his safety and the safety of the other officers cannot be disputed by Cline, who cannot testify as to what events occurred while she was asleep.  *See Chappell v. City of Cleveland*, 585 F.3d 901, 914 (6th Cir. 2009) (explaining that a reasonable jury may not usually draw inferences from what witnesses do not perceive).  Accordingly, Defendant Jason Bammann's Motion for Summary Judgment with respect to Plaintiff Cline (Doc. 72)  is **<u>GRANTED</u>** as to this count.

### E.  Plaintiffs Kierre Fuller and Milanie Cline

There are less facts in the record with respect to these two Plaintiffs, but what facts do exist are well-summarized by the R&R, which recommends granting Defendants' Motion for Summary Judgment on their claims:

Plaintiffs do not allege that Defendant police officers hurt or attempted to hurt Kierre; rather, they appear to claim that Defendant Bammann's course of action in carrying Kierre downstairs with one arm while toting his rifle in the other and failure to give Kierre to his mother right away somehow amounted to excessive force.  Taking the facts in the light most favorable to Plaintiffs, the court concludes that Bammann did not use excessive force against Kierre.  First, it is undisputed that Defendant Bammann did not point his rifle at Kierre while carrying the boy downstairs, but merely held it with his other hand.  Second, as stated above, the officers in this case had a reasonable interest in

64

keeping all the occupants of the Cline/Fuller residence under control and in one place while they were executing the search warrant. They also had an interest in sweeping the house quickly and efficiently. Given the fact that Kierre Fuller was four years old at the time of the search, a reasonable officer under the circumstances might well have thought it would be safer and more efficient to carry Kierre downstairs than to pursue some other course of action, such as allowing Kierre to walk down by himself or giving him immediately to his mother, who had been put in handcuffs and, by Plaintiffs' account, was very emotional at the time. Third, it is undisputed that once Plaintiff Cline arrived downstairs, her handcuffs were removed and Kierre was placed in her lap. Thus, it appears from the undisputed facts that Kierre was reunited with his mother within moments of his removal from the bedroom.  The court cannot say that any of Defendant Bammann's actions with respect to Kierre was objectively unreasonable under the circumstances.

Plaintiffs do not specifically allege any incidents of excessive force as against Milanie Cline . . . .

(R&R at 59-60) (citations omitted).

The Plaintiffs did not file a proper objection to these conclusions.[45]  They have not preserved the right to further review.  *See Thomas*, 474 U.S. at 149-52; *Crum*, 921 F.2d at 645 n.1; *Gonzales*, 2006 U.S. Dist. LEXIS 73370, at *3-4.  The Court, accordingly, **GRANTS** all of the Defendants' Motions for Summary Judgment with respect to Plaintiffs Kierre Fuller's and Milanie Cline's claims of excessive force.

## IX. WHETHER THERE IS LIABILITY UNDER § 1983 BECAUSE LAW ENFORCMENT OFFICIALS DETAINED THE PLAINTIFFS FOR AN UNREASONABLE LENGTH OF TIME

### A.  Relevant Facts

Viewing the facts in the light most favorable to the Plaintiffs, as the Court must, it appears that the Plaintiffs were detained for between thirty and forty-five minutes.  (Smith Dep. at 50:6-19; *see also* Doc. 98 ("Parella Dep.") at 8:8-11; Doc. 102 ("Cline Opp.") at 29 (collecting relevant deposition testimony).)  Fuller and Willis, moreover, were in handcuffs for approximately thirty minutes: Willis on

---

[45] The Plaintiffs do mention Kierre Fuller in one of their headings (*see* Plaintiffs' Obj. at 32) and in their list of persons subjected to excessive force (*id*. at 28), but they never attempt to explain how or why the R&R was flawed with respect to its conclusions about his claim of excessive force.

the couch and Fuller on his stomach.  (R&R at 4-5.)[46]  Yet, after a mere two to three minutes, Detective

Snavely left the house, called his informant, and explained that Foster was not inside:

> [The informant and I] had a conversation on the phone.  I said, you know, we've covered
> this a number of times as far as where you saw him, where you saw him go into, and all
> that.  And for some reason I don't know, he wasn't found inside.  I'm not saying he
> wasn't inside, but he wasn't found inside.

(Snavely Dep. at 31:8-12.)  When Detective Snavely left, ASORT team members were still in the house.

At least one Defendant, Mansfield Police Officer Frank Parella, describes a timeline that is

consistent with one asserted by the Plaintiffs.  He first testified that he entered the house approximately

ten minutes after the search began:

> I exited my car, walked across the street, and waited outside until they entered the house
> and secured the house. . . . I'm going to say probably ten minutes after the team entered
> the house, I went in. I was advised it was all clear to go in. I was going to go in to see if
> they had found who they was looking for.  And I walked in, and some of the members of
> the ASORT team were in, like, the living room area.  And the next room, I believe, was,
> like, a dining room area, and I saw some black persons had been detained there.  And
> they told me that they had searched the house and they didn't find who they was looking
> for.  I do remember someone from the house asking me who I was.  I introduced myself,
> and they asked me, you know, if I could explain to them what was going on.  And I told
> them that I would go out and tell the Ontario officers that somebody should go in there
> and talk to those people, let them know what was going on.  That's what I did.  And then
> I left.

(Parella Dep. at 6:10-7:5.)  He explained that he remained in the house for an additional ten minutes.

(*Id.* at 7:6-7.)  During those ten minutes, he testified that "[t]he ASORT team members were standing

close by [the Plaintiffs].  I didn't particularly notice if they were handcuffed or not, though.  <u>At that

point, those persons were not free to roam around the house.</u>" (*Id.* at 8-11) (emphasis added).  After

leaving the house, Parella stated:

---

[46] Detective Schmidt was standing with the plaintiffs for the duration of this detention (*see* Doc.
85 ("Myers Dep.") at 28:24-29:3; 36:4-15), Officer Parella was with the plaintiffs from the 11th – 20th
minutes of the detention (Parella Dep. at 6:10-7:7), and Captain Myers was intermittently present
throughout the detention.  Captain Myers eventually allowed Detective Schmidt to remove the
handcuffs, and relieved Schmidt from his post (*see* Myers Dep. at 28:24-29:3;36:4-15; 37:3-7).  As
indicated below, Captain Myers describes a <u>very</u> different timeline for these events.  The Court's task at
this stage of litigation, however, is only to determine what a reasonable jury could conclude.

> I walked outside, and I told Riley Snavely – he was from the Ontario Police Department. And there was another officer from the Ontario Police Department standing in an alley beside the house. And I said, Hey, I just went in there, and people were asking questions. I said, This is your search warrant.  You should go in and explain to them.  And then I left.

(*Id.* at 8:16-22.)  In sum, Parella testified that the Plaintiffs were still restrained twenty minutes after the commencement of the search, between seventeen and eighteen minutes after Detective Snavely left the house, and no less than ten minutes after Parella himself was told that the house was secure.

Detective Snavely, Captain Myers, and ASORT Team Member Alfrey, on the other hand, offer testimony that differs markedly from Parella's and the Plaintiffs'.  Detective Snavely, for example, testifies that the ASORT team members left after somewhere between five and eight minutes.  (Snavely Dep. at 31:19-22.)  This is supported by Alfrey's testimony:

> QUESTION:   And what's the purpose of detaining all the occupants in the house?
>
> ANSWER:      Until we can determine whether or not somebody's got a weapon.
>
> QUESTION:   How long were you in the house?
>
> ANSWER:      Just a few minutes.
>
> QUESTION:   More than 10?
>
> ANSWER:      No.

(Alfrey Dep. at 28:3-10.)

Captain Myers testifies to an even shorter timeline.  He recalls that the ASORT Team Members left the house less than two to three minutes after the beginning of the search.  (Myers Dep. at 28:24-29:3 ("I was surprised because it wasn't very long when they started to come back out.  Two or three minutes, I saw members of the ASORT team begin to exit the front of the residence.  I then pulled up right in front of the residence and got out and walked up.").)  Myers, moreover, explains that when he entered the house only Detective Schmidt was in the living room and:

> [t]here was a black male standing, I believe he was standing, in the living room. There was a black male sitting on a kitchen chair just inside the kitchen, which was adjacent to

the living room.  And I saw that he still had a flex cuff on him. He had his hands behind his back in a flex cuff.  Detective Schmidt asked me if he could release that guy, and I said yes.  And I watched Detective Schmidt walk over and cut the flex cuff off of the guy that was in the kitchen.  I then went back outside to the alley, up the alley to where Detective Snavely was talking with the informant.  And then I went back inside and realized that nobody had brought a copy of the search warrant with them. I then informed one of the guys that was standing there – and I don't know either one of these guys by name – that nobody had brought a copy of the warrant.  I identified myself, who I was, and then I informed them that I would have to return to the Mansfield Police Department, where I knew that the original search warrant was located.  I told them I would make a copy and I would be right back in a few minutes.  We then left the house. Since Joey Foster was not located in the house, we left.

(*Id.* at 24:1-23.)

A reasonable jury could credit Captain Myers' testimony, but there is also little question that a reasonable jury could find that the plaintiffs were restrained for twenty-five minutes or more after the police had completed their search of the premises and concluded that the house was secure.[47]  It is, accordingly, this later characterization that the Court must accept as true for purposes of summary judgment.

**B.  Whether the Plaintiffs Suffered a Depravation of a Constitutional Right**

### 1.  Applicable Law

Law enforcement officials "may detain persons without probable cause while executing a search warrant if justified by the circumstances."  *Michigan v. Summers*, 452 U.S. 692, 705 (1981).  This authority is "categorical," and "it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure."  *Duncan v. Jackson*, 243 Fed. Appx. 890, 896 (6th Cir. 2007) (quotation marks and citation omitted).  While law enforcement may not detain individuals "for a prolonged and unnecessary period of time," *Rettele*, 550 U.S. at 614, "so long as the officers do not detain . . . occupants beyond the point of the premises search, the detention has not exceeded its permissible scope," *United States v. Vite-Espinoza*, 342 F.3d 462, 473 (6th Cir. 2003) (Clay, J.,

---

[47] All testimony before the Court indicates that efforts to search the house in any manner concluded after less than ten minutes, and arguably after less than five.

concurring) (explaining *Summers*, 452 U.S. at 705).  A court, in determining whether a detention has exceeded a reasonable duration, must give substantial deference to the judgment of the officers on the scene.  *See, e.g.*, *Muehler v. Mena*, 544 U.S. 93, 100 (2005) ("[T]he 2-to 3-hour detention in handcuffs in this case does not outweigh the government's continuing safety interests.").

Nevertheless, the power to detain suspects under *Summers* is not without limit.  First, and perhaps self-evidently, if the search is unreasonable, the detention is as well: the government does not have a legitimate interest in detaining suspects during an unconstitutional search.  *Pray v. City of Sandusky*, 49 F.3d 1154, 1160 (6th Cir. 1995) ("[It is] for the trier of fact to determine, based on the credibility of the evidence before it, at what point the officers knew or reasonably should have known they were at the wrong residence, and to determine what searches and seizures occurred after that."); *see also Harman v. Pollock*, 446 F.3d 1069, 1085 (10th Cir. 2006) (per curiam) ("[F]actual disputes exist as to whether the full scale search took place after the officers should have realized they were in the wrong residence."); *cf. Jernigan v. City of Royal Oak*, 202 Fed. Appx. 892, 896 (6th Cir. 2006) ("[I]t took the officers an hour to determine the startlingly obvious fact that the men had done nothing wrong."); *cf. also Rettele*, 550 U.S. at 613-14 ("[D]etention represents only an incremental intrusion on personal liberty <u>when the search of a home has been authorized by a valid warrant</u>."   (citations omitted) (emphasis added)).  In the same vein, the power to detain suspects under *Summers* terminates with the end of the search itself – to legitimately detain suspects after the conclusion of a search, the police must have some *other* reason for doing so.  *See United States v. Fountain*, 2 F.3d 656, 665 (6th Cir. 1993) ("The issue presently before us requires that we determine whether the district court correctly concluded that the continued detention . . . at the conclusion of the search was supported by 'reasonable suspicion.'"); *cf. United States v. Jenson*, 462 F.3d 399, 404 (5th Cir. 2006) ("Detention . . . may last no longer than required to effect the purpose of the stop."); *United States v. Randall*, 62 Fed. Appx. 96, 101

(6th Cir. 2003) ("Facts ascertained during an initial stop may provide reasonable suspicion for further detention.").

There is a particular concern with the length of a detention incident to search when handcuffs are used on those who are not suspected of any crime.  Although, "the Supreme Court's decisions . . . clearly permit an officer to handcuff and detain an individual during the execution of a search warrant," *Vance v. Wade*, 546 F.3d 774, 783 (6th Cir. 2008), Justice Kennedy has explained:

> The safety of the officers and the efficacy of the search are matters of first concern, but so too is it a matter of first concern that excessive force is not used on the persons detained, especially when these persons, though lawfully detained under *Michigan v. Summers*, 452 U.S. 692 (1981), are not themselves suspected of any involvement in criminal activity.

*Muehler*, 544 U.S. at 102 (Kennedy, J., concurring).[48]  Of special relevance here, handcuffs must be removed "if, at any point during the search, it would be readily apparent to any objectively reasonable officer that removing the handcuffs would not compromise the officers' safety or risk interference or substantial delay in the execution of the search."  *Id.*  There is <u>considerable</u> deference given to the judgment of officers on the scene, but the constitution does require that judgment actually be exercised: police "handcuffing during searches [should not be] routine."  *Id.*

### 2.  The R&R and Objections

The R&R concludes that summary judgment is appropriate as to all defendants on this claim.  It explains:

> Plaintiffs claim that they were detained in the Cline/Fuller residence for up to 30-45 minutes.  They claim that they should have been released within 5-8 minutes of the officers' entry into the residence "because by then the defendants knew that Joe Foster was not present and they had stopped looking for him at 347 S. Main."  Plaintiffs allege that several of the individual police officers are not entitled to qualified immunity based on this issue.  They claim that "Myers was responsible for the extended detention of the plaintiffs in their own home.  He is not entitled to qualified immunity on that issue since he knew that Joe Foster was not present well before he removed all restraints on the plaintiff[s'] liberty."  They also state that "Officers Mager, Parella and Schmidt

---

[48] Justice Kennedy's concurrence is particularly persuasive both because it is well-reasoned and because he provided the fifth vote for the majority in *Muehler*.

participated in and failed to end the excessive detention of the plaintiffs despite their knowledge that the suspect was not in the home."

. . . .

The relevant question . . . [is] which, if any, constitutional violations the defendant[s] . . . committed . . . after realizing that they were in the wrong place.  Plaintiffs' sole allegation on this issue is that they were detained too long after Defendant police officers realized that Joseph Foster was not in the house.  The court sees a few problems with this argument. First, Plaintiffs have not presented any evidence indicating that any individual Defendants stayed and continued to commit constitutional violations against Plaintiffs despite knowing that Joseph Foster was not in the house. As a general matter, it certainly is more difficult to prove a negative — i.e., knowledge that something is not, as opposed to affirmative knowledge that something is. . . .  [T]he only way that Defendants could have learned that Joseph Foster was not in the house was by thoroughly searching the house.  A thorough search necessarily takes time.  Moreover, some of Defendants reasonably may have continued to harbor suspicions that Foster was either in the house or somewhere nearby even after ASORT's five to eight minute-long sweep of the house.

Second, even if some of Defendants remained on the premises after they believed Joseph Foster was not in the house, the court does not believe that such action on the part of the police would have been objectively unreasonable under the circumstances.  Defendants had received authorization from the Prosecutor's Office to use ASORT because they believed that they were searching for an armed and dangerous felon.  Given the suspect's apparent volatility, it would have been natural and reasonable in such a situation for Defendants to hesitate somewhat about leaving immediately after ASORT's brief sweep of the house.  Additionally, Plaintiffs, by their own estimate were restrained for well under an hour, a good portion of which they spent sitting on furniture in the living room — as opposed to lying face down on the floor — and during which most of them were not wearing handcuffs. . . .  Given these facts, the court cannot say that there was no "law enforcement reason to justify such restraints" for 30-45 minutes or that Plaintiffs' alleged detention time of 30-45 minutes was excessive as a matter of law.

(R&R at 62-64.)

The Plaintiffs object to this conclusion, asserting that the relevant question for a jury is whether and for how long law enforcement officials detained the Plaintiffs after concluding that Foster was not at 347 South Main:

[T]here is [substantial] evidence that says the ASORT team was out of the house in five to eight minutes, having determined that Joe Foster was not there, and yet the plaintiffs were all detained from 35 to 45 minutes, depending on which piece of evidence you look at, and yet the Magistrate just determines that that is a reasonable detention . . . .  There is a lot of case law that says you can have lengthy detentions, but you still have to look at the underlying reasons.  In this case, a[n] [un]contested issue of fact is they knew Joe

71

Foster was not there within eight minutes.  There is no reason to hold onto these people
for 35 to 45 minutes . . . .

(9/24/09 Hrg. Tr. at 60:1-17 (Argument of Plaintiffs' Counsel); *see also* Plaintiffs' Obj. at 39 ("Under

precedent existing at the time the warrant was served, officers were required to leave the home as soon

as they discovered Mr. Foster was not there. . . .  The proper inquiry is whether they detained the

Plaintiffs after they knew Foster was not present.")

### 3.  Analysis

Viewing the facts in the light most favorable to the non-moving party, the question is whether a

reasonable jury could find that the Defendants violated the Plaintiffs' Fourth Amendment rights by

detaining the Plaintiffs for twenty-five minutes or more after concluding the house was secure.  The

Court has detailed the timeline of the detention above, but two facts are of special relevance: (1)

Detective Snavely called his informant within minutes and reported that Foster had not been found in the

house (Snavely Dep. at 31:8-12) and; (2) ASORT members were standing in the room with the Plaintiffs

(Parella Dep. 7:8-11) rather than continuing to search the house.  This Court concludes that, viewing the

facts in the light most favorable to the nonmoving party, a reasonable jury could find that the Plaintiffs'

constitutional rights were violated.  *See Pray*, 49 F.3d at 1160 (6th Cir. 1995); *Jernigan*, 202 Fed. Appx.

at 896.[49]

---

[49] During this time, some of the Plaintiffs, none of whom were suspected of any wrongdoing,
were restrained in handcuffs.  (R&R at 62-63.)  Contrary to the Defendants' suggestion, the fact that all
of the Plaintiffs were not restrained in handcuffs does not necessarily make the detention more
reasonable.  First, the question is whether any individual Plaintiff's rights were violated, and Plaintiff
Earl Fuller, who, viewing the facts in the light most favorable to the nonmoving party, lay face down on
the ground in handcuffs for 25 minutes, was not somehow less restrained because Plaintiff Melanie
Cline was allowed to sit on the couch holding her child.  Second, on the record as it currently stands, a
reasonable jury could conclude that it was objectively unreasonable to keep some of the Plaintiffs in
handcuffs, based in part of the fact that the officers felt no need to keep other plaintiffs in handcuffs.
This is not, of course, to say that the Defendants could not provide testimony that would explain why an
objectively reasonable officer would take such action, only that there is currently no such evidence in
the record.  As previously indicated, this Court will follow Justice Kennedy's formulation of the law
here, and there is no question that a reasonable jury could conclude that handcuffs were not removed
even though it would have been "readily apparent to any objectively reasonable officer that removing

Precisely because the R&R is thorough and well-considered, the Court believes it is helpful to address directly why it does not reach the same conclusion as the R&R on this particular point.  The R&R gives three reasons that the detention was reasonable, and the Court will address each in turn.

First, the R&R suggests that the detention was not unreasonable because a "thorough search necessarily takes time."  This is, of course, true, and detentions of a much greater length have been upheld as reasonable.  *Muehler*, 544 U.S. at 100 ("[T]he 2-to 3-hour detention in handcuffs in this case does not outweigh the government's continuing safety interests.").  The problem is that a reasonable jury could conclude that the search was completed in five to eight minutes and that the law enforcement officials considered the premises secure at this point.  The length of time that a different search might have taken cannot be used to justify the detention in this case; the question is only whether the Plaintiffs were detained after the Defendants had concluded this particular search.  It is of course, possible that the Defendants will give testimony that they did not consider the premises secure or the search concluded, and that a jury would consider that testimony credible.  But there is no current record evidence to that effect; the current record evidence is to the contrary, that all search activities concluded after 5-8 minutes or less, and that Detective Riley Snavely was on the phone with his informant reporting that Foster had not been found during the time that the residents of 347 South Main, none of whom were suspected of any wrongdoing, were detained.

Second, the R&R found that "some of Defendants reasonably may have continued to harbor suspicions that Foster was either in the house or somewhere nearby even after ASORT's five to eight minute-long sweep of the house. . ."  (R&R at 63.)  This not persuasive, however, because the Defendants do not point to record evidence in support of such an explanation, and it is the Defendants who have the burden of demonstrating reasonable suspicion that detention is necessary.  *Fountain*, 2

_____

the handcuffs would not compromise the officers' safety or risk interference or substantial delay in the execution of the search."  *Muehler*, 544 U.S. at 102 (Kennedy, J., concurring).

F.3d at 665.  Even if they had offered this explanation, moreover, it would not compel judgment as a matter of law.  Viewing the facts in the light most favorable to the non-moving party, the law enforcement officials on the scene concluded their search after less than ten minutes, which is not the type of behavior in which an objectively reasonable officer engages if he believes that a violent suspect is on the premises.  Similarly, "suspicions that Foster was . . . somewhere nearby" would not necessarily allow the objectively reasonable officer to detain unrelated third parties who are not suspected of any wrongdoing; "nearby" is not 347 South Main.  None of this, of course, prohibits the Defendants from making such arguments to a jury and, depending on the facts elicited at trial, a jury might well be reasonable in believing such arguments.  But these arguments are not sufficient to compel judgment as a matter of law, particularly because the Defendants do not point to any record evidence in support of them.

Third, the R&R found that, even if the search had concluded, it was not unreasonable to detain the Plaintiffs for an additional 25 minutes.  The Court believes the law compels a different result, rather, once a search is over, the detention of persons not suspected of any crime incident to that search must end as well.  *See Pray*, 49 F.3d at 1160; *see also Jernigan*, 202 Fed. Appx. at 896; *accord Harman*, 446 F.3d at 1085.  Indeed, the Sixth Circuit has found that even detention for less than 10 minutes after the conclusion of a search may be too long.  *Pray*, 49 F.3d at 1160.  As the Fifth Circuit explained while citing to *Pray*:

> Defendants argue that they made an honest mistake in going into the Handley home and that they accordingly are entitled to qualified immunity.  If the evidence was undisputed that this was all that occurred, defendants would be correct, and they would be entitled to qualified immunity.  However, plaintiffs offered evidence that defendants did not immediately depart after learning that they were in the wrong house.  That is an issue to be resolved by a jury.  Qualified immunity does not provide a safe harbor for police to remain in a residence after they are aware that they have entered the wrong residence by mistake.

*Simmons v. City of Paris*, 378 F.3d 476, 480-81 (5th Cir. 2004) (emphasis added).

The Defendants attempt to distinguish *Pray* and *Simmons* because they actually wanted to search 347 South Main (although they arguably lacked probable cause to do so), in contrast to the officers in *Pray* and *Simmons* who sought to search a different residence than the one actually searched.  But the Court can see no reason that the rationale of these cases is not equally applicable once law enforcement officials conclude that the person for whom they are searching is not on the premises being searched, especially given the flimsy evidentiary reed upon which the decision to search these particular premises was based.  *See El Bey v. Roop*, 530 F.3d 407, 421 (6th Cir. 2008) (relying upon *Pray* to explain that law enforcement officials needed to halt search efforts once those officials determined that they had detained someone other than the person for whom they were looking); *Humphrey v. Mabry*, 482 F.3d 840, 846-47 (6th Cir. 2007) ("[T]he use of  force to effect a seizure after officers knew or should have known that they had the wrong person is inherently unreasonable." (citing *Pray*, 49 F.3d at 1161)).

As previously explained, the police must have reasonable suspicion to continue to detain individuals after a search has concluded.  *Fountain*, 2 F.3d at 665.  While this is not a high standard, these defendants point to nothing in the record that would establish such reasonable suspicion and, indeed, there is at least some evidence to the contrary.  The Court concludes, viewing the facts in the light most favorable to the non-moving party, that a reasonable jury could find that the Plaintiffs suffered a deprivation of their constitutional rights when they were detained by the Defendants after the Defendants had concluded that Foster was not on the premises.[50]

---

[50] The presence of disputed issues of material fact becomes particularly salient when Counsel's position during oral argument is compared with Defendant Parella's deposition testimony:

THE COURT: But there is testimony, though, that the police determined within five to ten minutes  that what they were looking for was not there.

COUNSEL: No.  That Joe Foster was not readily seen.  That is all they determined, that the – the house they secured, no one had any weapons, you know, or had access to any weapons.  They didn't find Joe Foster, but they didn't do a complete search of every nook and cranny of the house for Joe Foster.  They didn't complete a search for the gun used by Joe Foster, or the stolen property or the tools.

## C.  The Propriety of Recovering Against Any Particular Defendant

It does not appear that the Plaintiffs have alleged that either the municipal defendants or ASORT is liable for their detention, and the Court certainly does not see any evidence in the record that those entities somehow caused the Plaintiffs' detention.  The question, then, is whether any of the individually named Defendants caused the deprivation of a clearly established right in an objectively unreasonable manner.

### 1.  Defendants Ed Schmidt and Frank Parella

Notwithstanding this Court's finding that the Plaintiffs' constitutional rights were violated as a general matter, Defendants Schmidt and Parella argue that they cannot be considered the proximate cause of any such violation:

> THE COURT: So you are saying during the whole period of time they were there, they were still searching?
>
> COUNSEL:   Your Honor, what I am saying is that the warrant granted them the authority to conduct the search. . . . what I'm saying is the warrant gave law enforcement the authority to be there, to do that.  Under those circumstances, even if you get to 45 minutes, that is not excessive detention.
>
> THE COURT: But the law doesn't say you can stay there as long as it would take you if you chose to engage in a room by room, inch by inch search of the house.  The law says you can only detain as long as the purpose for the warrant is still being served.  If they didn't search, if they went in and decided after a few minutes that they were not going to find what they wanted . . . then the detention is supposed to stop, right?
>
> . . . .
>
> COUNSEL:   I guess it depends on what you mean by "stop the detention" as opposed to leave the premises.

(9/24/09 Hrg. Tr. at 72:22-74:17.)  But Defendant Parella confirmed that the Plaintiffs were restrained for at least ten minutes after Parella was told that the house was secure.  (*See* Parella Dep. at 6:10-7:7; 7:8-11 ("At that point, [the Plaintiffs] were not free to roam around the house.").)  And the Plaintiffs, as explained above, contend that they were detained for at least 25 minutes after the conclusion of the search.  While a reasonable jury may disagree, and it is possible that additional facts elicited at trial could cause this Court to conclude, as a matter of law, that the Plaintiffs were not detained unduly after the conclusion of the search, for purposes of summary judgment the Court cannot accept the Defendants' counsel's argument that the Plaintiffs were not detained over the Plaintiffs' testimony that they were.

> Plaintiffs claim that the fact that Schmidt and Parella allegedly remained talking on the porch of the home for 15 minutes was not objectively reasonable.  Plaintiffs offer no evidence that Schmidt and Parella were restraining Plaintiffs' liberty as they stood outside the house; they have no evidence that Schmidt or Parella controlled the scene they offer no evidence that either detective believed the wrong house had been targeted; and they have no information whatsoever that Schmidt or Parella did not have a good faith belief that the underlying warrant was a valid one.  Plaintiffs also offer no authority suggesting that an officer who stands outside a home chatting while others are inside commits an unlawful seizure.

(Doc. 125 at 7.)  The Defendants are correct on this point, although not in the precise way articulated here.  First, the Defendants gloss over Parella's testimony that ASORT told him "that they had searched the house and they didn't find who they [were] looking for."  (Parella Dep. at 6:10-7:5.)  Nevertheless, Parella went to find an Ontario police officer because he apparently believed that someone needed to address the situation.  It was surely reasonable for Parella to have done so:

> I introduced myself, and they asked me, you know, if I could explain to them what was going on.  And I told them that I would go out and tell the Ontario officers that somebody should go in there and talk to those people, let them know what was going on.  That's what I did.  And then I left.

(*Id*.)  Although Parella remained in the house for an additional ten minutes (*id*. at 7:6-7), which is long enough to implicate *Pray*, the Court will not conclude that it was objectively unreasonable for him to do so after having informed the Ontario officers of the situation, particularly because the facts do not indicate that Parella was in a position of authority.

As for Detective Schmidt, the Plaintiffs simply point to no relevant facts whatsoever: they did not, for example, even submit his deposition into evidence.  About Schmidt, a reasonable jury could conclude nothing more than that he was at the scene of these events: they would not be able to conclude, for example, that he was aware or should have been aware that the detention continued after the conclusion of the search.

Accordingly, Defendants Ed Schmit and Frank Parella's Motion for Summary Judgment (Doc. 72) is **<u>GRANTED</u>** as to this count of the complaint.

### 2.   Defendant Dale Myers

The situation of Captain Dale Myers is different from the other Defendants: Myers does not dispute that he proximately caused the restraint of the Plaintiffs.  While he asserts that the Plaintiffs were free to leave long before the Plaintiffs contend that they were free to do so, he does not deny that he was responsible for any detention that did occur.  Should a jury ultimately conclude that Myers' version of events is the accurate one, or find some middle ground between Myers' testimony and the Plaintiffs', this Court will revisit the question of qualified immunity.  On summary judgment, however, the Court concludes that the Plaintiffs have overcome Myers' presumption of qualified immunity.

The present question is only whether, in light of clearly established law, a jury could find that it was objectively unreasonable to detain Plaintiffs for twenty five minutes or more after the conclusion of a search absent reasonable suspicion that the Plaintiffs had committed any crime.  *See Binay v. Bettendorf,* 601 F.3d 640, 650 (6th Cir. 2010) ("Questions remain as to whether Defendants continued to detain Plaintiffs at gunpoint long after the risk of flight and risk to the officers subsided, particularly in light of the rationale behind the limited authority to detain the occupants of a premises during a proper search – to prevent flight and minimize the risk to the officers." (citing *Hill v. McIntyre*, 884 F.2d 271, 277 (6th Cir. 1989)).[51]  If the Defendants had concluded their search and had no purpose for remaining at the premise, this does not seem to be a close call.  *See id*.; *Pray*, 49 F.3d at 1161; *Fountain*, 2 F.3d at 665.  Accordingly, Defendant Dale Myers' Motion for Summary Judgment (Doc. 94) is **<u>DENIED</u>** as to this count of the complaint.

---

[51] In *Binay*, the plaintiffs alleged that the use of masks by SWAT-team members contributed to the excessive nature of the force.  *Binay*, 2010 U.S. App. LEXIS 8084, at *13 ("Questions remain as to whether the officers' wearing of masks during the entry and search . . . added to an environment of intimidation and terror such that it contributed to a use of excessive force.").  These Plaintiffs have made frequent reference to the SWAT-team uniforms, but have never presented those references as part of the analysis that the Court should undertake in determining whether the Defendants' employed excessive force for purposes of summary judgment.  In part for this reason, the Court can see no plain reason why that particular holding from *Binay* would impact any of the analysis in this opinion.

## X.  MOTION TO EXCLUDE TESTIMONY

The Plaintiffs ask this Court to exclude certain expert testimony proffered by the Defendants from consideration in this order.  (Doc. 64.)  Because the Court ultimately found that expert testimony immaterial to this opinion, the Court finds the Plaintiffs' Motion to be **MOOT**.

## XI. STATE LAW CLAIMS

The Defendants have also moved for summary judgment on all of the Plaintiffs' state law claims (*see* Docs. 69, 71, 72, 94): spoliation of evidence, intentional infliction of emotional distress, negligent infliction of emotional distress, and assault and battery (*see* FAC ¶¶ 71-74).  The Court now turns to the claims against various Defendants.

### A.  Municipal Defendants

The Plaintiffs assert only the negligent infliction of emotional distress against the municipal defendants.  (*See* Plaintiffs' Opp. at 65.)[52]  The municipal defendants argue that they are absolutely immune from such a claim under Ohio law, which provides in relevant part:

> Except as provided [below], a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function. . . .
> (B)
> (1) [P]olitical subdivisions are liable for injury, death, or loss to person or property caused by the negligent operation of any motor vehicle by their employees . . . .
>
> (2) [P]olitical subdivisions are liable for injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions of the political subdivisions.
>
> (3) [P]olitical subdivisions are liable for injury, death, or loss to person or property caused by their negligent failure to keep public roads in repair and other negligent failure to remove obstructions from public roads. . . .

---

[52] The Plaintiffs also reference a claim for wrongful death, but that claim is not asserted in this action, indeed, no one in this action died as a result of police conduct.  It appears that this language, along with certain other argumentation in this section of the briefing, was borrowed mistakenly from the Plaintiffs' briefing in *Rush, et al. v. Mansfield, et al.*, Case No. 07cv1068 (N.D. Ohio).

> (4) [P]olitical subdivisions are liable for injury, death, or loss to person or property that is caused by the negligence of their employees and that occurs within or on the grounds of, and is due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental function . . . .

> (5) [A] political subdivision is liable for injury, death, or loss to person or property when civil liability is expressly imposed upon the political subdivision by a section of the Revised Code . . . .

O.R.C. § 2744.02(A)(1) & (B)(1-5).  Accordingly, the municipal defendants could only be liable if some section of the Revised Code expressly imposes liability upon them, as none of the other bases for immunity could apply: this action does not involve a motor vehicle (*see* O.R.C. § 2744.02 (B)(1)), proprietary function (*see* O.R.C. § 2744.02 (B)(2)),[53] public road (*see* O.R.C. § 2744.02 (B)(3)), or public building (*see* O.R.C. § 2744.02 (B)(4)).

The Plaintiffs assert that the Revised Code creates an exception to liability when municipal employees act "wantonly and recklessly."  (Plaintiffs' Opp. at 65.)  The section of the Revised Code to which they refer provides, in relevant part:

> (A) In a civil action brought against a political subdivision . . . <u>the following defenses or immunities may be asserted to establish nonliability</u> . . . .

> (5) The political subdivision is immune from liability if the injury, death, or loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner.

O.R.C. § 2744.03(A)(5) (emphasis added).  The problem for the Plaintiffs is that this section of the Revised Code provides *defenses* to liability if one of the exceptions in § 2744.03(B) is implicated: it cannot be used as an independent basis to *impose* liability. *Cater v. City of Cleveland*, 697 N.E.2d 610, 617 (Ohio 1998) ("Appellants further contend that R.C. 2744.03(A)(5) provides an independent basis for

---

[53] The Revised Code makes clear that the provision of police services is a government function. O.R.C. § 2744.01(C)(2)(a) ("The provision or nonprovision of police, fire, emergency medical, ambulance, and rescue services or protection [is a government function].").

imposing liability on the city. We reject this contention. . . . R.C. 2744.03(A)(5) is a defense to liability;
it cannot be used to establish liability.").[54]

Accordingly, the municipal defendants Motions for Summary Judgment (Docs. 69, 71, 72, 94)
are **GRANTED** as to the Plaintiffs' state law claims.

## B.  ASORT

The Plaintiffs appear to allege all four state law claims against ASORT.  (Plaintiffs' Opp. at 58.)
ASORT seems to concede for purposes of summary judgment that a reasonable jury could find for the
Plaintiffs on each of these four claims.  ASORT, however, argues that it is also immune under O.R.C. §
2744.02, because it should be considered a "political subdivision":

> Defendants, of course, have asserted that ASORT is not an entity at all.  However, to the
> extent that it is, Defendants would argue that ASORT is more akin to the "joint
> emergency" or "joint interstate emergency" entities listed under O.R.C. §2744.01(F) and
> allowed in the "included but not limited to" language of the same.  ASORT is performing
> the quintessential governmental function in its provision of police services.  O.R.C.
> §2744.01(C)(2)(a).  As such, ASORT, if considered an entity *sui juris* and it should also
> be considered a "political subdivision" under O.R.C. §2744.01(F).

(Doc. 109-1 ("Shelby Rep.") at 30-31.)

There is nothing in § 2744.01, however, that would justify extending the definition of "political
subdivision" used there to a private entity such as ASORT.  *See Ryll v. Columbus Fireworks Display
Co., Inc.*, 769 N.E.2d 372, 378 (Ohio 2002) (Douglas, J., concurring) ("[P]ursuant to R.C. Chapter 2744,
political subdivisions are no longer subject to suits in the same manner as private parties."); *Adamsky v.
Buckeye Local Sch. Dist.*, 653 N.E.2d 212, 216 (Ohio 1995) ("[T]he only significant classification

---

[54] *Cater* is a plurality opinion, and thus not binding, particularly given that the Sixth Circuit
reserved the question of whether § 2744.03(A)(5) can provide an independent basis for liability, albeit in
an unpublished opinion.  *See Justice v. Marion County Sheriff's Dep't*, Case No. 99-3123, 2000 U.S.
App. LEXIS 498, at *18 (6th Cir. Jan. 6, 2000).  The Court follows *Cater* here, however, because it
concludes, as have all of the cases that this Court has seen reach this issue subsequent to *Justice*, that it
is inappropriate to read a statute that provides defenses to liability as imposing an independent basis for
liability.  *See, e.g.*, *Moore v. County of Lake*, 2010 Ohio 825, ¶35 (Ohio Ct. App. 2010); *Wright v.
Mahoning County Bd. of Comm'rs*, 2009 Ohio 561, ¶25 (Ohio Ct. App. 2009); *Krokey v. City of
Cleveland*, 765 N.E.2d 889, 893 (Ohio Ct. App. 2001).

created by R.C. 2744.04(A) is a classification based on the nature of the defendant, *i.e.*, whether the defendant is a political subdivision or a private entity."); *Bratton v. Couch*, 2003 Ohio 3743, ¶23 (Ohio Ct. App. 2003) ("Appellant claims the trial court erred in . . . extending political subdivision immunity to a private corporation . . . . We agree.").  For the reasons expressed when determining that ASORT is an unincorporated association, the Court finds particularly probative the comparison to a volunteer fire department, which is not immune under Ohio law unless it is directly controlled by a municipality.  *See Lish v. Coolville Volunteer Fire Dep't*, 70 Ohio Misc. 2d 74, 79 (Ohio C.P. 1995); *Cincinnati Ins. Co. v. Rose*, 63 Ohio Misc. 2d 1, 7 (Ohio C.P. 1992) (Frost, J.).

Accordingly, because ASORT is a private unincorporated association and not a political subdivision, ASORT's Motion for Summary Judgment as to Plaintiffs' state law claims (Doc. 71) is **<u>DENIED</u>**.

### C.  Individual Defendants

The question of which state law claims are asserted against which individual defendants presents something of a difficult question.  On one hand, it is plausible to read the Plaintiffs' briefing as asserting all four state law claims against each of the individual Defendants (*see* Plaintiffs' Opp. at 60), but it is difficult to see how all of these claims could be asserted in good faith against all of the individual defendants.  To take one example, Defendant Lance Combs was not present during the execution of the search warrant, so he obviously did not assault anyone there.  The Plaintiffs' approach to these claims is indicative of their approach generally: they allege a tremendously large number of troubling facts and expect Judge McHargh or this Court to explain to them what particular causes of action might arise from those facts.  But the Defendants do not really press this problem to its logical conclusion, simply asserting instead that all defendants are immune under state law.  Consequently, the Court will consider

a narrow question, which is whether any of the violations of federal law also give rise to the state law claims asserted by the Plaintiffs.[55]

Individuals, unlike municipalities, do not enjoy a blanket grant of immunity under O.R.C. § 2744.02.  Instead, the relevant provision of Ohio law explains that an individual is "immune from liability unless" his "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner . . . ."  O.R.C. § 2744.03 (A)(6)(b).  The Plaintiffs do not suggest that any of the Defendants acted "with malicious purpose" or "in bad faith," the question is thus whether the Plaintiffs can show that any of the individual defendants acted in a wanton or reckless manner in a way that proximately caused some injury.

Although claims of "wanton or reckless" behavior are not necessarily coextensive with the analysis of qualified immunity, under the facts of this particular case, the state law immunity analysis is not distinguishable from the analysis of qualified immunity.  In particular, there is not a genuine issue of material fact as to whether Defendants Alfrey, Combs, Bammann, Schmidt, and Parella caused some type of harm to the Plaintiffs that was unreasonable under the circumstances.[56]  On the other hand, given

---

[55] The state law claims, of course, are not necessarily coextensive with the claims under federal law.  The Plaintiffs, however, do not point the Court to any record evidence that would allow this Court to determine precisely what incremental state law claims the Plaintiffs might be making.  For example, the Plaintiffs assert a claim for spoliation, which is obviously not considered in the discussion of any of the Plaintiffs' claims under § 1983.  The Court does gather from the record that certain documentation may have been destroyed, but the Plaintiffs make no effort to explain who might be responsible for the destruction of this evidence.  (*See* Plaintiffs' Opp. at 33.)  Indeed, the Plaintiffs appear to be confusing an independent claim for spoliation of evidence under state tort law with a claim that they are entitled to an adverse instruction *at trial*.  The Court reserves that issue for the appropriate time.

[56] On this record, there is no evidence that Defendants Schmidt and Parella caused any harm to the Plaintiffs, and the Plaintiffs have abandoned their knock-and-announce claim against Defendant Mager.  As to Defendant Combs, Plaintiffs argue that Comb's role as the Commander of ASORT subjects him to liability.  Given the total lack of record citation in this portion of the Plaintiffs' brief, and the lack of development in the record of this case about Combs' personal involvement in the purported constitutional violations, however, Plaintiffs have failed to meet their burden to defeat his motion for summary judgment.  (*See* Shelby Rep. at 31 ("Plaintiffs . . . contend Capt. Combs acted 'recklessly' without even being at the scene or involved in the case. (Opp. Br., at 62). Plaintiffs, however, provide no support for this contention.").)

that there is a genuine issue of material fact as to whether Defendant Meyers violated Plaintiff Fuller's Fourth Amendment right to be free from excessive force in an objectively unreasonable manner, there is also a genuine issue of material fact as to whether he recklessly assaulted Fuller.  Similarly, because there is a genuine issue of material fact as to whether Mack, Mager, and Snavely violated the Plaintiffs' constitutional rights in an objectively unreasonable manner by executing an invalid warrant, there is similarly a genuine issue of material fact as to whether these Defendants recklessly inflicted emotional distress on the Plaintiffs.

Accordingly, Defendants Alfrey's, Combs', Bammann's, Mager's, Schmidt's, and Parella's Motions for Summary Judgment (Docs. 69, 71, 72) are **GRANTED** as to all state law claims, and Defendants Mack's, Meyer's, and Snavey's Motions for Summary Judgment (Doc. 94) are **GRANTED IN PART AND DENIED IN PART** as explained above.

## XII. CONCLUSION

For the aforementioned reasons, the Motion to Exclude Testimony (Doc. 64) is **MOOT**, the Motions for Summary Judgment brought by Jeff Alfrey, Jason Bammann, Lance Combs, John Mager, Frank Parella, and Ed Schmit (Docs. 69, 72, 94) are **GRANTED** as to those Defendants, the Motions for Summary Judgment brought by the municipal defendants (Docs. 69, 71, 72, 94) are **GRANTED** as to those Defendants, the Motion for Summary Judgment brought by ASORT as to its capacity for suit (Doc. 70) is **DENIED**, the Motion for Summary Judgment brought by ASORT as to the substantive claims against it (Doc. 71) is **GRANTED IN PART AND DENIED IN PART**, Riley Snavely's Motion for Summary Judgment (Doc. 94) is **DENIED** as to him, and the Motions for Summary Judgment brought by all other Defendants (Docs. 71, 72, 94) are **GRANTED IN PART AND DENIED IN PART** as to those Defendants.

**IT IS SO ORDERED.**

s/Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: September 30, 2010**